
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

USCA Case #11-1271    Document #1321792    Filed: 07/29/2011

JUL 2 9 2011

**RECEIVED**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 2 9 2011

**CLERK**

NO. 11-1271

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In Re:  AIKEN COUNTY, SOUTH CAROLINA; ROBERT L.
FERGUSON; WILLIAM LAMPSON; GARY PETERSEN; STATE
OF SOUTH CAROLINA; STATE OF WASHINGTON; NATIONAL
ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS;
NYE COUNTY, NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION,
and GREGORY B. JACZKO, Chairman of the United States Nuclear
Regulatory Commission, Respondents.

---

## PETITION FOR WRIT OF MANDAMUS
## (AGENCY ACTION UNREASONABLY WITHHELD)

---

THOMAS R. GOTTSHALL
S. ROSS SHEALY
Haynsworth Sinkler Boyd, P.A.
Post Office Box 11889
Columbia, SC 29211-1889

*Attorneys for Aiken County*


BARRY M. HARTMAN
CHRISTOPHER R. NESTOR
JOHN ENGLERT*
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20005-1600
*not admitted*

*Attorneys for Robert L. Ferguson,
William Lampson, and Gary Petersen*


ALAN WILSON*
Attorney General for the State of
  South Carolina
JOHN W. MCINTOSH*
ROBERT D. COOK*
Post Office Box 11549
Columbia, SC 29211
*not admitted*

WILLIAM HENRY DAVIDSON, II
KENNETH PAUL WOODINGTON
Davidson & Lindemann, P.A.
1611 Devonshire Dr., 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568

*Attorneys for the State of South Carolina*


ROBERT M. MCKENNA*
Attorney General
ANDREW A. FITZ
TODD R. BOWERS
State of Washington
Office of the Attorney General
Post Office Box 40117
Olympia, WA 98504-0117
*not admitted*

*Attorneys for State of Washington*


JAMES BRADFORD RAMSAY
ROBIN J. LUNT
National Assoc. of Regulatory Utility
  Commissioners
1101 Vermont Ave. N.W., Suite 200
Washington, DC 20005

*Attorneys for NARUC*


ROBERT M. ANDERSEN
Akerman Senterfitt LLP
750 9th Street, N. W.
Suite 750
Washington DC 20001

*Attorneys for Nye County*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties, Intervenors, and *Amici Curiae***

The following is a list of all parties, intervenors and *amici* in this action.

### 1.    Parties

The Petitioners in this action are:  Aiken County, South Carolina; Robert L. Ferguson, William Lampson, and Gary Petersen (the "Ferguson Petitioners"); the State of South Carolina; the State of Washington; the National Association of Regulatory Utility Commissioners (NARUC); and Nye County, Nevada.

The Respondents are the United States Nuclear Regulatory Commission (NRC) and NRC Chairman, Gregory Jaczko.

### 2.    Intervenors

There are currently no intervenors in this action.

### 3.    Amici Curiae

There are currently no Amici participants in this action.

**B.    Ruling Under Review**

This is an original action filed pursuant to 42 U.S.C. 10139(a)(1)(B).

**C.    Related Cases**

*In re Aiken County*, No. 10-1050, *consolidated with* 10-1052, 10-1069, and 10-1082.

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the National Association of Regulatory Utility Commissioners (NARUC) respectfully submits this disclosure statement. NARUC is a quasi-governmental non-profit association incorporated in the District of Columbia. NARUC has no parent corporation nor is there any publicly held corporation that owns stock or other interest in NARUC. NARUC is supported predominantly by dues paid by its State public utility commissioner members and through revenues generated by meetings of those members held three times each year.

Respectfully submitted,
s/ *James Bradford Ramsay*
JAMES BRADFORD RAMSAY
General Counsel
National Association of Regulatory
Utility Commissioners
1101 Vermont Avenue, N.W., Suite 200
Washington, DC 20005
DATED: July 29, 2011         (202) 898-2207

1

# TABLE OF CONTENTS

I.     BACKGROUND ................................................................................ 1

II.    ISSUES PRESENTED ...................................................................... 2

III.   JURISDICTION AND VENUE ....................................................... 3

IV.   THE PARTIES ................................................................................. 4

V.    FACTS AND GOVERNING LAW ................................................. 9

VI.   REASONS WHY THE WRIT SHOULD ISSUE.......................... 20

     A.  Standard........................................................................... 20

     B.  NRC's Duty to Consider the Yucca Mountain License Application ........ 22

         1.   Withholding Review of ASLB Order.................................. 23

         2.   Terminating Review of Yucca Mountain License Application.......... 25

     C.  NRC's Duty to Issue a Final Decision Approving or Disapproving the Yucca Mountain License Application ................................................. 27

VII.  RELIEF SOUGHT......................................................................... 28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Cuomo v. United States NRC*,
   772 F.2d 972 (D.C. Cir. 1985)..........................................................................24

*Hodges v. Abraham*,
   300 F.3d 432 (4th Cir. 2002) ...........................................................................6

*In re Aiken County*,
   __ F.3d __, 2011 WL 2600685 (D.C. Cir. 2011).........................20, 21, 22, 27, 28

*In re Am. Rivers & Idaho Rivers United*,
   372 F.3d 413 (D.C. Cir. 2004)................................................................21, 22, 23

*In re Bluewater Network*,
   234 F.3d 1305 (D.C. Cir. 2000)........................................................................25

*In re Int'l Chem. Workers Union*,
   958 F.2d 1144 (D.C. Cir. 1992)....................................................................22, 23

*NARUC v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988)..........................................................................7

*Pub. Citizen Health Research Group v. FDA*,
   740 F.2d 21 (D.C. Cir. 1984)......................................................................21, 25

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987)........................................................................20

*Telecomm. Research & Action Center v. Fed. Commc'ns Center (TRAC)*,
   750 F.2d 70 (D.C. Cir. 1984)..........................................................21, 24, 25, 26

## Statutes

5 U.S.C. § 555(b) ...................................................................................21

5 U.S.C. § 706(1) ................................................................................3, 21

28 U.S.C. § 1651(a) ................................................................................3

28 U.S.C. § 2412 ...................................................................................29

Nuclear Waste Policy Act (NWPA),
    42 U.S.C. §§ 10101-10270 ...............................................................1

42 U.S.C. § 10101(31)............................................................................8

42 U.S.C. § 10131(b)(1) .......................................................................10

42 U.S.C. § 10131(b)(2) .........................................................................9

42 U.S.C. § 10134(b)............................................................................10

42 U.S.C. § 10134(d) ..............................................................1, 12, 24, 27

42 U.S.C. § 10134(e)............................................................................27

42 U.S.C. § 10136(c)..............................................................................8

42 U.S.C. § 10137(d)..............................................................................8

42 U.S.C. § 10139(a)(1)(B) .....................................................................3

42 U.S.C. § 10139(a)(2) ..........................................................................3

## Regulations

10 C.F.R. § 2.1007(a)(2).......................................................................20

10 C.F.R. § 2.309(d)(2)(iii)......................................................................8

10 C.F.R. Part 2, Appendix D .........................................................12, 24

69 Fed. Reg. 32,836-37 (June 14, 2004) ................................................................. 19

73 Fed. Reg. 34,348 (June 17, 2008) ..................................................................... 10

73 Fed. Reg. 40,883 (July 16, 2008) ..................................................................... 10

73 Fed. Reg. 53,284 (Sept. 15, 2008) .................................................................... 13

## Legislative History

Pub. L. No. 107-200, 116 Stat. 735 (2002) (codified at 42 U.S.C. § 10135) .......... 10

## Other Authorities

2010 Annual Report on Commission Adjudication, SECY-11-0008
    (OCAA Report) (Jan. 13, 2011),
    available at http://www.nrc.gov/reading-rm/doc-collections/commission/ ......... 15

Acceptance and Safety Review of the Yucca Mountain Geologic
    Repository,
    available at http://www.nrc.gov/waste/hlw-disposal/licensing/
    acceptance-safety.html ..................................................................................... 11

Department of Energy, Final Environmental Impact Statement for a
    Geologic Repository for the Disposal of Spent Nuclear Fuel and High-
    Level Radioactive Waste at Yucca Mountain, Nye County, Nevada,
    DOE/EIS-0250,
    available at: http://nepa.energy.gov/nepa_documents/EIS/EIS0250/
    RGD_SUMM/RGSUM_sum_conclus12.pdf ....................................................... 4

Department of Energy, Savannah River Site High-Level Waste Tank
    Closure Final Environmental Impact Statement, DOE/EIS-0303 (2002),
    available at http://nepa.energy.gov/nepa_documents/EIS/eis0303/
    feis/CHAP_7.PDF ............................................................................................. 6

iv

Fact Sheet on Licensing Yucca Mountain,
    available at http://www.nrc.gov/reading-rm/doc-collections/fact-
    sheets/fs-yucca-license-review.html ............................................................ 11, 12

House Committee on Science, Space, and Technology Majority Staff,
    *Yucca Mountain: The Administration's Impact on U.S. Nuclear Waste
    Management Policy* (SST Committee Report), June 2011,
    available at http://science.house.gov/letter/staff-report-yucca-mountain-
    safety
    ....................................................................................................................... 17

Internal Commission Procedures, Chapter III ("Voting"),
    available at http://www.nrc.gov/about-nrc/policy-making/
    internal.html#Meetings........................................................................................ 17

Licensing Process for the Yucca Mountain Geologic Repository,
    available at http://www.nrc.gov/waste/hlw-disposal/licensing/licensing-
    process.html........................................................................................................ 12

NRC's Process for Deciding Whether or Not to Authorize Construction of
    a Repository at Yucca Mountain, Nevada,
    available at http://www.nrc.gov/waste/hlw-disposal/licensing/
    acceptance-safety/timeline.html .......................................................................... 12

Nuclear Energy Institute, *Nuclear Waste Fund Payment Information by
    State Through Q1 FY2011*,
    available at http://www.nei.org/resourcesandstats/documentlibrary/
    nuclearwastedisposal/graphicsandcharts/nuclearwastefundpaymentinfor
    mationbystate/ ...................................................................................................... 7

Office of Inspector General, Nuclear Regulatory Commission, *NRC
    Chairman's Unilateral Decision to Terminate NRC's Review of DOE
    Yucca Mountain Repository License Application*, OIG Case No. 11-05
    (Exhibit 7) ............................................................... 15, 16, 17, 18, 19

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ASLB | Atomic Safety and Licensing Board |
| AULG | Affected Unit of Local Government |
| DOE | United States Department of Energy |
| LSN | Licensing Support Network |
| NARUC | National Association of Regulatory Utility Commissioners |
| NEPA | National Environmental Policy Act |
| NRC | Nuclear Regulatory Commission |
| NWPA | Nuclear Waste Policy Act |
| OCAA | Office of Commission Appellate Adjudication |
| OIG | Office of Inspector General |
| SER | Safety Evaluation Report |
| SRS | Savannah River Site |

# I.    BACKGROUND

1.    Petitioners bring this petition seeking a writ of mandamus (a) to compel the Nuclear Regulatory Commission (NRC) to meet its mandatory statutory obligation under the Nuclear Waste Policy Act (NWPA), 42 U.S.C. §§ 10101-10270, to "consider" the license application for authorization to construct the Yucca Mountain geologic repository for high-level nuclear waste, as specifically required by 42 U.S.C. § 10134(d); and (b) to require the NRC to meet its mandatory statutory obligation to approve or disapprove such license application within three years of its submission, an obligation that was required to be met by June 3, 2011.

2.    The Yucca Mountain license application was submitted by the Department of Energy (DOE) on June 3, 2008, and the NRC began its consideration of the license application. This consideration involved two related activities: (a) technical review of the license application by NRC staff and (b) adjudication of contested issues by the NRC's Atomic Safety and Licensing Board (ASLB). DOE, however, moved to withdraw the license application on March 3, 2010. On June 29, 2010, DOE's motion to withdraw was denied by the ASLB. The next day, the NRC *sua sponte* ordered expedited briefing regarding review of the ASLB decision. However, the NRC has failed to issue its decision regarding review of the ASLB order. At the same time, the NRC has terminated its

own staff's technical review of the license application and the adjudication of contested issues in the licensing proceeding has come to an effective standstill.

3.      Although the NWPA mandates that NRC "shall consider" the license application, NRC has unreasonably and unlawfully withheld its consideration by (a) withholding its decision regarding DOE's motion to withdraw and (b) terminating its staff's technical review of the license application and allowing effective suspension of the adjudication before the ASLB.

4.      Although the NWPA mandates that NRC "shall issue a final decision approving or disapproving" the construction authorization within three years of submission, the NRC has failed to issue a decision by June 3, 2011 or comply with the requirements to extend the deadline by one year.

## II.     ISSUES PRESENTED

• Has the NRC unreasonably withheld its consideration of the Yucca Mountain license application by:

   i. failing to issue its decision regarding review of the ASLB's order?

   ii. terminating its staff review of the Yucca Mountain license application and allowing effective suspension of the ASLB adjudication?

2

• Has the NRC unreasonably delayed its decision to approve or disapprove issuance of a construction authorization for the Yucca Mountain repository by failing to render a decision within the three years provided by statute?

### III.   JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to NWPA Section 119(a)(2), 42 U.S.C. § 10139(a)(1)(B), which provides the United States courts of appeals shall have original and exclusive jurisdiction over any civil action: "alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part [42 U.S.C. §§ 10131-10145]. . . ."

6.     This Court has jurisdiction to issue a writ of mandamus to compel an agency action that has been unreasonably withheld or delayed pursuant to 28 U.S.C. § 1651(a) and 5 U.S.C. § 706(1).

7.     Venue is proper in this Court pursuant to the NWPA Section 119(a)(2), 42 U.S.C. § 10139(a)(2), which provides:  "[t]he venue of any proceeding under this section shall be in the judicial circuit in which the petitioner involved resides or has its principal office, or in the United States Court of Appeals for the District of Columbia."

3

## IV.   THE PARTIES

8.      Aiken County is the location of a significant segment of the Savannah River Site (SRS), one of the DOE locations currently acting as a temporary storage facility for spent nuclear fuel and high-level radioactive waste.  Aiken County owns substantial real property in close proximity to SRS.  *See* Ex. 1 (Affidavit of J. Clay Killian, Aiken County Administrator).  Yucca Mountain is the site selected for the long-term disposal of SRS's radioactive materials.  DOE's environmental analysis demonstrates that failure to go forward with Yucca Mountain could result in "widespread contamination at the 72 commercial and 5 DOE sites across the United States, with resulting human health impacts."[1]  The SRS site is one of the five referenced DOE sites.  Aiken County therefore has a concrete interest that is impaired by the Respondent's withholding actions required by the NWPA regarding the license application.

9.      Petitioners Robert L. Ferguson, Gary Petersen, and William Lampson are individuals who have lived and worked near the Hanford Site in Washington State for decades, and who are presently, and will continue to be, harmed by the "temporary" storage of high-level radioactive waste there.  *See* Ex. 2 (Declarations

-------

[1] *See* Department of Energy, Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada, DOE/EIS-0250 Section S.12, p. S-82, available at: http://nepa.energy.gov/nepa_documents/EIS/EIS0250/RGD_SUMM/RGSUM_sum_conclus12.pdf (last visited July 28, 2011).

4

of Robert Ferguson, William Lampson, and Gary Petersen). As with the other petitioners, each and every intervening day that Respondents withhold actions required by the NWPA regarding the Yucca Mountain license application causes a substantial additional delay in the opening of any permanent repository for high-level radioactive waste, and consequently causes Petitioners to suffer continued and extended exposure to the dangers of such waste stored temporarily at the Hanford Site. Petitioners' injuries are actual, concrete injuries that are caused by Respondent's withholding of mandatory duties under the NWPA and are redressable by the relief sought. It is exactly this kind of additional, unlimited delay that the NWPA was intended to prevent.

10.    South Carolina is also home to SRS. It is an owner of adjacent and nearby property, including at least one road within the site. *See* Ex. 3 (South Carolina Standing Affidavit). South Carolina therefore has the same concrete injury as Aiken County as a result of Respondents' withholding of actions required by the NWPA regarding the Yucca Mountain license application. In addition, South Carolina also houses seven commercial nuclear reactors that have been required to store onsite the spent nuclear fuel they generate. Continued delay in the approval of a permanent repository for this material only exacerbates the danger posed by the temporary storage of such toxic material. The Court of Appeals for the Fourth Circuit has held that the Governor of South Carolina (and by extension

the State itself) is essentially a neighboring landowner to the SRS, whose property is at risk of environmental damage from DOE's activities at SRS. South Carolina "therefore has a concrete interest that NEPA was designed to protect; as such, [the State] possesses the requisite standing to enforce [its] procedural rights under NEPA." *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002). These conclusions apply with equal force to the NWPA. South Carolina also has an interest as an environmental regulator. *See* Department of Energy, Savannah River Site High-Level Waste Tank Closure Final Environmental Impact Statement, DOE/EIS-0303 (2002) at 7-2, 7-8, available at http://nepa.energy.gov/nepa_documents/EIS/eis0303/feis/CHAP_7.PDF (last visited July 28, 2011) (collecting state statutes and regulations imposing regulatory oversight).

11.     Washington has an interest as a property owner, a resource manager, a regulator, and a sovereign in the management and disposition of approximately 56 million gallons of untreated high-level radioactive tank waste currently stored at DOE's Hanford Nuclear Reservation (Hanford) located in Washington. *See generally* Ex. 4 (Affidavit of Suzanne L. Dahl-Crumpler). The clear and present danger posed by this waste to the citizens, environment, and commerce of Washington is demonstrated by the fact that approximately one million gallons of the waste has already leaked from Hanford's tanks. *Id.* ¶¶ 22-23, 25. The Hanford tank waste, as well as other waste in Washington, is presumptively slated for

disposal at Yucca Mountain after treatment and the treatment process for tank waste has been designed to meet Yucca Mountain specific standards. *Id.* ¶¶ 41-48, 51. Therefore, Washington has compelling interests that have been, and will continue to be, adversely affected by Respondents' withholding of actions required by the NWPA regarding the Yucca Mountain license application.

12.    The National Association of Regulatory Utility Commission (NARUC) has been consistently recognized by Congress and courts as the proper party to represent the interests of state utility commissioners. *See, e.g., NARUC v. U.S. Dep't of Energy*, 851 F.2d 1424 (D.C. Cir. 1988).    NARUC members, many located within 10-40 miles of working reactors, have recognized statutory charges to protect the health, safety, and economic interests of electric ratepayers who have already paid, through rates, more than $17 billion into the Nuclear Waste Fund, in part, to support the process of reviewing a permanent repository.[2]    All these interests are directly impacted by the Respondents' failure to comply with the NWPA. *See generally* Ex. 5 (Affidavit of Phyllis Reha).

13.    Nye County, Nevada, the host county for the proposed Yucca Mountain nuclear waste repository, is recognized by the NWPA as the "affected

_____

[2] *See* Nuclear Energy Institute, *Nuclear Waste Fund Payment Information by State Through Q1 FY2011*, available at http://www.nei.org/resourcesandstats/ documentlibrary/nuclearwastedisposal/graphicsandcharts/nuclearwastefundpayment informationbystate/ (last visited July 28, 2011).

unit of local government" with "jurisdiction over the site of a repository" (AULG). *See, e.g.*, 42 U.S.C. §§ 10101(31), 10136(c), 10137(d). Congress determined that the AULG must be allowed by DOE to participate in oversight of all activities and operations at the repository. 42 U.S.C. § 10137(d). The AULG also has standing as a matter of right in the licensing proceeding. 10 C.F.R. § 2.309(d)(2)(iii). Nye County exercised these rights under the NWPA and has conducted numerous scientific and technical reviews at the site, funded pursuant to Section 116 of the NWPA. 42 U.S.C. § 10137(d). *See generally* Ex. 6 (Affidavit of Lewis Darrell Lacy). County residents have worked at the site since the inception of the Yucca Mountain characterization. *Id.* On May 11, 2009, the NRC granted Nye County's petition to intervene as a matter of right in the licensing proceeding and admitted all but one of Nye County's contentions.[3] Nye County has been provided millions of dollars of funding under Sections 116 and 117 of the NWPA and has used that funding to assist in the characterization of the site and to conduct scientific and technical oversight of activities at the repository site. The County has already been injured by delays caused by NRC's failure to act. Financial assistance under Sections 116 and 117 of the NWPA, jobs for Nye County citizens, and support for attendant infrastructure and other improvements in the County will be improperly

---

[3] *See* Order of ASLB (Identifying Participants and Admitted Contentions), *In re U.S. Dep't of Energy*, NRC No. 63-001, LBP No. 09-06 (May 11, 2009).

discontinued if the Yucca Mountain repository project is unjustifiably terminated. Nye County citizens would serve as first responders, and would be among the first to be harmed, should an accident occur at the site. The County wants the repository built and operated in a safe manner and only continuation of the NRC licensing proceeding can determine if that is possible. Nye County continues to rely upon NWPA grant and funding assistance to protect its citizens' safety and also has an interest in preventing the repository from being abandoned without adequate safety justification and in preserving the economic and other benefits from the safe operation of the repository that are provided by the NWPA for the AULG. Thus, Nye County's stake in the license adjudication exists regardless of NRC's decision on construction authorization.

14.     Respondent NRC is the federal agency mandated by Congress under the NWPA to consider the license application for a nuclear repository and issue a final decision approving or disapproving the issuance of said license.

15.     Respondent Gregory B. Jaczko is Chairman of the NRC and the agency's principal executive officer.

## V.     FACTS AND GOVERNING LAW

16.     Congress enacted the NWPA in 1982 to establish a "definite Federal policy" for the disposal of high-level radioactive waste and spent nuclear fuel. 42 U.S.C. § 10131(b)(2). The NWPA outlines a detailed, prescriptive, and stepwise

9

process for the "siting, construction, and operation of repositories" to provide a "reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste . . . ." 42 U.S.C. § 10131(b)(1).

17.    Under Public Law 107-200, passed July 23, 2002, the Yucca Mountain site received official site designation as the site of the nation's geologic repository. *See* Pub. L. No. 107-200, 116 Stat. 735 (2002) (codified at 42 U.S.C. § 10135).

18.    The official site designation required DOE to submit an application to construct a high-level waste geologic repository at Yucca Mountain pursuant to 42 U.S.C. § 10134(b) ("the Secretary shall submit to the Commission an application for a construction authorization for a repository at such site").

19.    On June 3, 2008, DOE submitted to the NRC its license application for construction authorization for the Yucca Mountain geologic repository. 73 Fed. Reg. 34,348 (June 17, 2008) (corrected in 73 Fed. Reg. 40,883 (July 16, 2008)).

20.    DOE's application is a "17-volume, 8600-page construction authorization . . . over two decades in the making and undergirded by millions of pages of studies, reports, and related materials at a reported cost of over 10 billion dollars." Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 at 1-2 (June 29, 2010).

21.    The NRC's review of DOE's application occurs through two concurrent processes.    *See* "Fact Sheet on Licensing Yucca Mountain," available at http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/fs-yucca-license-review.html (last visited July 28, 2011).    In the first process, the technical staff of the NRC reviews the entirety of DOE's application to determine whether the application complies with applicable NRC regulations.    *Id.*  More than 100 staff and contractors with expertise in disciplines including geochemistry, hydrology, climatology, structural geology, volcanology, seismology, health physics, and engineering are involved in this review, which includes testing DOE's scientific and engineering analyses.    *Id.*; *see also* "Acceptance and Safety Review of the Yucca Mountain Geologic Repository," available at http://www.nrc.gov/waste/hlw-disposal/licensing/acceptance-safety.html (last visited July 28, 2011).    The product of the staff's review is a safety evaluation report (SER), issued by the NRC staff in volumes.    The SER contains the staff's findings on the repository design, determines whether the proposed facility will meet NRC regulations to protect public health and safety, and determines whether construction of the facility may be authorized. *See id.*

22.    The second process involves an adjudicatory hearing before the ASLB in which parties with standing may challenge technical and legal aspects of DOE's application.    *See* "Fact Sheet on Licensing Yucca Mountain,"

11

available at http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/fs-yucca-license-review.html (last visited on July 28, 2011). The adjudicatory process involves only admitted contentions (i.e., issues related to the license application) put forth by those petitioners accepted as parties. *See id.* The NRC staff participates in the adjudication, with its position based on the SER. *Id.*

23.    After the NRC staff reviews DOE's application and the ASLB completes its hearing and issues a decision, the NRC (Commission itself) will decide whether to authorize DOE to construct a high-level waste repository at Yucca Mountain. *See* "Licensing Process for the Yucca Mountain Geologic Repository," available at http://www.nrc.gov/waste/hlw-disposal/licensing/licensing-process.html (last visited July 28, 2011); *see also* "NRC's Process for Deciding Whether or Not to Authorize Construction of a Repository at Yucca Mountain, Nevada," available at http://www.nrc.gov/waste/hlw-disposal/licensing/acceptance-safety/timeline.html (last visited July 28, 2011).

24.    In order to accomplish its staff review, formal adjudication, and final Commission decision within the timeline of 42 U.S.C. § 10134(d), the NRC has promulgated a Schedule for the Proceeding on Consideration of Construction Authorization for a High-Level Waste Geologic Repository. *See* 10 C.F.R. Part 2, Appendix D.

25.    In September 2008, the NRC staff found that the application contained sufficient information to begin its detailed technical review.    Accordingly, the application was docketed for staff review and a notice of hearing was issued for the ASLB adjudication.    Department of Energy, Notice of Acceptance for Docketing of a License Application for Authority to Construct a Geologic Repository at a Geologic Repository Operations Area at Yucca Mountain, NV, 73 Fed. Reg. 53,284 (Sept. 15, 2008).

26.    By early 2010, the ASLB had begun its review and adjudication of the Yucca Mountain application, having admitted approximately 300 contentions for hearing and initiating a discovery phase.    *See* Order of ASLB (Identifying Participants and Admitted Contentions), *In re U.S. Dep't of Energy*, NRC No. 63-001, LBP No. 09-06 (May 11, 2009).    However, on March 3, 2010, at the direction of the President, DOE filed a motion to withdraw its application with prejudice.    *See* Department of Energy Motion to Withdraw, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Mar. 3, 2010).

27.    Petitioners Aiken County, NARUC, South Carolina, and Washington intervened in the licensing proceeding expressly for the purpose of opposing DOE's withdrawal motion as contrary to the NWPA.    Petitioner Nye County, an original party to the license proceeding, also opposed DOE's motion on the same grounds.

28.    On April 23, 2010, the NRC directed the ASLB to resolve DOE's motion expeditiously, stating that "the prudent course of action is to resolve the matters pending before our agency as expeditiously and responsibly as possible." The NRC directed the ASLB to resolve the motion within 45 days. Memorandum and Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (Apr. 23, 2010).

29.    On June 29, 2010, following expedited briefing and oral argument by the participants in the licensing proceeding, the ASLB denied DOE's motion to withdraw the Yucca Mountain license application. Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 29, 2010).

30.    The following day, the NRC *sua sponte* issued an order requesting that the parties file concurrent opening and responsive briefing in consecutive weeks on whether the NRC should review the ASLB's decision, and if so, whether to reverse or affirm it. Order, *In re U.S. Dep't of Energy*, NRC No. 63-001 (June 30, 2010).

31.    On July 2, 2010, the NRC asked this Court to suspend a related proceeding challenging the President's and DOE's decision to abandon Yucca Mountain, stating that the NRC had established an "expedited briefing schedule" for review of the ASLB order and asserting that "[h]olding the cases in abeyance until the Commission renders a final decision in response to that briefing would likely crystallize, narrow, or even wholly eliminate the issues . . . conserving both judicial

14

and the parties' resources." *See* Federal Respondents' Motion to Vacate Briefing and Oral Argument Schedule and Hold Cases in Abeyance, *In re Aiken County*, Case No. 10-1050 (July 2, 2010).

32.    Briefing to the NRC regarding review of the ASLB's denial of DOE's motion to withdraw was completed by participants in the licensing proceeding on July 19, 2010. 2010 Annual Report on Commission Adjudication, SECY-11-0008 ("OCAA Report") at Attachment: "Commission Adjudicatory Decisions, January–December 2010" p. 9 (Jan. 13, 2011).[4]

33.    Twenty-two days later, on or about August 10, 2010, the NRC's Office of Commission Appellate Adjudication (OCAA) had "prepared alternative draft decisions addressing appeals of the [ASLB's] decision on the issue of the Department of Energy's (DOE's) motion to withdraw its application to construct a geologic repository at Yucca Mountain, Nevada." *Id.* at 3.

34.    All four NRC Commissioners voting on the license withdrawal issue[5] voted shortly thereafter. NRC Commissioner Svinicki voted on August 25, 2010. Ex. 7 (Office of Inspector General, Nuclear Regulatory Commission, "NRC Chairman's Unilateral Decision to Terminate NRC's Review of DOE Yucca

---

[4]Available at http://www.nrc.gov/reading-rm/doc-collections/commission/secys/2011/2011-0008scy.pdf (last visited July 28, 2011).

[5] NRC Commissioner Apostolakis has recused himself from voting in this proceeding. *See* Notice of Recusal (July 15, 2010).

Mountain Repository License Application," OIG Case No. 11-05) at 33.   NRC

Commissioner Ostendorff voted on August 26, 2010.  *Id.*  NRC Commissioner

Magwood voted on September 15, 2010.  *Id.*  NRC Chairman Jaczko initially voted

on August 25, 2010, withdrew his vote, and then re-voted on October 29, 2010.  *Id.*

35.    Two days after NRC Chairman Jaczko voted for the second time, the

OCAA provided the Commission with a draft affirmation order detailing the status

of the NRC commissioners' vote. Ex. 7 at 33.

36.    Since November 1, 2010, the draft affirmation order of NRC's

decision has sat in abeyance and could remain in limbo until the NRC is presented

with a forcing function such as litigation, according to NRC's general counsel.

Ex. 7 at 35.

37.    As of December 31, 2010, the OCAA's draft decision on the Yucca

Mountain license application was the only draft decision pending before the NRC.

OCAA Report at 5.

38.    The NRC has failed to follow its own internal policies and procedures

regarding the scheduling of an affirmation session and formal decision.  Ex. 7 at

31-37.

39.    At a May 4, 2011, Congressional hearing, NRC Commissioners

Svinicki, Magwood, and Ostendorff indicated that their votes have not changed, and

that the Commissioners view their votes as final.  House Committee on Science,

16

Space, and Technology Majority Staff, *Yucca Mountain: The Administration's Impact on U.S. Nuclear Waste Management Policy* ("SST Committee Report"), June 2011, at 36-37.[6]

40.    The NRC Chairman has continued to block consideration of ASLB's decision to deny DOE's Motion to Withdraw the License Application.    SST Committee Report at 37.  During an investigation by the NRC's Office of Inspector General, one Commissioner informed the investigator that NRC Chairman Jaczko stated "that he would not take action until a majority of the Commission agreed to suspend the ASLB's adjudicatory proceedings." Ex. 7 at 36.

41.    Under the NRC's internal procedures, the effect of a 2-2 Commission vote is to deny a request for Commission action.    *See* Internal Commission Procedures, Chapter III ("Voting"), available at http://www.nrc.gov/about-nrc/policy-making/internal.html#Meetings (last visited July 28, 2011).

42.    The NRC has still has not issued a formal final decision regarding the ASLB's order denying DOE's motion to withdraw.

43.    Comments from NRC Chairman Jaczko indicate that any efforts by the NRC to issue a decision on the motion to withdraw have been abandoned, rather than merely delayed.  In May 2011, Chairman Jaczko testified before Congress that

---

[6]    Available at http://science.house.gov/letter/staff-report-yucca-mountain-safety (last visited July 28, 2011).

"[w]e will be done with closeout by the end of this fiscal year. At that time, if those legal questions are unresolved, they are unresolved." Ex. 8 (Congressional Hearing Transcript, May 4, 2011).

44.    The lack of a decision from the NRC regarding DOE's withdrawal motion has resulted in an effective standstill of the Yucca Mountain license adjudication in the 13 months since the ASLB's order denying DOE's motion to withdraw, including a cessation of deposition discovery during that period. *See* Ex. 9 (Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (June 10, 2011)) ("if and when the adjudicatory process actively resumes").

45.    At the same time the NRC's decision on the ASLB's decision has been pending, and notwithstanding the denial of DOE's motion to withdraw, the NRC Chairman unilaterally directed termination of the NRC Staff's review of the Yucca Mountain license application. Ex. 7 at 44. The Chairman "strategically provided three of the four other Commissioners with varying amounts of information about his intention to proceed to closure," and has terminated the NRC's review of the license application although "a majority of the Commissioners did not think the conditions to proceed to closure (i.e. withdrawal or suspension) had been met." Ex. 7 at 44-45.

46.    As part of the NRC Chairman's unilateral decision to cease consideration of the Yucca Mountain license application, the Chairman prevented the release of the NRC staff's Safety Evaluation Report Volume 3, "Review of Repository Safety After Permanent Closure" ("SER-3"), although a majority of NRC Commissioners disagreed with the Chairman's direction to stop work on SER-3. Ex. 7 at 44-45. The publication of SER-3 is essential to consideration of the license application and thus fulfillment of the NRC's statutory obligation to issue a final decision approving or disapproving issuance of a construction authorization. *See* Ex. 7 at 45 (stating that decision to stop work on SER is a factor preventing the agency from meeting its statutory obligation); Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 21, 2009), at 2 ("Few non-NEPA contentions can be adjudicated before relevant portions of the SER are issued."); Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (Feb. 25, 2011), at 3 ("when the Staff's SER becomes available, the Board intends to move this proceeding forward as expeditiously as circumstances permit").

47.    The ASLB adjudication is supported by a web-based Licensing Support Network (LSN) that is a database for all documentation regarding the application, including discovery and the hearing process. *See* 69 Fed. Reg. 32,836-37 (June 14, 2004). The LSN is central to the adjudicatory proceeding

before the ASLB, and is also critical to the NRC staff's review of the application's technical merits. This importance is underscored by 10 C.F.R. § 2.1007(a)(2), which states that access to the LSN "shall be provided" by the NRC through its website. Despite this requirement, the LSN will be shutdown on August 5, 2011, as part of the NRC's termination of license review. The ASLB has prepared for this shutdown. *See* Ex. 10 (Order of the ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 18, 2011)), Ex. 11 (Memorandum from Daniel J. Graser, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 26, 2011)), Ex. 12 (Order of the ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04 (July 28, 2011)).

48.     An illustrative depiction of the process and timeline for the NRC's consideration of DOE's application, together with a representation of the NRC's current status in that regard, is attached as Exhibit 13 to this Petition.

## VI.     REASONS WHY THE WRIT SHOULD ISSUE

### A.     Standard

Mandamus is an extraordinary remedy, but it is appropriately imposed where an agency has refused to perform a statutory duty or has unreasonably delayed in doing so. *In re Aiken County*, __ F.3d __, 2011 WL 2600685 at *5 (D.C. Cir. 2011); *Sierra Club v. Thomas*, 828 F.2d 783, 793-94 (D.C. Cir. 1987). As this

Court has explained: "When agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates. And even when agency delay or recalcitrance does not rise to a level that justifies either of the above courses, [the] APA empowers the court to evaluate the pace of the agency decisional process and to order expedition if the pace lags unreasonably." *Pub. Citizen Health Research Group v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984) (citing 5 U.S.C. §§ 555(b), 706(1)) (case citations omitted).

In assessing whether to issue the writ, the Court must determine whether the agency has a duty to act and, if so, whether it has unreasonably delayed in complying with that duty. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). Whether a delay is reasonable is judged by application of the factors laid out in *Telecommunications Research and Action Center v. Federal Communications Center*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*). *In re Aiken County*, 2011 WL 2600685 at *5. These can be summarized as: (1) the time agencies take to make decisions, which is subject to a 'rule of reason' and any timetables imposed by Congress; (2) the nature and extent of the interests prejudiced by the delay, with any delays impacting human health and welfare considered less tolerable; and (3) the impact, if any, of issuing the writ on the

21

agency's other duties or competing priorities. Finally, although "there is 'no per se rule on how long is too long' to wait for agency action . . . a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers*, 372 F.3d at 419 (quoting *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992)).

## B.    NRC's Duty to Consider the Yucca Mountain License Application

The NRC has a clear and specific statutory duty to *consider* the Yucca Mountain license application. "[W]e note that the NWPA requires the Commission to review the application, *see* 42 U.S.C. sec. 10134(d) ('The Commission shall consider an application for a construction authorization for all or part of a repository . . . .') . . . ." *In re Aiken County*, 2011 WL 2600685 at *5. As discussed above at paragraphs 21-23, consideration of the license application includes detailed technical review by the NRC staff and an adjudication of contested issues by the ASLB, followed by a final decision by the Commission itself. The NRC is unreasonably withholding its consideration of the license application by (a) unreasonably delaying or withholding its decision on review the ASLB's order denying DOE's motion to withdraw, and (b) terminating its staff's review of the Yucca Mountain license application and permitting effective suspension of the ASLB adjudication.

### 1.    Withholding Review of ASLB Order

The NRC's failure to issue a decision on whether it will review, and if so, reverse or uphold the June 29, 2010, ASLB order denying DOE's motion to withdraw is unreasonable. Briefing to the NRC by participants in the licensing proceeding has been completed for over a year, and all Commissioners voted on the issue by October 29, 2010. Although "there is 'no per se rule on how long is too long' to wait for agency action . . . a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers*, 372 F.3d at 419 (quoting *In re Int'l Chem. Workers Union*, 958 F.2d at 1149). The NRC required the ASLB to resolve the very same issue in the first instance within 45 days. Ultimately, the ASLB was able to conduct briefing, hold oral argument, and decide the motion in approximately 75 days.

The day after the ASLB's denial of DOE's motion to withdraw, the NRC itself solicited expedited briefing on the issue of whether it should review, and if so whether it should reverse or affirm the ASLB order. After ordering this briefing, the NRC has unreasonably delayed its decision. *See* ¶¶ 32-43 above. Despite representations to this Court nearly a year ago that the NRC's decision was forthcoming, *see* paragraph 31 above, no decision has been issued. Indeed, the NRC's own general counsel has indicated that litigation such as the instant petition would be necessary in order for the NRC to release its decision. *See* ¶ 36 above.

Furthermore, the NRC's delay is unjustifiable and unreasonable in light of the speed with which Congress directed the NRC to proceed with the underlying licensing proceeding pursuant to the NWPA. The NWPA mandates that the NRC will consider the application and issue a final decision approving or disapproving the license within three, or at most four, years. 42 U.S.C. § 10134(d). The NRC has promulgated a schedule for accomplishing this task that, based on the sheer scope of task, already consumes the entire period allowed even without the current inexplicable 13-month hiatus. *See* 10 C.F.R. Part 2, Appendix D. Resolution of DOE's motion to withdraw the license application is a necessary step in the critical path towards the NRC's final decision on the merits of the underlying license application, and this internal decision had itself already consumed over a year. Such delay is manifestly unreasonable. *See TRAC*, 750 F.2d at 80 (statutory timetable or other indication of the speed with which Congress expects the agency to proceed in the enabling statute is relevant to reasonableness of delay).

The NRC's unreasonable delay affects the public interest in the orderly and timely consideration of the Yucca Mountain licensing application, as dictated by Congress. *Cuomo v. United States NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985) (noting that "the public interest should be gauged [by the decrees of] Congress, the elected representatives of the entire nation . . . ."). The NRC's unreasonable delay also affects the strong interests of Petitioners who intervened in the Yucca

24

Mountain licensing proceeding to litigate the very issue being unreasonably delayed, and to protect themselves from the harms caused by delay in construction of a permanent repository as provided for by law. *TRAC*, 750 F.2d at 80 ("the court should also take into account the nature and extent of the interests prejudiced by delay").

### 2.    Terminating Review of Yucca Mountain License Application

The NRC's termination of consideration of the license application by the technical staff of the agency is per se unreasonable in light of the NRC's duty under the NWPA to consider the license application, and in light of the denial of DOE's motion to withdraw. This "agency recalcitrance . . . in the face of a clear statutory duty" requires that the Court use its "power to order the agency to act to carry out its substantive statutory mandate[]." *Pub. Citizen*, 740 F.2d at 32; *see also In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000).

DOE's license application, which the NWPA requires the NRC to consider, is a "17-volume, 8600-page construction authorization . . . over two decades in the making and undergirded by millions of pages of studies, reports, and related materials at a reported cost of over 10 billion dollars" Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. 63-001, ASLBP No. 09-892-HLW-CAB04, at 1-2 (June 29, 2010). The NRC has previously recognized the magnitude of its duty to consider the license application. *See* Order of Commission, *In re U.S. Dep't of*

25

*Energy*, NRC No. PAPO-00, at 1-2 (Nov. 10, 2004) ("Review of an application likely will prove an immense undertaking. DOE has generated millions of Yucca Mountain-related documents since Congress charged it with responsibility for the repository. What's more, Congress has imposed a three-year deadline for the licensing proceeding."); Order of Commission, *In re U.S. Dep't of Energy*, NRC No. 63-001 (June 30, 2009), at 2 ("the most extensive proceeding in the agency's history").

Notwithstanding the NRC's admission that review of the license application—especially in light of the NWPA's statutory timeline—would be a challenge, the NRC has nonetheless completely terminated its own staff's review of the license application while refusing to rule on the DOE motion, even though its own adjudicatory body determined that the DOE motion should be rejected. The NRC did so without a vote of the Commissioners, and a majority of the Commissioners have indicated that the conditions to terminate review have not been met. *See* ¶¶ 45-46 above. The NRC has further allowed the ASLB adjudication to come to an effective standstill, with the adjudication's central LSN now preparing for shutdown. *See* ¶¶ 44, 46-47 above. Because the NRC's unreasonable withholding of its mandatory review affects human health and welfare, *see* paragraph 16 above, the NRC's inaction is less tolerable than delay that affects mere economic regulation. *TRAC*, 750 F.2d at 80.

26

C.    **The NRC's Duty to Issue a Final Decision Approving or Disapproving the Yucca Mountain License Application**

The NWPA provides "that the Commission *shall* issue a *final decision* approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the *submission* of such application . . . ."    42 U.S.C. § 10134(d) (emphasis added).    The Court acknowledges that DOE "submitted" its Yucca Mountain application in June 2008, and that, thus, "the three year statutory deadline . . . has potentially already come and gone." *In re Aiken County*, 2011 WL 2600685 at *5.

DOE has "suggested that the . . . deadline should toll from September 15, 2008, the date when the application was *docketed*, rather than from when the application was *submitted*." *Id.* at 5 n.1.  However, the starting point for statutory interpretation—the statute's plain language—establishes that the statutory deadline began to run in June 2008, when DOE submitted its application.[7]  Indeed, the NRC itself has previously recognized that the statutory deadline is tied to the submission of the license application. *See* Order of Commission, *In re U.S. Dep't of Energy*,

_____

[7] Alternatively, even if the "submission" date is taken to be September 8 or 15, 2008, the NRC will have still failed to comply with the three-year deadline, which will end in September 2011.  It is physically impossible for the NRC to conclude its consideration by that date, given the current status of the agency's progress and the scope of tasks that would need to be completed. *See* ¶¶ 20-24, 44-48 above.  The same holds true even if the NRC were to comply with the reporting requirements in 42 U.S.C. § 10134(d) and (e) to extend the agency's deadline by one calendar year.

27

NRC No. PAPO-00, at 2-3 (Feb. 2, 2004) ("The purpose of the regulations is to enable the Commission to meet its statutory obligation to complete its examination of the application within three years of its filing."); Order of ASLB, *In re U.S. Dep't of Energy*, NRC No. PAPO-00, at 4 (Aug. 31, 2004) (stating that "the three-year deadline does not begin until after DOE submits its license application").

The NRC has an express statutory obligation to issue a decision on the merits within a defined timeframe, which this Court has recognized. *In re Aiken County*, 2011 WL 2600685 at *5. The Commission should have issued its final decision on the merits on June 3, 2011. It has not. Instead, it has taken numerous steps demonstrating that it *never* intends to issue a decision on the merits of DOE's application. *See* ¶¶ 36-48 above. The Court should therefore issue a writ of mandamus compelling the NRC to issue a final merits-based decision approving or disapproving DOE's application for a construction authorization.

## VII.   RELIEF SOUGHT

WHEREFORE, Petitioners pray that this Court issue its Order:

a.      Determining that the NRC has unreasonably delayed consideration of the license application;

b.      Compelling the NRC to immediately resume consideration of the license application by reinstating the technical staff review;

c.    Compelling the NRC to issue its final decision regarding review of the June 29, 2010, ASLB order denying DOE's motion to withdraw the Yucca Mountain license application within 30 days;

d.    Determining that the NRC has unreasonably delayed approving or disapproving of the license application;

e.    Compelling the NRC to provide this Court with a proposed schedule containing appropriate milestones and a date certain on which a decision approving or disapproving the Yucca Mountain license application will be issued;

f.    Directing the NRC to update the Court on the status of the matter every 60 days;

g.    Awarding Petitioners reasonable costs, litigation expenses, and attorney fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 or other applicable law; and

h.    Granting such other and further relief as this Court deems just and proper.

\\\

\\\

\\\

29

RESPECTFULLY SUBMITTED this 29th day of July 2011.

*Thomas R Gottshall* u/permission BMH

THOMAS R. GOTTSHALL
S. ROSS SHEALY
Haynsworth Sinkler Boyd, P.A.
Post Office Box 11889
Columbia, SC 29211-1889

*Attorneys for Aiken County*

*Barry M Hartman*

BARRY M. HARTMAN
CHRISTOPHER R. NESTOR
JOHN ENGLERT*
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20005-1600
*not admitted*

*Attorneys for Robert L. Ferguson,
William Lampson, and Gary Petersen*

ALAN WILSON*
Attorney General for the State of
  South Carolina
JOHN W. MCINTOSH*
ROBERT D. COOK*
Post Office Box 11549
Columbia, SC 29211
*not admitted*

*Kenneth P Woodington* u/permission BMH

WILLIAM HENRY DAVIDSON, II
KENNETH PAUL WOODINGTON
Davidson & Lindemann, P.A.
1611 Devonshire Dr., 2nd Floor
Post Office Box 8568
Columbia, SC 29202-8568

*Attorneys for the State of South Carolina*

ROBERT M. MCKENNA*
Attorney General

*Andrew A Fitz* with permission BMH

ANDREW A. FITZ
TODD R. BOWERS
State of Washington
Office of the Attorney General
Post Office Box 40117
Olympia, WA 98504-0117
*not admitted*

*Attorneys for State of Washington*

*James B Ramsey* with permission BMH

JAMES BRADFORD RAMSAY
ROBIN J. LUNT
National Assoc. of Regulatory Utility
Commissioners
1101 Vermont Ave. N.W., Suite 200
Washington, DC 20005

*Attorneys for NARUC*

*Robert M Andersen* with permission BMH

ROBERT M. ANDERSEN
Akerman Senterfitt LLP
750 9th Street, N. W.
Suite 750
Washington DC 20001

*Attorneys for Nye County*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the page limitations of Fed. R. App. P. 21(d), because this petition consists of 30 pages, excluding the parts of the petition exempted.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt. and Times New Roman type style.

                                        s/ *Andrew A. Fitz*
                                        ANDREW A. FITZ
                                        TODD R. BOWERS
                                        State of Washington
                                        Office of the Attorney General
                                        Post Office Box 40117
                                        Olympia, WA  98504-0117

## CERTIFICATE OF SERVICE

I herby certify that on the 29th day of July 2011, a copy of the Petition for

Writ of Mandamus (Agency Action Unreasonably Withheld) was served by email

and United States Mail upon the following:

| | |
|---|---|
| U.S. Nuclear Regulatory Commission<br>Atomic Safety and Licensing Board<br>Mail Stop T-3F23<br>Washington, D.C. 20555-0001 | Thomas S. Moore, Chair<br>  tsm2@nrc.gov<br>Paul S. Ryerson, Administrative Judge<br>  psr1@nrc.gov<br>Richard E. Wardwell, Administrative Judge<br>  rew@nrc.gov<br>Anthony C. Eitreim, Chief Counsel<br>  Anthony.Eitreim@nrc.gov<br>Daniel J. Graser, LSN Administrator<br>  djg2@nrc.gov<br>Alan S. Rosenthal<br>  Alan.Rosenthal@nrc.gov<br>Matthew Rotman<br>  matthew.rotman@nrc.gov<br>Katherine Tucker<br>  katie.tucker@nrc.gov<br>Joseph Deucher<br>  joseph.deucher@nrc.gov<br>Andrew Welkie<br>  axw5@nrc.gov<br>JackWhetstine<br>  jgw@nrc.gov<br>Patricia Harich<br>  patricia.harich@nrc.gov<br>Sara Culler<br>  sara.culler@nrc.gov |
| U.S. Nuclear Regulatory Commission<br>Office of the Secretary<br>ATTN: Docketing and Service<br>Mail Stop: O-16C1<br>Washington, D.C. 20555-0001 | hearingdocket@nrc.gov |

| | |
|---|---|
| U.S. Nuclear Regulatory Commission<br>Office of the General Counsel<br>Mail Stop O15-D21<br>Washington, D.C. 20555-0001 | Michelle D. Albert<br>   Michelle.Albert@nrc.gov<br>Elva Bowden Berry<br>   Elva.BowdenBerry@nrc.gov<br>Jessica A. Bielecki<br>   Jessica.Bielecki@nrc.gov<br>Karin Francis<br>   kxf4@nrc.gov<br>Joseph S. Gilman<br>   jsg1@nrc.gov<br>Christopher Hair<br>   christopher.hair@nrc.gov<br>Daniel W. Lenehan<br>   daniel.lenehan@nrc.gov<br>Megan A. Wright<br>   Megan.Wright@nrc.gov<br>Mitzi A. Young<br>   may@nrc.gov<br>Marian L. Zobler<br>   mlz@nrc.gov<br>Mail Center<br>   ogcmailcenter@nrc.gov |
| U.S. Nuclear Regulatory Commission<br>Office of Commission Appellate<br>   Adjudication<br>Mail Stop: O-16C1<br>Washington, DC 20555-0001 | OCAA Mail Center<br>   ocaamail@nrc.gov |
| U.S. Department of Energy<br>Office of General Counsel<br>1000 Independence Ave. S.W.<br>Washington, DC 20585 | Sean A. Lev<br>   sean.lev@hq.doe.gov<br>Martha S. Crosland<br>   martha.crosland@hq.doe.gov<br>Nicholas P. DiNunzio<br>   nicholas.dinunzio@hq.doe.gov<br>James Bennett McRae<br>   ben.mcrae@hq.doe.gov<br>Cyrus Nezhad<br>   cyrus.nezhad@hq.doe.gov<br>Christina C. Pak<br>   christina.pak@hq.doe.gov |

| | |
|---|---|
| Counsel for U.S. Department of Energy<br>Morgan, Lewis & Bockius LLP<br>1111 Pennsylvania Ave., NW<br>Washington, DC 20004 | Clifford W. Cooper<br>　ccooper@morganlewis.com<br>Lewis M. Csedrik<br>　lcsedrik@morganlewis.com<br>Raphael P. Kuyler<br>　rkuyler@morganlewis.com<br>Charles B. Moldenhauer<br>　cmoldenhauer@morganlewis.com<br>Thomas D. Poindexter<br>　tpoindexter@morganlewis.com<br>Alex S. Polonsky<br>　apolonsky@morganlewis.com<br>Thomas A. Schmutz<br>　tschmutz@morganlewis.com<br>Donald J. Silverman<br>　dsilverman@morganlewis.com<br>Shannon Staton<br>　sstaton@morganlewis.com<br>Annette M. White<br>　annette.white@morganlewis.com<br>Paul J. Zaffuts<br>　pzaffuts@morganlewis.com |
| Hunton & Williams LLP<br>Riverfro Plaza, East Tower<br>951 East Byrd St.<br>Richmond, VA 23219 | Kelly L. Faglioni<br>　kfaglioni@hunton.com<br>Donald P. Irwin<br>　dirwin@hunton.com<br>Stephanie Meharg<br>　smeharg@hunton.com<br>Edward Noonan<br>　enoonan@hunton.com<br>Micahel R. Shebelskie<br>　mshebelskie@hunton.com<br>Jason Wool<br>　jwool@hunton.com<br>Belinda A. Wright<br>　bwright@hunton.com |

| | |
|---|---|
| For U.S. Department of Energy<br>USA-Repository Services LLC<br>Yucca Mountain Project Licensing<br>    Group<br>1160 N. Town Center Dr., Suite 240<br>Las Vegas, NV 89144 | Stephen J. Cereghino<br>    stephen_cereghino@ymp.gov |
| For U.S. Department of Energy<br>Office of General Counsel<br>1551 Hillshire Dr.<br>Las Vegas, NV 89134-6321 | George W. Hellstrom<br>    George.hellstrom@ymp.gov |
| For U.S. Department of Energy<br>Tailsman International, LLC<br>1000 Potomac St., NW, Suite 300<br>Washington, DC 20007-3501 | Patricia Larimore<br>    plarimore@talisman-intl.com |
| Naval Sea Systems Command Nuclear<br>    Propulsion Program<br>1333 Isaac Hull Avenue SE<br>Washington Navy Yard, Bldg. 197<br>Washington, DC 20376 | Frank A. Putzu<br>    frank.putzu@naby.mil |
| Counsel for State of Nevada<br>Egan, Fitzpatrick , Malsch & Lawrence,<br>    PLLC<br>1750 K St. N.W., Suite 350<br>Washington, D.C. 20006 | Martin G. Malsch<br>    mmalsch@nuclearlawyer.com<br>Susan Montesi<br>    smontesi@nuclearlawyer.com |
| Egan, Fitzpatrick, Malsch & Lawrence<br>    PLLC<br>12500 San Pedro Avenue, Suite 555<br>San Antonio, TX 78216 | Charles J. Fitzpatrick<br>    cfitzpatrick@nuclearlawyer.com<br>John W. Lawrence<br>    jlawrence@nuclearlawyer.com<br>Laurie Borski<br>    lborski@nuclearlawyer.com |
| Counsel for Lincoln County, Nevada<br>Whipple Law Firm<br>1100 S. Tenth St.<br>Las Vegas, NV 89017 | Annie Bailey<br>    baileys@lcturbonet.com<br>Adam L. Gill<br>    adam.whipplelaw@yahoo.com<br>Eric Hinckley<br>    erichinckley@yahoo.com<br>Bret Whipple<br>    bretwhipple@nomademail.com |

| Lincoln County Nuclear Oversight Program<br>P.O. Box 1068<br>Caliente, NV 89008 | Connie Simkins<br>jcciac@co.lincoln.nv.us |
|---|---|
| Bureau of Government Affairs<br>Nevada Attorney General<br>100 N. Carson St.<br>Carson City, NV 89701 | Marta Adams<br>madams@ag.nv.gov |
| Nevada Agency for Nuclear Projects<br>Nuclear Waste Project Office<br>1761 East College Parkway, Suite 118<br>Carson City, NV 89706 | Steve Frishman, Tech<br>steve.frishman@gmail.com<br>Susan Lynch<br>slynch1761@gmail.com |
| Lincoln County District Attorney<br>P.O. Box 60<br>Pioche, NV 89403 | Gregory Barlow<br>lcda@lcturbonet.com |
| For Lincoln County, Nevada<br>Intertech Services Corporation<br>P.O. Box 2008<br>Carson City, NV 89702 | Mike Baughman<br>mikebaughman@charter.net |
| Nye County Regulatory/Licensing Advisor<br>18160 Cottonwood Rd. #265<br>Sunriver, OR 97707 | Malachy R. Murphy<br>mrmurphy@chamerscable.com |
| Nye Co. Nuclear Waste Repository Project Office<br>2101 E. Calvada Blvd., Suite 100<br>Pahrump, NV 89048 | Zoie Choate<br>zchoate@co.nye.nv.us<br>Celeste Sandoval<br>csandoval@co.nye.nv.us |
| Counsel for Eureka County, Nevada<br>Harmon, Curran, Speilberg & Eisenberg, LLP<br>1726 M. St. NW, Suite 600<br>Washington, DC 20036 | Diane Curran<br>dcurran@harmoncurran.com<br>Mathew Fraser<br>mfraser@harmoncurran.com |
| Nuclear Waste Advisory for Eureka County, Nevada<br>1983 Maison Way<br>Carson City, NV 89703 | Abigail Johnson<br>eurekanrc@gmail.com |

| Eureka County, Nevada<br>Office of the District Attorney<br>701 S. Main St., Box 190<br>Eureka, NV  89316-0190 | Theodore Beutel<br>tbeutel.ecda@eurekanv.org |
|---|---|
| Eureka County Public Works<br>P.O. Box 714<br>Eureka, NV 89316 | Ronald Damele<br>rdamele@eurekanv.org |
| For Eureka County, Nevada<br>NWOP Consulting, Inc.<br>1705 Wildcat Lane<br>Ogden, UT  84403 | Loreen Pitchford<br>lpitchford@comcast.net |
| Clark County Nevada<br>500 S. Grand Central Parkway<br>Las Vegas, NV  98155 | Phil Klevorick<br>klevorick@co.clar.nv.us<br>Elizabeth A. Vibert<br>elizabeth.vibert@ccdanv.com |
| Counsel for Clark County, Nevada<br>Jennings, Strouss & Salmon<br>1350 I St. NW, Suite 810<br>Washington, DC  20005-3305 | Alan I. Robbins<br>arobbins@jsslaw.com<br>Debra D. Roby<br>droby@jsslaw.com |
| Mineral County Nuclear Projects Office<br>P.O. Box 1600<br>Hawthorne, NV 89415 | Linda Mathias<br>yuccainfo@mineralcountynv.or |
| White Pine County, Nevada<br>Office of the District Attorney<br>801 Clark St., #3<br>Ely, NV 89301 | Kelly Brown<br>kbrown@mwpower.net |
| For White Pine County, Nevada<br>Intertech Services Corporation<br>P.O. Box 2008<br>Carson City, NV  89702 | Mike Baughman<br>mikebaughman@charter.net |
| Inyo County Yucca Mountain Repository<br>   Assessment Office<br>P.O. 367<br>Independence, CA  93526-0367 | Alisa M. Lembke<br>alembke@inyocounty.us<br>Cathreen Richards<br>crichards@inyocounty.us |
| Esmeralda County Repository Oversight<br>   Program<br>Yucca Mountain Project<br>P.O. Box 490<br>Goldfield, NV  89013 | Edwin Mueller<br>muellered@msn.com |

| | |
|---|---|
| Counsel for Churchill, Esmerald, Lander, and Mineral Counties, Nevada<br>Armstrong Teasdale, LLP<br>1975 Village Center Circle, Suite 140<br>Las Vegas, NV 89134-6237 | Jennifer A. Gores<br>jgores@armstrongteasdale.com |
| Kolesar & Leatham<br>1975 Village Center Circle, Suite 140<br>Las Vegas, NV 89134 | Robert F. List<br>rlist@klnevada.com |
| For City of Caliente, Lincoln County, and White Pine County, Nevada<br>P.O. Box 126<br>Caliente, NV 89008 | Jason Pitts<br>jayson@idtservices.com |
| White Pine County Nuclear Waste Project Office<br>959 Campton St.<br>Ely, NV 89301 | Mike Simon<br>wpnucwst1@mwpower.net<br>Melaine Martinez<br>wpnucwst2@mwpower.net |
| Counsel for Inyo County, California<br>Gregory L. James<br>712 Owens Gorge Road, HC 79, Box 1I<br>Mammoth Lakes, CA 93546 | Gregory L. James<br>gljames@earthlink.net |
| Counsel for Inyo County, California<br>Law Office of Michael Berger<br>479 El Sueno Rd.<br>Santa Barbara, CA 93110 | Michael Berger<br>michael@lawofficeofmichaelberger.com<br>Robert Hanna<br>robert@lawofficeofmichaelberger.com |
| Counsel for Nuclear Energy Institute<br>Pillsbury Winthrop Shaw Pittman LLP<br>2300 N St. N.W.<br>Washington, DC 20037-1122 | Jay E. Silberg<br>jay.silberg@pillsburylaw.com<br>Timothy J.V. Walsh<br>timothy.walsh@pillsburylaw.com<br>Maria D. Webb<br>maria.webb@pillsburylaw.com |
| Counsel for Nuclear Energy Institute<br>Winston & Strawn LLP<br>1700 K St. NW<br>Washington, DC 20006-3817 | William A. Horin<br>whorin@winston.com<br>Rachel Miras-Wilson<br>rwilson@winston.com<br>David A. Repka<br>drepka@winston.com<br>Carlos L. Sisco<br>csisco@winston.com |

| Nuclear Energy Institute<br>Office of the General Counsel<br>1776 I St. NW, Suite 400<br>Washington, DC  20006-3708 | Anne W. Cottingham<br>  awc@nei.org<br>Ellen C. Ginsberg<br>  ecg@nei.org<br>Jerry Bonanno<br>  jxb@nei.org |
|---|---|
| California Energy Commission<br>1516 Ninth St.<br>Sacramento, CA  95814 | Kevin W. Bell<br>  kwbell@energy.state.ca.us |
| California Department of Justice<br>Office of the Attorney General<br>1300 I St., P.O. Box 944255<br>Sacramento, CA  94244-2550 | Susan Durbin<br>  susan.durbin@doj.ca.gov<br>Michele Mercado<br>  michele.mercado@doj.ca.gov |
| California Department of Justice<br>Office of the Attorney General<br>1515 Clay St., 20th Floor<br>P. O. Box 70550<br>Oakland, CA  94612-0550 | Timothy E. Sullivan<br>  timothy.sullivan@doj.ca.gov |
| California Department of Justice<br>Office of the Attorney General<br>300 South Spring St., Suite 1702<br>Los Angeles, CA  90013 | Brian W. Hembacher<br>  brian.hembacher@doj.ca.gov |
| Native Community Action Council<br>P.O. Box 140<br>Baker, NV  89311 | Ian Zabarte<br>  mrizabarte@gmail.com |
| Counsel for Native Community Action<br>  Council<br>Alexander, Berkey, Williams & Weather,<br>  LLP<br>2030 Addison St., Suite 410<br>Berkeley, Ca  94704 | Curtis G. Berkey<br>  cberkey@abwwlaw.com<br>Rovianne A. Leigh<br>  rleigh@abwwlaw.com<br>Scott W. Williams<br>  swilliams@abwwlaw.com |

| | |
|---|---|
| Counsel for Joint Timbisha Shoshone Tribal Group<br>Fredericks, Peebles & Morgan LLP<br>1001 Second St.<br>Sacramento, CA 95814 | Felicia M. Brooks<br>fbrooks@ndnlaw.com<br>Ross D. Colburn<br>rcolburn@ndnlaw.com<br>Sally Eredia<br>seredia@ndnlaw.com<br>Darcie L. Houck<br>dhouck@ndnlaw.com<br>Brian Niegemann<br>bniegemann@ndnlaw.com<br>John M. Peebles<br>jpeebles@ndnlaw.com<br>Robert Rhoan<br>rrhoan@ndnlaw.com |
| Counsel for Joint Timbisha Shoshone Tribal Group<br>Fredericks, Peebles & Morgan LLP<br>3610 North 163rd Plaza<br>Omaha, NE 68116 | Shane Thin Elk<br>sthinelk@ndnlaw.com |
| Counsel for Joint Timbisha Shoshone Tribal Group<br>Godfrey & Kahn, S.C.<br>One East Main St., Suite 500<br>P.O. Box 2719<br>Madison, WI 53701-2719 | Julie Dobie<br>jdobie@gklaw.com<br>Steven A. Heinzen<br>sheinzen@gklaw.com<br>Douglas M. Poland<br>dpoland@gklaw.com<br>Hanna L. Renfro<br>hrenfro@gklaw.com<br>Jacqueline Schwartz<br>jschwartz@gklaw.com |
| Counsel for Joint Timbisha Shoshone Tribal Group<br>Godfrey & Kahn, S.C.<br>780 N. Water St.<br>Milwaukee, WI 53202 | Arthur J. Harrington<br>aharrington@gklaw.com |
| For Joint Timbisha Shoshone Tribal Group<br>3560 Savoy Boulevard<br>Pahrump, NV 89601 | Joe Kennedy<br>joekennedy08@live.com<br>Tameka Vazquez<br>purpose_driven12@yahoo.com |

x

| Counsel for Prairie Island Indian Community<br>Public Law Resource Center PLLC<br>505 N. Capitol Avenue<br>Lansing, MI 48933 | Don L. Keskey<br>donkeskey@publiclawresourcecenter.com |
| --- | --- |
| Prairie Island Indian Community Legal Department<br>5636 Sturgeon Lake Road<br>Welch, MN 55089 | Philip R. Mahowald<br>pmahowald@piic.org |

DATED this 29th day of July 2011, in Olympia, Washington.


DIANA MacDONALD
Legal Assistant

xi

## CERTIFICATE OF SERVICE

I herby certify that on the 29th day of July 2011, a copy of the Petition for

Writ of Mandamus (Agency Action Unreasonably Withheld) was served by hand

delivery upon the following:

Gregory B. Jaczko, Chairman
U.S. Nuclear Regulatory
Commission
11555 Rockville Pike
Mail Stop 14D21
Rockville MD  20852-2738

Eric H. Holder, Jr.
U.S. Attorney General
Robert F. Kennedy Bldg.
950 Pennsylvania Avenue, N.W.
Washington DC  20530-2000

DATED this 29th day of July 2011, in Washington, D.C.

JANE E. NILAN
Paralegal

xi

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 2 8 2011

RECEIVED

**Exhibit 1**



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED     JUL 2 8 2011

CLERK

**Affidavit of J. Clay Killian**
**Aiken County Administrator**

**11-1271**

JUL 29 2011

**RECEIVED**

11-1271

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

JUL 29 2011

**CLERK**

## AFFIDAVIT OF J. CLAY KILLIAN
## AIKEN COUNTY ADMINISTRATOR

Comes now the affiant, J. Clay Killian, who hereby states:

1.      I am the Administrator for Aiken County, South Carolina.

2.      Aiken County owns fourteen parcels of improved and unimproved real estate located in close proximity to the Savannah River Site ("SRS"). These parcels include industrial facilities, public parks, office buildings, as well as unimproved parcels. A listing of these properties is hereby attached.

3.      The locations of all of these parcels have been plotted by the Aiken County Department of Public Works, and all of them are within 10.52 miles of SRS. Most significantly, the Savannah River Research Center, owned by Aiken County is located contiguous to SRS, and houses the Center for Hydrogen Research, a multi-million dollar facility studying new products and services for the emerging hydrogen economy.

4.      The Savannah River Research Campus comprises 391 acres and has an assessed value of $18,700,000. The Campus is the location for the Center for Hydrogen Research, a facility comprising 60,000 square feet which was especially designed and constructed by Aiken Country for hydrogen production, storage and infrastructure research. The Center is designed to co-locate, in the same laboratory complex, hydrogen research programs being conducted by the Savannah River National Laboratory with programs sponsored by industry and academia. Lessees in the Research Center currently include Toyota and the Savannah River National Laboratory. Leases with Clemson University, the University of South Carolina, and South Carolina State University are in the process of negotiation and are not yet completed.

5.      The assessed value for these fourteen parcels totals $589,990,045, according to records kept by the Aiken County Assessor's Office from 2006.

J. Clay Killian
Administrator
County of Aiken, South Carolina
February 17, 2010

Sworn to before me this _17th_ day
of February, 2010

Notary Public for South Carolina

My Commission expires 7-27-2019

SCHEDULE OF AIKEN COUNTY PROPERTY CLOSE TO SAVANNAH RIVER SITE

| TPN | OLD TPN | SITUS | PROPERTY USE | DISTANCE FROM SRS | LAND SIZE | IMPROV. | ASSET($) | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 026-03-03-001 | 00-039-0-02-094 | 300 URQUHART DRIVE | INDUSTRIAL | 10.20 miles | 35.95 | YES | $180,000,000 | URQUHART SCE&G POWER PLANT |
| 026-14-01-020 | 00-039-0-02-095 | 300 URQUHART DRIVE | INDUSTRIAL | 10.50 miles | 0.29 | YES | INCLUDED ABOVE | URQUHART SCE&G POWER PLANT |
| 026-14-04-003 | 60-002-0-07-001 | URQUHART DRIVE | INDUSTRIAL | 10.52 miles | 0.17 | YES | INCLUDED ABOVE | URQUHART SCE&G POWER PLANT |
| 027-07-02-001 | 00-041-0-04-096 | 226 OLD JACKSON HWY. | INDUSTRIAL | 9.27 miles | 28.87 | YES | $391,133,245 | KIMBERLY CLARK INDUSTRIAL PLANT |
| 027-11-01-001 | | 227 OLD JACKSON HWY. | INDUSTRIAL | 9.21 miles | 25.65 | YES | INCLUDED ABOVE | KIMBERLY CLARK INDUSTRIAL PLANT |
| 026-11-12-001 | 60-001-0-08-001 | URQUHART DRIVE | PARK | 10.13 miles | 1.10 | YES | $27,000 | PLAYGROUND AND PARK |
| 039-19-01-001 | 00-061-0-01-010 | SPANN HAMMOND ROAD | PARK | 8.18 miles | 21.00 | YES | $34,800 | SPANN HAMMOND PARK |
| 039-19-01-006 | 00-061-0-01-093 | WATERS ROAD | CEMETERY | 7.97 miles | 1.00 | NONE | NO VALUE | CEMETERY |
| 040-07-02-002 | 00-062-0-01-253 | HAMMOND ROAD | DORMANT | 7.74 miles | 3.01 | NONE | $13,545 | NATURAL WOODED PARCEL |
| 055-16-02-003 | 00-086-0-01-194 | WILLISTON ROAD | PARK | 5.39 miles | 3.99 | YES | $32,955 | SPIDER WEBB PARK |
| 077-12-32-001 | 40-005-0-02-007 | 317 MAIN STREET | DORMANT | 0.83 miles | 0.82 | YES | UNKNOWN | FORMER CAMPBELLS SERVICE STATION |
| 127-00-01-001 | 00-164-0-01-047 | WILLISTON ROAD | RESEARCH CAMPUS | Adjacent | 391.00 | YES | $18,700,000 | CORPORATE RESEARCH CENTER |
| 141-17-12-008 | 50-011-0-03-016 | 716 OLD WHISKEY ROAD | DORMANT | 2.75 miles | 0.02 | NONE | $500 | NATURALLY WOODED LOT |
| 142-05-18-014 | 50-012-0-08-012 | WHISKEY ROAD | OFFICE | 2.10 miles | 1.10 | YES | $48,000 | AIKEN COUNTY MAGISTRATE OFFICE |
| | | | | | TOTAL | | $589,990,045 | |

NOTE:

THE DOLLAR AMOUNTS IN ASSETS WERE OBTAINED FROM  AIKEN COUNTY FINANCE DEPT.; PUBLIC WORKS DEPT. AND ASSESSOR'S OFFICE FILES.
THESE DOLLAR FIGURES ARE NOT INTENDED OR TO BE CONSTRUED AS MARKET VALUES OF THESE PARCELS

EXHIBIT B

## AFFIDAVIT OF J. CLAY KILLIAN
## AIKEN COUNTY ADMINISTRATOR

Comes now the affiant, J. Clay Killian, who hereby states:

1.      I am the Administrator for Aiken County, South Carolina.

2.      Aiken County owns fourteen parcels of improved and unimproved real estate located in close proximity to the Savannah River Site ("SRS"). These parcels include industrial facilities, public parks, office buildings, as well as unimproved parcels. A listing of these properties is hereby attached.

3.      The locations of all of these parcels have been plotted by the Aiken County Department of Public Works, and all of them are within 10.52 miles of SRS. Most significantly, the Savannah River Research Center, owned by Aiken County is located contiguous to SRS, and houses the Center for Hydrogen Research, a multi-million dollar facility studying new products and services for the emerging hydrogen economy.

4.      The Savannah River Research Campus comprises 391 acres and has an assessed value of $18,700,000. The Campus is the location for the Center for Hydrogen Research, a facility comprising 60,000 square feet which was especially designed and constructed by Aiken Country for hydrogen production, storage and infrastructure research. The Center is designed to co-locate, in the same laboratory complex, hydrogen research programs being conducted by the Savannah River National Laboratory with programs sponsored by industry and academia. Lessees in the Research Center currently include Toyota and the Savannah River National Laboratory. Leases with Clemson University, the University of South Carolina, and South Carolina State University are in the process of negotiation and are not yet completed.

5.      The assessed value for these fourteen parcels totals $589,990,045, according to records kept by the Aiken County Assessor's Office from 2006.


_____

J. Clay Killian
Administrator
County of Aiken, South Carolina
February 17, 2010


Sworn to before me this _____ day
of February, 2010


_____

Notary Public for South Carolina

My Commission expires_____

SCHEDULE OF AIKEN COUNTY PROPERTY CLOSE TO SAVANNAH RIVER SITE

| TPN | OLD TPN | SITUS | PROPERTY USE | DISTANCE FROM SRS | LAND SIZE | IMPROV. | ASSET($) | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 026-03-03-001 | 00-039-0-02-094 | 300 URQUHART DRIVE | INDUSTRIAL | 10.20 miles | 35.95 | YES | $180,000,000 | URQUHART SCE&G POWER PLANT |
| 026-14-01-020 | 00-039-0-02-095 | 300 URQUHART DRIVE | INDUSTRIAL | 10.50 miles | 0.29 | YES | INCLUDED ABOVE | URQUHART SCE&G POWER PLANT |
| 026-14-04-003 | 60-002-0-07-001 | URQUHART DRIVE | INDUSTRIAL | 10.52 miles | 0.17 | YES | INCLUDED ABOVE | URQUHART SCE&G POWER PLANT |
| 027-07-02-001 | 00-041-0-04-096 | 226 OLD JACKSON HWY. | INDUSTRIAL | 9.27 miles | 28.87 | YES | $391,133,245 | KIMBERLY CLARK INDUSTRIAL PLANT |
| 027-11-01-001 | | 227 OLD JACKSON HWY. | INDUSTRIAL | 9.21 miles | 25.65 | YES | INCLUDED ABOVE | KIMBERLY CLARK INDUSTRIAL PLANT |
| 026-11-12-001 | 60-001-0-08-001 | URQUHART DRIVE | PARK | 10.13 miles | 1.10 | YES | $27,000 | PLAYGROUND AND PARK |
| 039-19-01-001 | 00-061-0-01-010 | SPANN HAMMOND ROAD | PARK | 8.18 miles | 21.00 | YES | $34,800 | SPANN HAMMOND PARK |
| 039-19-01-006 | 00-061-0-01-093 | WATERS ROAD | CEMETERY | 7.97 miles | 1.00 | NONE | NO VALUE | CEMETERY |
| 040-07-02-002 | 00-062-0-01-253 | HAMMOND ROAD | DORMANT | 7.74 miles | 3.01 | NONE | $13,545 | NATURAL WOODED PARCEL |
| 055-16-02-003 | 00-086-0-01-194 | WILLISTON ROAD | PARK | 5.39 miles | 3.99 | YES | $32,955 | SPIDER WEBB PARK |
| 077-12-32-001 | 40-005-0-02-007 | 317 MAIN STREET | DORMANT | 0.83 miles | 0.82 | YES | UNKNOWN | FORMER CAMPBELLS SERVICE STATION |
| 127-00-01-001 | 00-164-0-01-047 | WILLISTON ROAD | RESEARCH CAMPUS | Adjacent | 391.00 | YES | $18,700,000 | CORPORATE RESEARCH CENTER |
| 141-17-12-008 | 50-011-0-03-016 | 716 OLD WHISKEY ROAD | DORMANT | 2.75 miles | 0.02 | NONE | $500 | NATURALLY WOODED LOT |
| 142-05-18-014 | 50-012-0-08-012 | WHISKEY ROAD | OFFICE | 2.10 miles | 1.10 | YES | $48,000 | AIKEN COUNTY MAGISTRATE OFFICE |
| | | | | | TOTAL | | $589,990,045 | |

NOTE:

THE DOLLAR AMOUNTS IN ASSETS WERE OBTAINED FROM AIKEN COUNTY FINANCE DEPT.; PUBLIC WORKS DEPT. AND ASSESSOR'S OFFICE FILES.

THESE DOLLAR FIGURES ARE NOT INTENDED OR TO BE CONSTRUED AS MARKET VALUES OF THESE PARCELS.

**Exhibit 2**

**Ferguson Plaintiffs' Declarations**

Declaration of Robert Ferguson
Declaration of William N. Lampson
Declaration of Gary Petersen



USCA Case #11-1271    Document #1321792    Filed: 07/29/2011    Page 1 of 1

CASE NO. **11-1271**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

In Re: AIKEN COUNTY, ROBERT L. FERGUSON, WILLIAM
LAMPSON, GARY PETERSEN, STATE OF SOUTH CAROLINA,
STATE OF WASHINGTON, NATIONAL ASSOCIATION OF
REGULATORY UTILITY COMMISSIONERS, NYE COUNTY,
NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and
GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory
Commission, Respondents.

## <u>DECLARATION OF ROBERT FERGUSON</u>

1.    My name is Robert Ferguson.  I have resided at 121 Fairwood

Court and 393 Columbia Pt. Drive, Richland WA, 99352 for the past thirty

years. I have also owned a business in Richland WA for the past nine years.

2.    My place of business is within about 4 miles of the United

States Department of Energy's Hanford Site.   The Hanford Site is a

decommissioned facility that has been used for the production of nuclear

materials and where now, millions of gallons of high-level radioactive

waste, containing hundreds of millions of curies of radioactivity, are

currently being temporarily stored.

3. According to government documents, leaking high-level radioactive waste storage tanks has contaminated ground water in and around where I reside, and threatens the Columbia River, which I use for recreation and greatly enjoy. I plan to maintain my business in its present location for the foreseeable future. Some call the Hanford Site the most contaminated nuclear site in the United States.

4. Under the Nuclear Waste Policy Act, the waste at the Hanford Site was being prepared for transit to Yucca Mountain, Nevada, the site selected as the permanent repository for this waste by Congress and the President in accordance with the Nuclear Waste Policy Act.

5. On January 29, 2010, it was announced that the President has directed the Secretary of Energy to ignore and abandon the Nuclear Waste Policy Act's mandate to expeditiously proceed to license and construct a permanent repository at Yucca Mountain for high-level radioactive waste from locations including the Hanford Site.

6. I have come to learn that shortly after that announcement, the Department of Energy filed a motion with the Nuclear Regulatory Commission ("NRC") seeking to withdraw its application to construct the facility. That the NRC has chosen to cease considering the application, and that the NRC has, for over a year, delayed even ruling on whether the DOE may withdraw its license application. I also understand that under the

2

Nuclear Policy Act the NRC is required to decide whether to approve or disapprove the license application within three years of when it was filed, and that it was filed on or about June 15, 2008.

7.    I understood that the Nuclear Waste Policy Act was the legal mechanism that would finally result in an expedited process that would ultimately result in the high–level radioactive waste at the Hanford Site being permanently disposed of in safe and secure way.

8.    The NRC's failure to consider the application, and its failure to decide the application with the three years provided for by law extends and continues the very danger that the Nuclear Waste Policy Act was intended by Congress to quickly end: the indefinite and continued environmental and human-health risk to me and others arising from the continued existence of the Hanford Site (and other sites), where nuclear waste continues to be stored in ways far less safe than Yucca Mountain. The absence of a repository for permanent disposal of this high-level radioactive waste will only increase the costs of disposal and continue to expose me, my family and others living and working around the Hanford Site to continued unacceptable environmental and human health risks.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

3

Executed on July 27, 2011.

Robert Ferguson

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

RECEIVED

11-1271

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

CLERK

THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Robert L. Ferguson, et al.  )
                            )
              Petitioners,  )
                            )
                            )    Case No. 10-1052
        v.                  )
                            )
                            )
BARACK OBAMA, et al.        )
                            )
              Respondents.  )
_____)

### DECLARATION OF WILLIAM N. LAMPSON

1.    My name is William Lampson.  I reside at 8308 Sunset Lane, Pasco Washington 99301.  I have lived in this area my entire life.

2.    My residence is located within 15 miles of the United States Department of Energy's Hanford Site.  The Hanford Site is a decommissioned facility that has been used for the production of nuclear materials and where now, millions of gallons of high-level radioactive waste, containing hundreds of millions of curies of radioactivity, are currently being temporarily stored.

3.    According to government documents, leaking high-level radioactive waste storage tanks has contaminated ground water in and around where I reside, and threatens the Columbia River, which I use for recreation and greatly enjoy.  I have heard the Hanford Site called the most contaminated nuclear site in the United States.

4.    Under the Nuclear Waste Policy Act, the waste at the Hanford Site was being prepared for transit to Yucca Mountain, Nevada, the site selected as the permanent

DC-1423531 v1

**ADD064**

repository for this waste by Congress and the President in accordance with the Nuclear Waste Policy Act.

5.     On January 29, 2010, it was announced that the President has directed the Secretary of Energy to ignore and abandon the Nuclear Waste Policy Act's mandate to expeditiously proceed to license and construct a permanent repository at Yucca Mountain for high-level radioactive waste from locations including the Hanford Site.

6.     After years of waiting and delay, I understood that the Nuclear Waste Policy Act was the legal mechanism that would finally result in an expedited process that would ultimately result in the high–level radioactive waste at the Hanford Site being permanently disposed of in safe and secure way.

7.     The President and Secretary's final action abandoning the Yucca Mountain project extends and continues the very danger that the Nuclear Waste Policy Act was intended by Congress to quickly end: the indefinite and continued environmental and human-health risk to me and others arising from the continued existence of the Hanford Site (and other sites), where nuclear waste continues to be stored in ways far less safe than Yucca Mountain. The absence of a repository for permanent disposal of this high-level radioactive waste will only increase the costs of disposal and continue to expose me, my family and others living and working around the Hanford Site to continued unacceptable environmental and human health risks.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

2

**ADD065**

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Executed on April / 2010.

William N. Lampson

3



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 2 9 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

JUL 2 9 2011

CLERK

CASE NO. _____ **11-1271**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In Re: AIKEN COUNTY, ROBERT L. FERGUSON, WILLIAM
LAMPSON, GARY PETERSEN, STATE OF SOUTH CAROLINA,
STATE OF WASHINGTON, NATIONAL ASSOCIATION OF
REGULATORY UTILITY COMMISSIONERS, NYE COUNTY,
NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and
GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory
Commission, Respondents.

### DECLARATION OF GARY PETERSEN

1.      My name is Gary Petersen.  I reside at 238 Somerset, Richland,

Washington, 99354.  I have lived there for the past 40 years.

2.      My residence is located within two miles of the United States

Department of Energy's Hanford Site.  The Hanford Site is a

decommissioned facility that has been used for the production of nuclear

materials and where now, millions of gallons of high-level radioactive

waste, containing hundreds of millions of curies of radioactivity, are

currently being temporarily stored.

3.     According to government documents, leaking high-level radioactive waste storage tanks has contaminated ground water in and around where I reside, and threatens the Columbia River, which I use for recreation and greatly enjoy. I also use drinking water provided by the City of Richland that comes from the Columbia River. Some call the Hanford Site the most contaminated nuclear site in the United States.

4.     Under the Nuclear Waste Policy Act, the waste at the Hanford Site was being prepared for transit to Yucca Mountain, Nevada, the site selected as the permanent repository for this waste by Congress and the President in accordance with the Nuclear Waste Policy Act.

5. On January 29, 2010, it was announced that the President has directed the Secretary of Energy to ignore and abandon the Nuclear Waste Policy Act's mandate to expeditiously proceed to license and construct a permanent repository at Yucca Mountain for high-level radioactive waste from locations including the Hanford Site.

6.     I have come to learn that shortly after that announcement, the Department of Energy filed a motion with the Nuclear Regulatory Commission ("NRC") seeking to withdraw its application to construct the facility. That the NRC has chosen to cease considering the application, and that the NRC has, for over a year has delayed even ruling on whether the

2

DOE may withdraw its license application. I also understand that under the Nuclear Policy Act the NRC is required to decide whether to approve or disapprove the license application within three years of when it was filed, and that it was filed on or about June 15, 2008.

7.    I understood that the Nuclear Waste Policy Act was the legal mechanism that would finally result in an expedited process that would ultimately result in the high–level radioactive waste at the Hanford Site being permanently disposed of in safe and secure way.

8.    The NRC's failure to consider the application, and its failure to decide the application with the three years provided for by law extends and continues the very danger that the Nuclear Waste Policy Act was intended by Congress to quickly end: the indefinite and continued environmental and human-health risk to me and others arising from the continued existence of the Hanford Site (and other sites), where nuclear waste continues to be stored in ways far less safe than Yucca Mountain. The absence of a repository for permanent disposal of this high-level radioactive waste will only increase the costs of disposal and continue to expose me, my family and others living and working around the Hanford Site to continued unacceptable environmental and human health risks.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2011.

_____
Gary Petersen

JUL 20 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

CLERK

**Exhibit 3**

**South Carolina Standing Affidavit**
**Affidavit of Carla Griffin**

**11-1271**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT     Document #1321792          Filed: 07/29/2011          Page 71 of 197

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED     JUL 2 0 2011
CLERK

JUL 2 0 2011

**RECEIVED**

CASE NO. _____  **11-1271**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In Re: AIKEN COUNTY, ROBERT L. FERGUSON, WILLIAM
LAMPSON, GARY PETERSEN, STATE OF SOUTH CAROLINA,
STATE OF WASHINGTON, NATIONAL ASSOCIATION OF
REGULATORY UTILITY COMMISSIONERS, NYE COUNTY,
NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and
GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory
Commission, Respondents.

## AFFIDAVIT OF CARLA GRIFFIN

PERSONALLY APPEARED BEFORE ME, Carla Griffin, duly sworn, who
deposes and says the following:

1.    I am over 21 years old and am personally familiar with the matters set
forth herein.

2.    I am employed by the Division of General Services, South Carolina
Budget and Control Board. The Division of General Services acts as the
property manager for property owned by the State of South Carolina.

3.    The Savannah River Site occupies approximately 300 square miles of
land in South Carolina, almost all of which is in Aiken and Barnwell
Counties.

4.     As shown in the attached land inventory reports, listing the State's property in Aiken and Barnwell Counties, the State of South Carolina owns approximately 70 parcels of land in Aiken County and approximately 50 parcels of land in Barnwell County.

5.     The parcels listed in the attachments include state parks, heritage preserves and other natural resource areas, as well as parcels dedicated to a number of other uses. The total acreage of state-owned land in the two counties is in excess of 4,000 acres.

6.     A substantial part of the land listed in the inventories lies within ten miles of the Savannah River Site.

7.     Part of the land owned by the State includes two highways, U.S. 278 and S.C. 125, that run through the Savannah River Site.

FURTHER AFFIANT SAYETH NOT.

_Carla Griffin_
CARLA GRIFFIN
Deputy Director
Division of General Services
SC Budget and Control Board


SWORN TO BEFORE ME THIS 28th

DAY OF July, 20 11 .

Anita B. Hoyer
NOTARY PUBLIC FOR SOUTH CAROLINA

MY COMMISSION EXPIRES:

8/21/2016

2

## *State Building and Property Services*    *State Owned Land Inventory Report*    *Aiken County*

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | AIKEN STATE PARK - 1145 STATE PARK RD | AIKEN | AIKEN | 237 | 00297-002-001 | | STATE PARK | STATE PARK |
| EDUCATION, DEPARTMENT OF | AIKEN SCHOOL BUS SHOP - EASTSIDE OF US #1 | AIKEN | AIKEN | 8.615 | 00-153-001-013 | SERVICE/MAINTANCE FACILITY | SHOP | SHOP |
| VOCATIONAL REHABILITATION DEPARTMENT | YORK ST | AIKEN | AIKEN | 5.64 | 120-15-01-007 | AREA OFFICE & TRAINING CENTER | OFFICE/TRAINING | OFFICE/TRAINING |
| VOCATIONAL REHABILITATION DEPARTMENT | YORK ST | AIKEN | AIKEN | 7.31 | 120-14-03-001 | AREA OFFICE & TRAINING CENTER | OFFICE/TRAINING | OFFICE/TRAINING |
| FORESTRY COMMISSION, SC | SILVERTON  TOWER, SC 125/ATOMIC RD | AIKEN | AIKEN | 5.24 | 076-14-05-003 | B&CB APPROVAL TO SELL 9/29/10 | SURPLUS | SURPLUS |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | AIKEN STATE PARK - 1145 STATE PARK RD | AIKEN | AIKEN | 136 | N/A-02-009 | | STATE PARK | STATE PARK |
| TRANSPORTATION, SC DEPARTMENT OF | SC HWY 125 & BEECH ISLAND AVE | BEECH ISLAND | AIKEN | 7 | 00-039-003-020 | BEECH ISLAND SECTION SHED | SECTION SHED | SECTION SHED |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | AIKEN STATE PARK - 1145 STATE PARK RD | AIKEN | AIKEN | 205 | N/A-02-011 | | STATE PARK | STATE PARK |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 0.61 | 087-15-01-004 | GREGG-GRANITEVILLE LIBRARY | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | AIKEN STATE PARK - 1145 STATE PARK RD | AIKEN | AIKEN | 428.5 | 00-297-002-001 | | STATE PARK | STATE PARK |
| NATURAL RESOURCES, SC DEPARTMENT OF | WINDMILL HIGH POND | MONETTA | AIKEN | 30.11 | 00-213-01-071 | | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | SAVANNAH RIVER BLUFFS | AIKEN | AIKEN | 35.66 | 00-003-001-018 | | HERITAGE PRESERVE | HERITAGE PRESERVE |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| NATURAL RESOURCES, SC DEPARTMENT OF | SAVANNAH RIVER BLUFFS | AIKEN | AIKEN | 48,18 | 00-003-001-026 | | HERITAGE PRESERVE | HERITAGE PRESERVE |
| EMPLOYMENT & WORKFORCE, DEPARTMENT OF | RICHLAND AVE | AIKEN | AIKEN | 2.3 | 00-155-01-052 | | ADMIN OFFICE | ADMIN OFFICE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | 62,1 | 087-15-01-008 | PACER CROSSINGS | STUDENT HOUSING | STUDENT HOUSING |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | AIKEN STATE PARK - 1145 STATE PARK RD | AIKEN | AIKEN | 66 | N/A-02-010 | | STATE PARK | STATE PARK |
| CLEMSON UNIVERSITY | HWY #154 | AIKEN | AIKEN | 403 | 00-196-001-008 | MULT. PARCELS - CAMP LONG | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| NATURAL RESOURCES, SC DEPARTMENT OF | HENDERSON HP - GUNTER TRACT | AIKEN | AIKEN | 168.58 | 00-129-01-010 | HERITAGE PRES ADDITION | HERITAGE PRESERVE | HERITAGE PRESERVE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | 62.1 | 087-15-01-008 | SCIENCES BUILDING | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | BUSINESS & EDUCATION CENTER | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| MOTOR VEHICLES, SC DEPARTMENT OF | US HWY 78 & SC HWY 215 (RICHLAND AVE) | AIKEN | AIKEN | 1.4 | | DMV | SCDMV | SCDMV |
| TRANSPORTATION, SC DEPARTMENT OF | US HWY #25 | NORTH AUGUSTA | AIKEN | 1.07 | 0014-01-002 | OLD N AUGUSTA/SWEETWATER SECTION SHED - PER AGREEMENT, DEEDED FROM DPS 4/3/06 | SECTION SHED | SECTION SHED |
| MOTOR VEHICLES, SC DEPARTMENT OF | ASCAUGA LAKE RD | NORTH AUGUSTA | AIKEN | 2.816 | 00-01.5-01-023 | DMV (LOCATED NEAR BELLVEDERE) | SCDMV | SCDMV |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 1.476 | 087-15-01-002 | STUDENT ACTIVITIES CENTER | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| FORESTRY COMMISSION, SC | GRANITEVILLE TOWER, HWY #149 | GRANITEVILLE | AIKEN | 4.53 | 077-001-001 | B&CB APPROVAL TO SELL 12/14/10 | SURPLUS | SURPLUS |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 0.5534 | 087-15-01-007 | HUMANITIES & SOCIAL SCIENCES BUILDING | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| ADJUTANT GENERAL | 365 BETTIS ACADEMY RD | GRANITEVILLE | AIKEN | 10.584 | 00-052-001-067 | NATIONAL GUARD (WARRENVILLE ARMORY) | ARMORY | ARMORY |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 0.54 | 087-15-01-010 | SUPPLY & MAINTENANCE BUILDING | SUPPORT SERVICES/STORAGE/MA INTENANCE | SUPPORT SERVICES/STORAGE/M AINTENANCE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 0.394 | 087-15-01-001 | SOFTBALL ANCILLARY BUILDING (CONCESSIONS/RESTROOMS) | ATHLETIC/RECREATION AL | ATHLETIC/RECREATIO NAL |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 2.7 | 087-15-01-009 | ETHERREDGE CENTER FOR FINE & PERFORMING ARTS | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 0.912 | 087-15-01-003 | PENLAND CLASSROOM/ADMIN BUILDING | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| MOTOR VEHICLES, SC DEPARTMENT OF | AIRCO BLVD & US 78 | AIKEN | AIKEN | 5 | 00-203-01-007 | VACANT PROPERTY | SCDMV | SCDMV |
| TRANSPORTATION, SC DEPARTMENT OF | WASHINGTON RD | WAGENER | AIKEN | 21.45 | 357-01-207 | WAGNER SECTION SHED | SECTION SHED | SECTION SHED |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | 13.96 | 087-15-01-005 | CHILDREN'S CENTER | CHILDCARE FACILITY | CHILDCARE FACILITY |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 11.6295 | 087-15-01-012 | PACER COMMONS | STUDENT HOUSING | STUDENT HOUSING |
| MOTOR VEHICLES, SC DEPARTMENT OF | S/S US HWY # 78 & HWY 215 | AIKEN | AIKEN | 9.4 | 121-12-08-005 | INCL: PARCEL 2 & 3 TMS - 00-015-01-023, 00-203-01-007 | | |
| NATURAL RESOURCES, SC DEPARTMENT OF | OAK RIDGE CLUB DRIVE | WILLISTON | AIKEN | 129.71 | 268-00-03-003 | GOPHER TORTOISE HERITAGE PRESERVE | HERITAGE PRESERVE | HERITAGE PRESERVE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 375 ROBERT BELL PARKWAY | | AIKEN | 260.53 | 087-14-01-001 | CONVOCATION CENTER | ATHLETIC/RECREATION AL | ATHLETIC/RECREATIO NAL |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| UNVERISITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | TENNIS TRAILER | ATHLETIC/RECREATIONAL | ATHLETIC/RECREATIONAL |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | RED CLIFF STATE PARK - HWY 125 & HWY 278 | AIKEN | AIKEN | 352.13 | 00-062-001-054 & 00-062-001-56 & 00-062-001-007 | COUNTY SHOWS 349.13 + 3 ACRES | STATE PARK | STATE PARK |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | 16.04 | 087-14-02-001 | SOCCER | ATHLETIC/RECREATIONAL | ATHLETIC/RECREATIONAL |
| NATURAL RESOURCES, SC DEPARTMENT OF | OUTING CLUB RD | AIKEN | AIKEN | 14.22 | 00-129-01-135 | HENDERSON HP ADDN | HERITAGE PRESERVE | HERITAGE PRESERVE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | PICKENS-SALLEY HOUSE | OFFICE/ADMIN | OFFICE/ADMIN |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | RUTH PATRICK SCIENCE EDUCATION CENTER | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| NATURAL RESOURCES, SC DEPARTMENT OF | S/S OF HWY 125 | AIKEN | AIKEN | 1.2 | 00-089-02-028 | SC WATER RESOURCES COMMISSION | WELL SITE | WELL SITE |
| NATURAL RESOURCES, SC DEPARTMENT OF | GRAYMARE HOLLOW ROAD | NEW ELLENTON | AIKEN | 0.23 | 00-111-01-060 | SC WATER RESOURCES COMMISSION | WELL SITE | WELL SITE |
| NATURAL RESOURCES, SC DEPARTMENT OF | WINDSOR ROAD EAST | AIKEN | AIKEN | 97.326 | 256-00-08-005 | TO PROTECT THE "GOPHER TORTOISE" | HERITAGE PRESERVE | HERITAGE PRESERVE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | ALAN B MILLER NURSING BUILDING | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | | AIKEN | | 087-15-01-008 | MCGRATH SENIORNET LEARNING CENTER | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| NATURAL RESOURCES, SC DEPARTMENT OF | GOPHER TORTOISE - HURT TRACT | AIKEN | AIKEN | 110.079 | 00-336-02-003 | ADDITION TO GOPHER TORTOISE PRESERVE | HERITAGE PRESERVE | HERITAGE PRESERVE |
| COMMERCE, SC DEPARTMENT OF | INTERSECTION OF HWY 72 & HWY 81 | MAGNOLIA & CALHOUN FALLS | ABBEVILLE | 834.89 | N/A-01-005 | PROPERTY IS HELD FOR THE LAKESIDE A. RUSSELL PROJECT | RUSSELL PROJECT | RUSSELL PROJECT |

| Agency Name | Location \ Address | City | County Name | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| DISABILITIES & SPECIAL NEEDS, DEPARTMENT OF | 101 & 103 DUPONT DR | AIKEN | AIKEN | 1.6 | 00-154-01-006 | TWO BUILDINGS ARE LOCATED ON THIS PROPERTY | RESIDENCE | RESIDENCE |
| NATURAL RESOURCES, SC DEPARTMENT OF | HENDERSON HP (HWY 1467) | RIDGECREST | AIKEN | 197.5 | 00-129-01-017 | | HERITAGE PRESERVE | HERITAGE PRESERVE |
| MENTAL HEALTH, SC DEPARTMENT OF | 1135 GREGG HWY, AIKEN SC 29801 | AIKEN | AIKEN | 16.47 | 00-104-01-170 | AIKEN-BARNWELL MENTAL HEALTH CENTER | MAIN CENTER | MAIN CENTER |
| NATURAL RESOURCES, SC DEPARTMENT OF | GOPHER TORTOISE | AIKEN | AIKEN | 182.782 | 00-337-01-007 | | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | GOPHER TORTOISE HP ADDN | AIKEN | AIKEN | 492.817 | 00-320-01-003 | | HERITAGE PRESERVE | HERITAGE PERSERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | HERITAGE PRESERVE (3 MILES NW OF AIKEN) HENDERSON | AIKEN | AIKEN | 8.86 | 00-129-0-01-078 | HERITAGE PRESERVE | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | BORDER OF GOPHER TORTOISE PRES | WINDSOR | AIKEN | 426.338 | 00-320-01-005 | ADDITION TO GOPHER TORTOISE PRES | HERITAGE PRESERVE | HERITAGE PRESERVE |
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 471 UNIVERSITY PARKWAY | AIKEN | AIKEN | 8.5 | 087-15-01-006 | PACER DOWNS APARTMENTS | STUDENT HOUSING | STUDENT HOUSING |
| NATURAL RESOURCES, SC DEPARTMENT OF | BEAR BRANCH | AIKEN | AIKEN | 172.25 | 00-098.0-01-002 | | HERITAGE PRESERVE | HERITAGE PRESERVE |
| DISABILITIES & SPECIAL NEEDS, DEPARTMENT OF | 625 & 629 CHESTERFIELD ST (SANDERS/RUDNICK) | AIKEN | AIKEN | 2 | 30-041-06-011 | TWO BUILDINGS ARE LOCATED ON THIS PROPERTY | RESIDENCE | RESIDENCE |
| NATURAL RESOURCES, SC DEPARTMENT OF | OUTING CLUB RD | AIKEN | AIKEN | 3.08 | 00-129-01-138 | HENDERSON HP ADDN | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | OUTING CLUB RD | AIKEN | AIKEN | 3.8 | 00-129-01-082 | HENDERSON HP ADDN | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | OUTING CLUB RD | AIKEN | AIKEN | 29.39 | 00-129-01-005 | HENDERSON HP ADDN | HERITAGE PRESERVE | HERITAGE PRESERVE |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| UNIVERSITY OF SOUTH CAROLINA-AIKEN CAMPUS | 375 ROBERT BELL PARKWAY | | AIKEN | | 087-14-01-001 | ROBERTO HERNANDEZ STADIUM | ATHLETIC/RECREATIONAL | ATHLETIC/RECREATIONAL |
| TRANSPORTATION, SC DEPARTMENT OF | 1931 UNIVERSITY PARKWAY (US HWY 118) | AIKEN | AIKEN | 21,8 | 00-130-01-021 | | MAINTENANCE COMPLEX | MATENANCE COMPLEX |

Records:    66

# *State Building and Property Services*

State Owned Land
Inventory Report      *Barnwell County*

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| CLEMSON UNIVERSITY | US #78 | BLACKVILLE | BARNWELL | 1296 | 086-00-00-013 | | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 6.4 | 072-08-01-014 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 0.02 | 072-09-06-006 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 19.72 | 072-09-04-014 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | FISH HATCHERY | BARNWELL | BARNWELL | 14.91 | 072-10-06-036 | | FISH HATCHERY | FISH HATCHERY |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 1.4 | 072-07-040 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 2.3 | 072-07-038 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 0.3 | 072-07-037-14 | | STATE LAKE | STATE LAKE |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK - HWY #3 | BLACKVILLE | BARNWELL | 4.38 | 106-00-00-002 | | STATE PARK | STATE PARK |
| TRANSPORTATION, SC DEPARTMENT OF | HWY #37 | BARNWELL | BARNWELL | 1 | TN-78-6-128 | RIGHT OF WAY (NOT SURPLUS PER KATHRYN COPELAND 9/16/10) | BORROW PIT | BORROW PIT |
| EMPLOYMENT & WORKFORCE, DEPARTMENT OF | 2214 WALL ST | BARNWELL | BARNWELL | 1.43 | 072-09-10-024 | | ADMIN OFFICE | ADMIN OFFICE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 81.9 | 071-00-00-023 | | STATE LAKE | STATE LAKE |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| CLEMSON UNIVERSITY | 3 MILES WEST OF BLACKVILLE ON US #78 | BLACKVILLE | BARNWELL | 1058.4 | 086-00-00-013 | | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| NATURAL RESOURCES, SC DEPARTMENT OF | FISH HATCHERY - HWY #64 | BARNWELL | BARNWELL | 2 | 072-10-06-038 | | FISH HATCHERY | FISH HATCHERY |
| TRANSPORTATION, SC DEPARTMENT OF | 2000 FULLER ST | BARNWELL | BARNWELL | 2.83 | 073-10-01-026 | MAINTENANCE SHOP | MAINTENANCE COMPLEX | MAINTENANCE COMPLEX |
| ADJUTANT GENERAL | 2501 MARBORO AVE | BARNWELL | BARNWELL | 5 | 072-12-04-003 | NATIONAL GUARD | ARMORY | ARMORY |
| EDUCATION, DEPARTMENT OF | BLACKVILLE SCHOOL BUS SHOP - COUNTRY CLUB RD | BLACKVILLE | BARNWELL | 6 | 123-05-00-001 | SERVICE/MAINTANCE FACILITY | SHOP | SHOP |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK - HWY #9 | BLACKVILLE | BARNWELL | 52.9 | 106-00-00-004 106-07-00-001 | | STATE PARK | STATE PARK |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK - HWY #9 | BLACKVILLE | BARNWELL | 6.57 | 106-00-00-004 106-07-00-001 | | STATE PARK | STATE PARK |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - WEST OF S-6-41 | BARNWELL | BARNWELL | 28.7 | 071-00-00-022 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 18.4 | 072-00-00-005 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 37.8 | 072-00-00-004 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 1 | 071-04-01-004 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 2.4 | 071-04-01-003 | | STATE LAKE | STATE LAKE |
| FORESTRY COMMISSION, SC | BARNWELL TOWER, S/S SC HWY #64 | BARNWELL | BARNWELL | 10 | 092-00-00-008 | OFFICE COMPLEX/BARNWELL COUNTY RECYCLE CENTER | OFFICE COMPLEX | OFFICE COMPLEX |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 0.6 | | | STATE LAKE | STATE LAKE |
| CLEMSON UNIVERSITY | HWY 78 | BLACKVILLE | BARNWELL | 0.115 | 86-00-00-014 | SHRUB BRANCH CHURCH | | |
| NATURAL RESOURCES, SC DEPARTMENT OF | LONG BRANCH BAY | BARNWELL | BARNWELL | 50.9 | 51-00-00-086 | HERITAGE PRESERVE | HERITAGE PRESERVE | HERITAGE PRESERVE |
| EDUCATIONAL TELEVISION NETWORK, SC | 123 ED CORTEZ LANE | BARNWELL | BARNWELL | 26.67 | 057-00-00-049 | TRANSMITTER SITE - WEBA | TRANSMITTING FACILITY | TRANSMITTING FACILITY |
| NATURAL RESOURCES, SC DEPARTMENT OF | HWY 78 | BARNWELL | BARNWELL | 180 | 029-00-00-011 | DITCH POND | HERITAGE PRESERVE | HERITAGE PRESERVE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 6.8 | | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 8.5 | | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 3.6 | | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 0.31 | | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 0.06 | | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | A SANDERS LAND | BARNWELL | BARNWELL | 1 | 094-00-00-012 | | WELL SITE | WELL SITE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 3.3 | 072-08-01-006 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN | BARNWELL | BARNWELL | 0.1 | | | STATE LAKE | STATE LAKE |

| Agency Name | Location \ Address | City | CountyName | Acres | Tax Map # | Notes | Current Use | Projected Use |
|---|---|---|---|---|---|---|---|---|
| NATURAL RESOURCES, SC DEPARTMENT OF | LAKE EDGAR BROWN - LAKE RD | BARNWELL | BARNWELL | 46.9 | 072-07-01-002 | | STATE LAKE | STATE LAKE |
| NATURAL RESOURCES, SC DEPARTMENT OF | TIMBER CO LAND | BARNWELL | BARNWELL | 1 | | | WELL SITE | WELL SITE |
| MENTAL HEALTH, SC DEPARTMENT OF | 916 REYNOLDS RD, BARNWELL SC 29812 | BARNWELL | BARNWELL | 0.77 | 72-11-06-008 | AIKEN- BARNWELL MENTAL HEALTH CENTER | POLLY BEST CLINIC | POLLY BEST CLINIC |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK | BLACKVILLE | BARNWELL | 4.6 | 106-00-00-004 | | STATE PARK | STATE PARK |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK | BLACKVILLE | BARNWELL | 43.3 | 106-00-00-004 | | STATE PARK | STATE PARK |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK - SC HWY #9 | BLACKVILLE | BARNWELL | 167.94 | 106-00-00-004 | | STATE PARK | STATE PARK |
| PARKS, RECREATION & TOURISM, SC DEPARTMENT OF | BARNWELL STATE PARK | BLACKVILLE | BARNWELL | 31.35 | 106-00-00-004 | | STATE PARK | STATE PARK |
| BUDGET & CONTROL BOARD-GENERAL SERVICES | NORTH OF SNELLING CITY LIMITS | SNELLING | BARNWELL | 18.5 | 037-01-00-001 | CHEM NUCLEAR DUMP - | OTHER - INDUSTRIAL | OTHER - INDUSTRIAL |
| BUDGET & CONTROL BOARD-GENERAL SERVICES | NORTH OF SNELLING CITY LIMITS | SNELLING | BARNWELL | 208.063 | 037-01-00-001 | CHEM NUCLEAR DUMP - | OTHER - INDUSTRIAL | OTHER - INDUSTRIAL |
| TRANSPORTATION, SC DEPARTMENT OF | 2000 FULLER ST | BARNWELL | BARNWELL | 3.27 | 073-10-01-026 | MAINTENANCE SHOP | MAINTENANCE COMPLEX | MAINTENANCE COMPLEX |
| NATURAL RESOURCES, SC DEPARTMENT OF | FISH HATCHERY - HWY #64 | BARNWELL | BARNWELL | 0.25 | 072-10-06-041 | | FISH HATCHERY | FISH HATCHERY |
| DENMARK TECHNICAL COLLEGE | 2030 ELLINGTON RD | BARNNWELL | BARNWELL | 4.01 | 072-09-04-004 | PROVIDE ACADEMIC SUPPORT FOR THE BARNWELL POPULATION, BUSINESS AND INDUSTRY | PROGRAM/ACADEMIC | PROGRAM/ACADEMIC |
| PUBLIC SAFETY, SC DEPARTMENT OF | 1270 MAIN STREET | BARNWELL | BARNWELL | 0.987 | | DMV & HIGHWAY PATROL (25%) | OFFICE | OFFICE |

Records:   **51**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 2 0 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 2 0 2011

CLERK

**Exhibit 4**

**Affidavit of Suzanne L. Dahl-Crumpler**

11-1271

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

USCA Case #11-1271     Document #1321792     Filed: 07/29/2011     Page 84 of 197

JUL 2 9 2011

**RECEIVED**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

JUL 2 9 2011

**CLERK**

NO. ___11-1271___

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

In Re:  AIKEN COUNTY, SOUTH CAROLINA; ROBERT L. FERGUSON; WILLIAM LAMPSON; GARY PETERSEN; STATE OF SOUTH CAROLINA; STATE OF WASHINGTON; NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS; NYE COUNTY, NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory Commission, Respondents.

## AFFIDAVIT OF SUZANNE L. DAHL-CRUMPLER

I, SUZANNE L. DAHL-CRUMPLER, swear and affirm under penalty of perjury that the following is true and correct.

1.  I am now, and at all times mentioned have been a citizen of the United States, and am a resident of the State of Washington, over the age of eighteen years, competent to make this affidavit, and make this affidavit from my own personal knowledge, judgment, and professional experience.

2.  I am and have been employed by the State of Washington, Department of Ecology (Ecology), Nuclear Waste Program, for 16 years, beginning in July 1995.  I have a Bachelor of Science in Geology and a Masters of

Science in Hydrogeology from Baylor University in Waco, Texas. I have over 20 years of experience in issues related to environmental cleanup, Resource Conservation and Recovery Act (RCRA) implementation, Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) implementation, ground water and fate and transport, risk assessments, and National Environmental Policy Act (NEPA) analysis.

    3.    As an employee of Ecology, I have worked on environmental compliance and cleanup issues related to the Department of Energy's (DOE) Hanford Nuclear Reservation since 1995.

    4.    I am currently the Nuclear Waste Program's Tank Waste Treatment Section Manager. I have worked in this position for over 2 years. Prior to that, I was the Nuclear Waste Program's Tank Waste Disposal Project Manager and Tank Waste Project Manager for approximately 12 years. In the past, Ecology had all Hanford tank waste issues in one project, which I managed. This included managing issues related to Hanford tank safety resolution, interim stabilization, tank farm operations, tank waste characterization, tank farm upgrades, tank waste retrieval, tank farm closure, characterization of the vadose zone and groundwater beneath the tanks, tank waste treatment, and tank waste disposal and storage after treatment. In my present position, I manage issues related to half of the entire Hanford tank program, which includes tank waste characterization, tank waste

2

treatment, and treated tank waste disposal and storage. Currently I supervise 16 people who work on tank waste treatment and disposal issues.

5.    I currently serve as the Nuclear Waste Program's management lead for issues related to DOE's development of the Draft Hanford Tank Closure Waste Management EIS, on which Ecology is a cooperating agency. During the 1995-97 time frame, I was involved as a key person in developing the Hanford Tank Waste Remediation System EIS (referenced further below), which Ecology co-authored with DOE.

6.    For approximately the last decade, I have served as Ecology's expert on high level waste issues. I have interacted with the Nuclear Regulatory Commission (NRC) and National Academy of Sciences on a number of occasions with respect to the classification of the low-activity waste derived from treating high-level waste, and in the possible disposal of "tank heels" that cannot be retrieved from tanks containing high-level waste.

7.    In this affidavit, I will describe the Hanford site; Hanford's high-level radioactive tank waste; Hanford's current system for storing that tank waste; the regulatory status of that tank waste; the current plan for treating and disposing of tank waste (including that plan's interrelationship with the Yucca Mountain project); and other spent nuclear fuel and high-level waste at Hanford and within Washington.

## A.     Hanford Description

8.     Hanford is part of the nationwide complex that was used in the production of plutonium for nuclear weapons.  The federal government selected the site in the early 1940s as part of the Manhattan Project.  It was used extensively throughout the Cold War for the production of weapons-grade plutonium.  Weapons production at Hanford ended in 1989, when the mission of the site was changed to cleanup.

9.     Hanford structures include nine inactive reactors along the Columbia River, five inactive chemical reprocessing facilities in the central plateau, several spent nuclear fuel storage basins along the Columbia River, the Plutonium Finishing Plant, fuel fabrication facilities, large underground storage tanks located on the central plateau, and many miscellaneous small underground storage tanks.

10.     From December 1944 to 1989, Hanford produced about two-thirds of the nation's weapons-useable plutonium.  This was accomplished by irradiating uranium fuel in production reactors located along the Columbia River.  The irradiated fuel was then chemically dissolved in separations plants.  Plutonium 239 was then processed into metallic oxide form for shipment to other DOE sites for finishing and placement in weapons.  Useable uranium extracted in the separations process was recycled into new reactor fuel.

4

11.     The chemical separations plants used varying processes over time. All produced a highly acidic and highly contaminated liquid waste stream that was directed into large underground storage tanks after the waste was neutralized by making the solutions strongly basic.  This waste stream ("tank waste") remains at the Hanford site today, with a current volume of approximately 56 million gallons. It is the focus of an ongoing multi-billion dollar cleanup effort, with severe and irreversible environmental consequences hanging in the balance.  Because of the nature of the waste and the way it is currently being stored, the cleanup effort is a series of interrelated and interdependent actions, the final piece of which is disposal of immobilized high-level radioactive waste at a deep geologic repository.  I will describe these particulars below.

**B.     Description of Hanford's Tank Waste**

12.     The radioactive and chemical make up, volume, and consistency of Hanford's tank waste is heterogeneous.  It is the product of various processing approaches, the neutralization of the waste with large volumes of sodium hydroxide intended to make the waste compatible with the carbon steel tanks, evaporation campaigns conducted to reduce the volume of waste, and additional reprocessing to recover uranium, cesium, and strontium.  The neutralization of waste was done by adding large amounts of sodium hydroxide, which caused the waste to be highly basic and to separate into different

5

radioactive and chemical layers. The evaporation campaigns caused the waste to precipitate and reduce the physical volume, and the various processing and reprocessing approaches added various chemicals to the waste. The tank waste thus varies widely in physical form from tank-to-tank and within tanks themselves, taking on the forms of vapor, supernate liquid, slurry, sludge, and saltcake with interstitial liquid.

13.    Hanford's tank waste can best be described as a witch's brew of a wide range of chemicals and radioactive elements. The waste contains at least 46 identified radionuclides. Because these radionuclides are the result of reprocessing spent nuclear fuel, tank waste is presumptively considered high-level waste under Nuclear Waste Policy Act unless key radionuclides are removed in sufficient concentrations to allow the separated waste to be disposed in something other than a deep geologic repository.

14.    In addition, Hanford's tank waste includes at least 26 hazardous waste constituents, including heavy metals and volatile organic compounds. All of these constituents are potentially harmful to human health and the environment. Because of the presence of these hazardous waste constituents, the State of Washington regulates Hanford tank waste as "mixed waste" under Washington's Hazardous Waste Management Act (HWMA), Chapter 70.105 Wash. Rev. Code, and the HWMA's implementing Dangerous Waste Regulations (Wash. Admin.

Code [WAC] 173-303). This regulation, in turn, is part of a state hazardous waste program authorized to stand in lieu of federal hazardous waste law under RCRA, 42 U.S.C. § 6926(b). *See* 51 Fed. Reg. 3,782 (1986); 52 Fed. Reg. 35,556 (1987); 55 Fed. Reg. 33,695 (1990); 59 Fed. Reg. 55,322 (1994); and 61 Fed. Reg. 7,736 (1996).

15.    All of Hanford's tank waste is considered by Washington to be "land disposal restricted" waste under RCRA and the HWMA. As a result, it must be treated to specified land disposal restriction standards before disposal. WAC 173-303-140(2)(a) (incorporating by reference 40 C.F.R. § 268.1(b)). However, due to the nature of the radioactive constituents in the waste, there is currently no treatment capacity for tank waste at Hanford. The tank waste instead continues to be stored in violation of the prohibition on storing land disposal restricted waste under the HWMA and RCRA. WAC 173-303-140(2)(a) (incorporating by reference 40 C.F.R. § 268.50).

16.    The 56 million gallons of waste in Hanford tank systems accounts for 60 percent of the high-level waste DOE is responsible for nationwide. This is an enormous quantity of waste. As a visual aid, DOE's own documents estimate that if the contents of the tanks were placed within an area with the footprint the size of a football field, they would form a column of high-level waste 150-feet tall.

## C.    Description of the Hanford Tank Waste System

17.    Currently, Hanford's tank waste is largely being stored in 177 underground tanks located in the central portion of the Hanford site. The tanks are grouped in 18 areas or "farms." A tank farm can contain from 2 to 18 tanks with associated pipes, valve pits, and diversion boxes.

18.    Of the 177 tanks, 28 are double-shell tanks (DSTs) that currently comply with RCRA and HWMA standards for hazardous waste tanks. The DSTs are buried beneath about seven feet of soil.

19.    The remaining 149 tanks are single-shell tanks (SSTs). These tanks were constructed between 1944 and 1964 with an expected operating life of approximately 25 years. The SSTs currently hold approximately 30 million gallons of tank waste. The SSTs are buried beneath 6-11 feet of soil.

20.    All 149 SSTs have been identified to the State of Washington by DOE as "unfit for use" pursuant to RCRA and the HWMA (40 C.F.R. § 265.191, incorporated by reference in WAC 173-303-400(3)). *Single Shell Tank System Integrity Assessment Report*, RPP-10435, Revision 0 (June 27, 2002) and transmittal letter from James E. Rasmussen, Energy Office of River Protection, to Michael Wilson, Department of Ecology.

21.    An additional significant part of the tank system is the ancillary equipment and the tank waste in that portion of the system. Hanford has the most

8

extensive ancillary equipment system in the nation, and perhaps the world. The ancillary equipment includes 145 miles of pipelines, 61 miscellaneous tanks, 6 vaults, 72 diversion boxes, 26 valve pits, 349 tank pits, 49 other pits, 3 evaporators, and 10 other above ground facilities. The ancillary equipment currently holds a significant portion of high-level waste near the surface (as much as an additional 2.5 million gallons).

22.     Near-term action is necessary to retrieve Hanford's tank waste. Numerous Energy documents state that 67 of the 149 SSTs are "known or suspected leakers." *See, e.g., U.S. Department of Energy, Office of River Protection 2-Year Progress Report to Congress*, DOE/ORP-2000-27 (Dec. 2000). The first known leakers were tanks TY-106 and U-101 in 1959. Tank T-106 is listed as having leaked the largest known quantity of waste, 115,000 gallons. Five of the 67 leakers suffered catastrophic failures, defined as either structural failure or loss of 50,000 gallons or more. There are seven tanks that have leaked between 20,000 and 50,000 gallons: C-101, S-104, SX-106, SX-108, TY-105, TY-106, and U-101. There is at least one known or suspected leaker in each tank farm, and 8 of the 12 SST farms contain more than 5 known or suspected leakers. Taken together, the SSTs have leaked an estimated total of approximately 1 million gallons of high-level mixed waste into surrounding soils.

9

23.     These leaks from tanks and associated ancillary equipment have resulted in vadose zone contamination at high concentrations, and some past leaks are already impacting groundwater at levels significantly above drinking water standards in these areas. There is future risk to the public as these contaminants move away from the tank farm areas. Many of the contaminants will be pervasive in the environment for thousands of years to come. It is clear that in some cases, remedial actions will be needed to protect human health and environment from just the past tank leaks alone. USDOE currently controls the land surface within the Hanford Site and by default the use of the groundwater directly below. However, in the future (300 – 3000 years from now), it is likely that this land and associated groundwater will be available for multiple uses and that during that time the groundwater will continue to be contaminated by tank waste. The Columbia River, which is a water source for municipal, agricultural, and industrial uses in south-central Washington, flows through or is contiguous to the Hanford Site on the north and east. Contaminants from past leaks that have migrated to the soil and the groundwater are present in high enough concentrations that it is possible they could migrate to the Columbia River and be present adjacent to the river in concentrations above acceptable limits.

24.     The State of Washington is the proprietor of all groundwater and surface water within the State, including the groundwater beneath the Hanford

10

Site and the surface water within the Columbia River. *See* Wash. Rev. Code § 90.03.010 (2010). The Columbia River (and the Hanford Site generally) support a variety of aquatic and terrestrial life, including salmon, in which the State of Washington maintains an interest. The State owns or controls land contiguous to or in the vicinity of the Hanford Site, including lands managed by the Washington Department of Fish & Wildlife directly abutting the Hanford Site; State Highway 240 (which runs through the Hanford Site); and State Highways 14, 24, and 224. The State has a direct and tangible interest in the health, safety, and welfare of its citizens, and of the lands, air, and waters of the State, which are threatened by tank waste stored at Hanford.

25.    Further leaks could occur in the future from both DOE's SST and DST systems. Today, the average SST is 43 years past its design life. As DOE has admitted, future tank failures can be expected as the SSTs exceed their design lives by longer and longer periods. Such leaks may occur during retrieval, and from infiltration of rainwater resolubilizing the tank waste and moving it out the bottom of the tanks or from associated ancillary equipment. In addition, some of the DSTs have exceeded or are approaching the end of their design life and by 2028, most will be at the end of their design life. Future failures in the DSTs can be expected as more of the tanks exceed their design life. For its own planning

purposes, DOE has assumed that one DST may fail in 2017 and one additional DST will fail every five years thereafter.

**D.     Regulatory Status of Tank Waste Retrieval, Treatment, and Disposal**

26.     To address Hanford's multiple environmental compliance issues, including prolonged storage of high-level waste, the Environmental Protection Agency, and DOE entered into the Hanford Federal Facility Agreement and Consent Order (HFFACO) in 1989.   Among other things, the HFFACO is a compliance order issued pursuant to RCRA and HWMA.   HFFACO Article I. The HFFACO establishes numerous milestones (schedules and associated regulatory requirements) for cleanup of the Hanford site and for bringing Hanford facilities into compliance with applicable requirements.

27.     These HFFACO milestones include requirements for retrieving waste from and closing the unfit-for-use SST system and for treating all of Hanford's tank waste to meet RCRA/HWMA land disposal treatment standards.   Currently, the HFFACO requires that DOE retrieve high-level waste from all 149 of Hanford's SSTs by 2018 and that it complete the treatment of that waste by 2028.

28.     In November 2008, Washington filed suit against the Secretary of Energy and DOE alleging that DOE had missed, or was certain to miss, HFFACO milestones for retrieving waste from SSTs (including the 2018 end date), for constructing and initiating a Waste Treatment Plant (WTP) to begin treating

12

Hanford's tank waste, and for completing treatment of all of Hanford's tank waste by 2028. *Washington v. Chu*, No. CV-08-5085-FVS (U.S.D.C., Eastern District of Washington). A settlement of this case was reached between Washington and DOE, under which a consent decree has been entered with the district court to govern SST retrieval, WTP construction, and WTP initial operations from the present-to-approximately 2022 timeframe. In addition, the HFFACO has been modified to, among other things, extend the current SST retrieval end date to no later than 2040 and extend the current tank waste treatment end date to no later than 2047.

29.    As mentioned above, accomplishing this work—and averting severe environmental consequences—is keyed on a number of interrelated and interdependent actions. In short, retrieving waste from Hanford's SSTs is currently tied to the construction and operation of the WTP complex. The WTP complex, in turn, is being designed and constructed to meet performance standards specific to the Yucca Mountain repository.

**E.    Plan for Treating and Disposing of Tank Waste**

30.    Hanford lacks sufficient compliant (DST) storage capacity to allow for the continued uninterrupted retrieval of waste from all of Hanford's SSTs. In fact, there is currently insufficient capacity to allow for the transfer of more than a limited amount of the waste now stored in the SSTs. To date, DOE's strategy for

13

addressing this situation has been to by and large rely on the prospective future treatment capacity of the WTP to remove waste from the DST and SST systems. DOE has expected that over time, this will free up DST capacity, which in turn will allow for the continued transfer of waste retrieved from the SSTs to the DSTs.

31.   Under this strategy, the WTP is the lynchpin for completing the Hanford tank waste mission.  It is vital to both treating tank waste in satisfaction of RCRA/HWMA treatment standards and creating the "throughput" necessary to allow SSTs to continue being retrieved.

32.   The WTP is a $12.3 billion facility, with several major facilities and ancillary support components.  Currently, approximately $7.1 billion has already been expended.  This includes design, engineering, construction, management costs, and fees.

33.   The WTP will consist of four major components: the Pretreatment Facility; the Low Activity Waste Vitrification Facility; the High Level Waste Vitrification Facility; and the Analytical Laboratory (LAB).

34.   The Pretreatment (PT) Facility will separate radioactive tank waste into high-level waste and low-activity waste fractions and transfer each waste type to the respective vitrification facility for immobilization.  As of July 2011, overall PT Facility completion is at 48 percent; engineering and design is 77 percent

14

complete, and construction is 37 percent complete. The budget for this component of the WTP is $5.2 billion, with $2.8 billion having already been expended.

35.    The Low-Activity Waste (LAW) Facility will vitrify low-activity waste from the PT Facility. Waste will be mixed with glass formers, vitrified into glass at an average daily rate of 30 metric tons, and placed in stainless-steel containers that will be disposed on site in the Integrated Disposal Facility. As of July 2011, overall LAW Facility completion is at 65 percent; engineering and design is 88 percent complete, and construction is 64 percent complete. The budget for this component of WTP is $2.07 billion, with $1.47 billion already having been expended.

36.    The High-Level Waste (HLW) Facility will receive the high-level waste fraction from the PT Facility. The concentrate is sampled and analyzed to determine the optimum blend of glass formers to add to the waste that will produce a vitrified waste form that is compliant with disposal requirements as outlined in the *Waste Acceptance System Requirements Document,* Revision 5, May 31, 2007, (WASRD) and other relevant documents, and also meets the required production rates. As of July 2011, overall HLW Facility completion is at 54 percent; engineering and design is 85 percent complete, and construction is 35

15

percent complete. The budget for this component of the WTP is $3.07 billion, with $1.84 billion having already been expended.

37.    The Analytical Laboratory (LAB) will support WTP operations by analyzing feed, vitrified waste, and effluent streams. As of July 2011, overall LAB completion is at 46 percent; engineering and design is 78 percent complete; construction is 63 percent complete. The budget for this component of the WTP is $.741 billion, with $.418 billion having already been expended.

38.    Upon the conclusion of treatment, the WTP will produce two output streams. The bulk of the chemicals and some of the radioactive elements will be captured in the low-activity fraction (10 percent of the radioactivity and 90 percent of the volume) and vitrified as Immobilized Low Activity Waste (ILAW). ILAW will be disposed on the Hanford site at a facility called the Integrated Disposal Facility. This facility is already constructed.

39.    The remaining high-level radioactive fraction (90 percent of the radionuclides and 10 percent of the volume) will be vitrified as Immobilized High Level Waste (IHLW). As further outlined below, Washington and DOE have presumed and planned for IHLW to be disposed of in a deep geologic repository.

40.    From the beginning, the WTP treatment approach was developed in consideration of the Nuclear Waste Policy Act. The current basis for ILAW to be disposed in near surface facilities, rather than a deep geologic repository licensed

16

by NRC, comes from a series of technical letters between DOE and the NRC in the 1980s and 1990s. These letters defined that ILAW disposal at Hanford can proceed if, among other things, tank wastes have been processed to remove key radionuclides to maximum extent technically and economically practical based on specific pretreatment, with vitrification of the low activity fraction. The remaining high level fraction was always assumed to require disposal in a deep geologic repository.

41. This exchange informed development of the 1996 Tank Waste Remediation System (TWRS) EIS and its associated Record of Decision (ROD). The TWRS ROD determined that the tank waste would be treated to generate separate low-activity waste and high-level waste outputs. It further indicated that the high-level waste output, in which the bulk of the radionuclides would be concentrated, would be disposed of offsite in a national geologic repository to permanently isolate the wastes from humans and the environment to the greatest extent practicable and provide for protection of public health and the environment. Attachment 1 (62 Fed. Reg. 8693) at 8693-95, 8698-700.[1] By act of Congress, this repository is currently sited at Yucca Mountain, Nevada.

---

[1] Attached hereto as Attachment 1 is a true and correct copy of the Record of Decision for the Tank Waste Remediation System, Hanford Site, Richland Washington, 62 Fed. Reg. 8693 (Feb. 26, 1997).

17

42.    DOE's subsequent planning documents also assume Hanford's IHLW among the inventories destined for the Yucca Mountain repository. For example, the *Final Environmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada* (February 2002) (YM FEIS) assumes IHLW inventories ranging from 8,315 canisters to 22,280 canisters generated from the WTP.  This is approximately 63% of the high-level waste planned for disposal at the repository.  Attachment 2 (YM FEIS, Vol. 2, App. A, Section 1.1.4.1) at A-8.[2]

43.    Based on this key planning assumption, the WTP has and is being designed and constructed to satisfy performance standards specific to the Yucca Mountain facility.   DOE's contract to provide design, engineering, and construction services for the WTP facilities specifies that DOE's WASRD is a "primary requirements reference" for the contract's statement of work. Attachment 3 (WTP Contract at Section C, Item 1.2.1.3) at C-100.[3]  The contract further specifies that the WTP and its IHLW output must meet key performance measures defined by the WASRD, including (but not limited to):

_____

[2] Attached hereto as Attachment 2 are true and correct copies of relevant experts from the YM FEIS.
[3] Attached hereto as Attachment 3 are true and correct copies of relevant excerpts of the WTP Contract DE-AC-AC27-01RV14136 (WTP Contract).

18

- As a general requirement, IHLW must meet the requirements established in the WASRD. Attachment 3 (Item 1.2.2.1.1, Product and Disposal Requirements) at C-101.

- Specific dimensional requirements of the canister system, to accommodate the final waste-form disposal at the repository. Attachment 3 (Item 1.2.2.1.2, Canister System) at C-101.

- Specific weight percent in IHLW of 25 components. Attachment 3 (Table TS-1.1, Minimum component Limits in High-Level Waste Glass) at C-102.

- Sampling and analysis requirements must support process control, environmental compliance and waste form qualification for DOE approval, based on the WASRD and other source documents. Attachment 3 (Item (18), Analytical Laboratory Facility Design) at C-50.

44.    The WASRD document, in turn, establishes the waste acceptance technical requirements for DOE's Civilian Radioactive Waste Management System, which manages waste destined for disposal at the Yucca Mountain repository. The WASRD is "the agreed upon reference source of waste acceptance criteria to which Federal Waste Custodians must conform for their wastes to be received by the repository." Attachment 4 (WASRD, Section 1.1) at 1.[4] Among other matters, the waste acceptance elements of the WASRD have been developed to specifically comply with the "applicable provisions of 10 CFR Part 63, 'Disposal of High-Level Radioactive Wastes in a Geologic Repository at

---

[4] Attached hereto as Attachment 4 are true and correct copies of relevant experts from the *Waste Acceptance System Requirements Document,* Revision 5, May 31, 2007 (WASRD).

Yucca Mountain, Nevada.' " Attachment 4 (WASRD, Section 3.1) at 9. For example, the WASRD specifies high-level waste requirements to satisfy Yucca Mountain-specific standards in the following areas:

- Durability and Phase Stability of Vitrified HLW
- HLW Canister Design and Materials of Construction
- Dimensional Envelope for HLW Canisters
- Filled HLW Canister Weights
- Capability to Lift HLW Canisters Vertically with Remote Handling Fixtures
- HLW Canister Sealing
- HLW Canister Labeling
- HLW Canister Drop
- Free Liquid in Canisters Containing HLW
- Radionuclide Content in High-Level Waste
- Criticality Potential in Canisters Containing HLW
- HLW Canister Surface Contamination
- Thermal Output in Canisters Containing HLW

Attachment 4 (WASRD, Section 4.8) at 30-33. In short, the WTP is being built to produce IHLW that conforms to the Yucca Mountain-specific standards established by the NRC in 10 C.F.R. pt. 63.

45.    Given the degree to which the WTP design and construction is tied to performance standards specific to Yucca Mountain, termination of the Yucca Mountain project would create significant uncertainty in Hanford's tank waste treatment and disposal mission. Due to the overall completion status of WTP (overall completion is at 59 percent; design and engineering is 82 percent complete, construction is 56 percent complete, and start-up and commissioning is

20

13 percent complete), the ability to alter design and construction of the complex is significantly foreclosed. The systems and components of the PT Facility, HLW Facility, and LAB are sufficiently complete to support the processing of high-level waste to meet disposal requirements outlined in the WASRD and other relevant documents. If the Yucca Mountain repository is terminated, significant regulatory, administrative, and technical issues will have to be revisited at Hanford. This could result in a construction tear-down and rebuild of the WTP to accommodate design and engineering changes necessary to meet another repository's waste acceptance criteria, with significant impacts to cost, scope, and the legally-binding compliance schedule overseen by Washington. Absent such changes, IHLW produced to satisfy Yucca Mountain-specific standards could become stranded at Hanford.

46.    Termination (or significant delay) of the Yucca Mountain project would have other effects at Hanford. For the last several years, the plan for storing IHLW at Hanford has been to build a single integrated storage and shipping facility with only enough capacity to service a "just in time" approach that links IHLW production with interim storage and shipping. If a deep geologic repository is terminated or significantly delayed, DOE has indicated that a total of five IHLW storage facilities will need to be built to contain approximately 12,000 IHLW canisters. Attachment 5 (Draft TC&WM EIS, Readers Guide) at 5, Table 4

21

at 22.[5]  Once vitrified, IHLW is not amenable to any further reprocessing.  If the waste was to remain stored at Hanford past the design life of the interim IHLW storage facilities (60 years), further replacement interim IHLW storage facilities would need to be constructed.  Attachment 5 (Draft TC&WM EIS, Readers Guide) at 11.

**F.    Other Hanford Spent Nuclear Fuel and High-Level Waste**

47.    In addition to the tank waste described above, there are more than 2,000 metric tons of spent nuclear fuel currently being stored at Hanford and assumed by DOE for disposal at the Yucca Mountain repository.  Attachment 2 (YM FEIS, Vol. 2, App. A, Section A.2.2.3, Table A-20) at A-27.  This amount includes not only spent fuel, but fuel that is failed and broken in various stages of decay (e.g., sludge form) after years of storage in cooling basins.  Termination (or significant delay) of the Yucca Mountain project would affect the disposition of this waste.

48.    Further, there are 1,335 capsules of cesium and 601 capsules of strontium currently stored at Hanford in the Waste Encapsulation Storage Facility.  These capsules are considered high-level waste and must be disposed of in a deep

---

[5] Attached hereto as Attachment 5 are true and correct copies of relevant experts from the *Draft Tank Closure and Waste Management Environmental Impact Statement for the Hanford Site, Richland, Washington* (Draft TC&WM EIS) (Oct. 2009).

geologic repository. DOE has included the capsules in the Hanford IHLW inventory destined for the Yucca Mountain repository described in Paragraph 41 above. The current plan is to either vitrify the capsules through the WTP (adding 340 IHLW canisters to the WTP's output), or find a way to ship them directly to a deep geologic repository. If additional canisters from the WTP are produced, the canisters would also need to be interim stored before being shipped to the repository. Without a deep geologic repository, Hanford and Washington are faced with indefinite long term storage of spent nuclear fuel, cesium and strontium capsules, and IHLW without a final disposal path identified. Termination (or significant delay) of the Yucca Mountain project would affect the disposition of this waste.

49. To the best of my knowledge, no final EIS prepared under NEPA analyzes the Hanford related impacts outlined in Paragraphs 44-47 above in the event the Yucca Mountain project is terminated or significantly delayed.

50. In its current *Draft Tank Closure and Waste Management Environmental Impact Statement for the Hanford Site, Richland, Washington*, DOE references termination of the Yucca Mountain project and the need to comply with NEPA before making decisions on alternatives to Yucca Mountain:

> *Notwithstanding the decision to terminate the Yucca Mountain program*, which was the development of a geologic repository for the disposal of HLW and SNF, DOE remains committed to meeting its

23

obligations to manage and ultimately dispose of HLW and SNF. The Administration intends to convene a blue ribbon commission to evaluate alternative approaches for meeting these obligations. *Decisions reached through this process will need to be addressed at a later date subject to appropriate NEPA review.*

Attachment 5 (Draft TC&WM EIS, Summary) at S-13.

51.    Finally, I am aware that approximately 581 metric tons of spent nuclear fuel (projected) is being stored at the Columbia Generating Station, a commercial nuclear power facility operated by Energy Northwest on land leased within the Hanford Reservation.   DOE has included this waste among the inventories destined for the Yucca Mountain repository.  Attachment 2 (YM FEIS, Vol. 2, App. A, Section A.1.1.4.1 Table A-7) at A-15. Termination (or significant delay) of the Yucca Mountain project would thus presumptively affect the disposition of this waste.

DATED this _27_ day of July 2011, in Richland, Washington.

SUZANNE L. DAHL-CRUMPLER

Subscribed and sworn to before me on _July 27, 2011_____ by Suzanne L. Dahl-Crumpler.



Notary Public in and for the State of Washington, residing at _Benton County_ .
My appointment expires _09-20-2012_ .

24

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED  JUL 29 2011

CLERK

Exhibit 5

**Affidavit of the Honorable Phyllis Reha
NARUC Member Commissioner**

11-1271

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

Document #1321792     Filed: 07/29/2011

JUL 29 2011

RECEIVED


UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

CLERK

CASE NO. _____ 11-1271

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

In Re: AIKEN COUNTY, ROBERT L. FERGUSON, WILLIAM
LAMPSON, GARY PETERSEN, STATE OF SOUTH CAROLINA,
STATE OF WASHINGTON, NATIONAL ASSOCIATION OF
REGULATORY UTILITY COMMISSIONERS, NYE COUNTY,
NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and
GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory
Commission, Respondents.

## PETITION FOR WRIT OF MANDAMUS
## (AGENCY ACTION UNREASONABLY WITHHELD)

## AFFIDAVIT OF THE HONORABLE PHYLLIS REHA,
## NARUC MEMBER COMMISSIONER,
## IN SUPPORT OF THE STANDING OF
## THE NATIONAL ASSOCIATION OF REGULATORY UTILITY
## COMMISSIONERS

Phyllis Reha, being duly sworn, states as follows:

1.    My name is Phyllis Reha.  I have been a Commissioner on the

Minnesota Public Utilities Commission and a voting member of the National

Association of Regulatory Utility Commissioners (NARUC) since May

2001.  I am also currently a member of the NARUC Committee on Energy

Resources and the Environment and NARUC's Subcommittee on Clean

Coal and Carbon Sequestration. I am also Co-Chair of the FERC/NARUC Collaborative on Smart Response and Co-Chair of the Consumer Information and Behavior Workgroup for the State Energy Efficiency Action Network (SEE Action). I also serve on the Advisory Councils of the New Mexico State University Center for Public Utilities, The National Council on Electricity Policy, and the Financial Research Institute of the University of Missouri.

2.    I receive official mail at the offices of the Minnesota Public Utilities Commission (121 7th Place East, Suite 350, Saint Paul, MN 55101), which is located approximately 31 miles from the Prairie Island Nuclear Generating Plant.

3.    NARUC, founded in 1889, includes as members commissioners at regulatory agencies in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands. These State government employees are charged with regulating the rates and conditions of service associated with the intrastate operations of electric, natural gas, water, and phone utilities.

4.    NARUC is *sui generis* and recognized by Congress in several statutes[1] and <u>consistently by this and other Article III Courts</u>[2] as well as a host of federal agencies, including the Nuclear Regulatory Commission Atomic Safety and Licensing Board,[3] as the proper entity to represent the collective interests of State utility commissions.    But even discounting NARUC's unique status, the association qualifies to represent its members under the law of this circuit permitting association petitions when (1) at least one of the association's members has standing to sue in its own right; (2) the interests the association seeks to protect are germane to its purpose; and (3)

---

[1]    <u>See</u> 47 U.S.C. § 410(c) (1971) (Congress designated NARUC to nominate members of Federal-State Joint Board to consider issues of common concern); <u>See also</u> 47 U.S.C. § 254 (1996); <u>See also</u> *NARUC, et al. v. ICC*, 41 F.3d 721 (D.C. Cir 1994) (where this Court explains "Carriers, to get the cards, applied to…(NARUC), an interstate umbrella organization that, as envisioned by Congress, played a role in drafting the regulations that the ICC issued to create the "bingo card" system.)

[2]    <u>See</u>, <u>e.g.</u>, *United States v. Southern Motor Carrier Rate Conference, Inc.*, 467 F. Supp. 471 (N.D. Ga. 1979), <u>aff'd</u> 672 F.2d 469 (5th Cir. 1982), <u>aff'd en banc</u> <u>on reh'g</u>, 702 F.2d 532 (5th Cir. 1983), <u>rev'd</u> <u>on other grounds</u>, 471 U.S. 48 (1985) (where the U.S. Supreme Court notes: "The District Court permitted . . . (NARUC) . . . to intervene as a defendant. Throughout this litigation, the NARUC has represented the interests of the Public Service Commission's of those States in which the defendant rate bureaus operate." 471 U.S. 52, n. 10. <u>See also</u>, *Indianapolis Power and Light Co. v. ICC*, 587 F.2d 1098 (7th Cir. 1982); *Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir. 1976); <u>Compare</u>, *NARUC v. Federal Energy Regulatory Commission*, 475 F.3d 1277 (D.C. Cir. 2007); *NARUC v. DOE*, 851 F.2d 1424, 1425 (D.C. Cir. 1988); *NARUC v. Federal Communications Commission*, 737 F.2d 1095 (D.C. Cir. 1984), <u>cert. denied</u>, 469 U.S. 1227 (1985).

[3]    Atomic Safety and Licensing Board *Memorandum and Order* (Granting Intervention to Petitioners and Denying Withdrawal Motion), LBP-10-11, *In the Matter of U.S. Department of Energy (High Level Waste Repository)* Docket No. 63-001-HLW; ASLBP No. 09-892-HLW-CABO4, <u>mimeo</u> at 31 (June 29, 2010) ("We agree with NARUC that, because state utility commissioners are responsible for protecting ratepayers' interests and overseeing the operations of regulated electric utilities, these economic harms constitute its members' injury-in-fact.")

neither the claim asserted nor the relief requested requires the associations' members to participate in the lawsuit.[4]

5.     NARUC meets every element of the *Waukesha* test. It is clear that participation of NARUC's members is not required in this suit. Moreover, there is no question that the interests NARUC seeks to protect in this appeal are germane to the association's purpose. In February 2010, NARUC passed a *"Resolution on National Policy for Management and Disposal of Spent Fuel from Commercial Nuclear Power Plants."* A copy of the resolution is attached. That resolution, *inter alia*, [1] points out that "NARUC and State utility commissions as stakeholders in the disposal policy on behalf of ratepayers—who continue to bear the ultimate cost of the fee payments to the Fund—should play an active role in representing their views to the Blue Ribbon Commission, drawing upon the multiple NARUC nuclear waste policy resolutions adopted over the past 25 years," and [2] specifically suggests "suspension of Nuclear Waste Fund fee payments unless and until a revised program is agreed upon or the Yucca Mountain Project is fully restarted." During my tenure as a Commissioner (and member of NARUC)

---

[4]      *City of Waukesha v. EPA* (*Waukesha*), 320 F.3d 228, 233 (D.C. Cir. 2003); see also *United Food & Commercial Workers v. Brown Group, Inc.*, 517 U.S. 544, 553, 557 (1996).

the association has been very active on nuclear issues,[5] participating in several court appeals, participating in Nuclear Regulatory Commission Atomic Licensing Board Proceedings on the proposed withdrawal of the Yucca Mountain application, and, because of our obvious interests, being asked to – and testifying before Congress as well as the so-called Blue Ribbon Commission formed by the Obama Administration on nuclear waste disposal issues.

6.      *There is also no question both that NARUC member Commissioners are injured by the Nuclear Regulatory Commission's (NRC) inaction on the Yucca Mountain License application and that this Court's actions can remedy that injury.*      Like almost all of my fellow NARUC State Commissioners, I am charged by State statute with overseeing the operations of electric utilities operating in my State.      For example, the Minnesota Public Utilities Commission has approved two separate extended power uprates at both the Prairie Island Nuclear Generating Plant and the Monticello Nuclear Generating Plant.

---

[5]      Since 1984, NARUC has maintained a separate Subcommittee on Nuclear Issues – Waste Disposal in 1984 focused exclusively on the NWPA process.   For well over 10 years, the association also has had a discrete Nuclear Waste Program office dedicated in part to monitoring fee and repository issues. In the last 11 years, NARUC has passed at least 18 policy resolutions requiring advocacy focused on the NWPA and related issues.

7.     Also like many of my NARUC colleagues, limiting both the expense and the risks[6] of on-site storage of spent nuclear fuel is a part of my broader regulatory responsibilities under the laws of my State.

8.     The Nuclear Waste Policy Act (NWPA), enacted in 1982, made the federal government responsible for safe and final disposal of such waste. Under the Act, utilities pay fees for disposal through the Nuclear Waste Fund (NWF). *Those fees are passed through to ratepayers.* Although utilities and their ratepayers continue to pay these charges, the United States Department of Energy (DOE), which manages the disposal program, failed

---

[6]     Safe operation of electric facilities, including nuclear plants, is a key focus of my Commission's oversight. See e.g., 2009 Minnesota Statutes, Chapter 216B.243 Certificate of Need for Large Energy Facility Subd. 3.Showing required for construction: *"No proposed large energy facility shall be certified for construction unless the applicant can show that demand for electricity cannot be met more cost effectively through energy conservation and load-management measures and unless the applicant has otherwise justified its need. In assessing need, the commission shall evaluate: ... (5) benefits of this facility, including its uses to protect or enhance environmental quality, and to increase reliability of energy supply in Minnesota and the region,"* ... *"(7) the policies, rules, and regulations of other state and federal agencies and local governments;"* ... *and "(12) if the applicant is proposing a nonrenewable generating plant, the applicant's assessment of the risk of environmental costs and regulation on that proposed facility over the expected useful life of that plant, including a proposed means of allocating costs associated with that risk"* and subd. 3b (b): *"Any certificate of need for additional storage of spent nuclear fuel for a facility seeking a license extension shall address the impacts of continued operations over the period for which approval is sought."* Additionally, Minnesota Administrative Rules 7855.0650 WASTES AND EMISSIONS provides that applicants for large energy facilities: *"shall provide data on wastes and emissions associated with construction or operation of the facility, including: A. the types and estimated amounts of solid, liquid, and gaseous radioactive wastes that would be produced by the facility, and the level of radioactivity of each in curies per year;"* and *"B. an analysis of human exposure to ionizing radiation attributable to operation of the facility, taking account of the pathways of radioactive releases to humans;".* Also see Minnesota Rules 7855.0660 POLLUTION CONTROL AND SAFEGUARDS EQUIPMENT: *" The applicant shall provide data regarding pollution control and safeguards equipment, including: A. the provisions that would be made for management of radioactive materials.. B. a description of contingency plans to reduce the effects of an accidental release of radioactive materials;"* and ... *"F. the measures that would be taken to prevent spills or leaks of pollutants, or to minimize the effects of spills or leaks on the environment."*

to meet its statutory and contractual obligation to begin waste acceptance in 1998. This continued DOE failure is exacerbated by the NRC's dismantling of the Nuclear Waste Program office and facilitated by the NRC's inaction on the required review of the Yucca Mountain License.

9.     Since 1981, Minnesota's ratepayers have paid over $ 300 million dollars in fees levied pursuant to the NWPA to develop a permanent storage site and *effectively bear both the increased costs and risks of onsite storage.* Cumulatively, ratepayers across the country, protected by my fellow NARUC Commissioners in other States, have contributed about $17 billion in fees.     There is no question that ratepayers I and my fellow State Commissioners are statutorily charged to protect are injured by the NRC's failure to comply with the NWPA's requirements to conduct the associated license review.     NARUC and its members have an obvious interest in assuring the license application, which even DOE has conceded raises no safety concerns, from being effectively abandoned though NRC failure to conduct the required review.

10.     Nuclear power supplies approximately 13,000 Kwh of electricity to homes and businesses in Minnesota according to the U.S. Energy

Information Administration. There are two nuclear power plants in Minnesota along with two Independent Spent Fuel Storage Installations.[7]

11.    Because nuclear power fuels about 20 percent of the nation's electricity supply, it raises both cost and safety issues for NARUC member State Commissioners across the country, especially for those where nuclear plants are located, *i.e.*, in Arizona, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Iowa, Kansas, Louisiana, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin. See, *U.S. Energy Information Administration, Independent Statistics and Analysis, States with Commercial Nuclear Industries,* at: http://www.eia.doe.gov/cneaf/nuclear/page/at_a_glance/reactors/states.html (Accessed March 12, 2010). Electric ratepayers in any jurisdiction served by those plants, including Minnesota's, pay the NWF fees and bear increases risks caused by DOE's failure to comply with its disposal obligations. As mentioned, *supra*, NRC's failure to review the still pending Yucca Mountain license application is directly related to that failure.

---

[7]    *See, State Profiles,* U.S. Energy Information Administration (Independent Statistics and Analysis) at: <http://www.eia.doe.gov/cneaf/nuclear/page/at_a_glance/reactors/states.html> (last accessed March 15, 2010) (Lists 31 states that have commercial nuclear reactors, the generation and capacity trends, general locations, and State emissions levels. Profiles updated with 2007 emissions data on November 6, 2009.)

12.    DOE's Final Environmental Impact Statement for the Yucca Mountain Geological Repository concludes that not building the repository could result in "widespread contamination of the seventy-two commercial and five DOE sites across the United States, with resulting human health impacts." (DOE/EIS—0250, Section 2.12).[8]

13.    Continued operation of existing nuclear plants *requires* some *safe* and secure method of disposing of the high level radioactive waste and spent nuclear fuel generated. Effective management and *permanent* disposal of nuclear waste is essential to minimize the life cycle costs of these facilities.

14.    Many of NARUC's State commission members scrutinize these costs of electric utilities to ensure ratepayers pay only for expenses that are reasonable and prudent.  These Commissions are responsible for assuring safe and reliable utility services. Utility plans for *interim* on-site storage involve large sums and raise significant financial issues.

---

[8]    *See, generally, Virginia Electric and Power Co. (North Anna Power Station, Units  1 and 2),* ALAB-342, 4 NRC 98, 105-6 (1976) (Zone of interests created by the AEA is avoidance of a threat to health and safety of the public). *Cf.* footnote 1 *supra.*

15.   Spent fuel continues to pile up at 73 locations in 35 States at sites that were never intended for long-term storage, and State-regulated utilities (along with numerous State commissions) expend significant resources on related protracted litigation over DOE's non-performance. Ratepayers ultimately bear not only the cost of utility payments to DOE intended to cover the cost of the disposal program *and* the costs of the additional on-site storage required by DOE's refusal to take that waste, but also the costs of the associated protracted litigation over DOE's refusal to take the waste.

16.   Delays in the repository program necessarily results in the owners and operators of nuclear power plants having to store greater quantities of used nuclear fuel for longer periods of time, increasing both costs and risks associated with interim storage and also providing additional reasons to delay construction of new plants.  Significantly, long term, any damages caused by DOE's breach of its obligations to take this waste, which is obviously directly contingent upon NRC approval of a long-term storage facility, cannot come from the NWF.  See *Alabama Power Co., v. United State,* 307 F.3rd (11th Cir. 2002).  In the meantime, ratepayers in my State (and many other NARUC member States) pay not only for enhanced

litigation costs and the increased costs of interim storage, but also via the NWF fees for a national storage.

17.    NARUC members' statutory responsibilities to protect electricity consumers from excess or unlawful rates are directly impaired by the NRC's conduct.  The NRC has effectively dismantled and frustrated the statutorily required Yucca Mountain Repository license review process.  Because of this conduct, ratepayers continue to pay fees for a virtually non-existent program that has an enormous budget surplus and an uncertain future.  This Court's response to this mandamus petition can ameliorate the injury.

18.    As State Commissioners, my NARUC colleagues across the country and I have an obvious interest in this proceeding – protecting ratepayers – an interest no other party will adequately represent.  There is no question that our respective statutory duties to protect ratepayers are impacted by whatever action this Court takes in response to this mandamus action.



Phyllis Reha

Sworn and subscribed to before me this 28th day of July, 2011

My Commission expires:

VERONICA J SLAGER
Notary Public
Minnesota
My Commission Expires January 31, 2015

*Resolution on National Policy for Management and Disposal of Spent Fuel from*
*Commercial Nuclear Power Plants*

**WHEREAS,** The Nuclear Waste Policy Act (NWPA) of 1982 sets national policy that the federal government is responsible for safe, permanent disposal of all government and commercial high-level radioactive waste, including spent nuclear fuel, in a geologic repository beginning in 1998; *and*

**WHEREAS,** Those who have benefitted from nuclear-generated electricity—reactor owners and ratepayers—under the NWPA were to pay for the commercial share of disposal costs through fees paid to the Nuclear Waste Fund; *and*

**WHEREAS,** Reactor owners and ratepayers made fee payments since 1983 totaling over $16 billion to the Fund, which earned another $13.5 billion in interest, to more than meet the needs of the repository development program, which encountered numerous managerial, financial, legal and political difficulties resulting in failure to meet the 1998 date set in statute and contracts with the reactor owners; *and*

**WHEREAS,** When the Department of Energy, as disposal program manager, failed to begin waste acceptance in 1998, the reactor owners sued for partial breach of contract for which the Federal Court of Appeals found the government liable; *and*

**WHEREAS,** DOE and the Justice Department estimate the liability for court-awarded damages and settlements could be as much as $12.3 billion—if the waste were to be accepted for disposal by 2020; *and*

**WHEREAS,** The Obama Administration declared its intent to terminate the Yucca Mountain repository development program and instead has appointed the Blue Ribbon Commission on America's Nuclear Future to evaluate alternative disposal strategies and recommend a new direction that does not involve Yucca Mountain; *and*

**WHEREAS,** NARUC believes current law regarding Yucca Mountain development must be followed, however the Association must prepare itself for the possibility that the Administration may succeed in canceling the repository project; *now, therefore be it*

**RESOLVED,** That the Board of Directors of the National Association of Regulatory Utility Commissioners, convened at its 2010 Winter Committee Meetings in Washington, D.C., expresses its disappointment at having the federal government take 25 years and expend over $10 billion on Yucca Mountain as the repository site only to have the repository project be proposed to be cancelled before the Nuclear Regulatory Commission made a safety and technical decision on the license application submitted in 2008; *and be it further*

**RESOLVED,** That NARUC call upon the Secretary of Energy not to withdraw the Yucca Mountain license application from the review process underway at the NRC; *and be it further*

**RESOLVED,** That NARUC and State utility commissions as stakeholders in the disposal policy on behalf of ratepayers—who continue to bear the ultimate cost of the fee payments to the Fund—should play an active role in representing their views to the Blue Ribbon Commission, drawing upon the multiple NARUC nuclear waste policy resolutions adopted over the past 25 years; *and be it further*

**RESOLVED,** That NARUC convey to the Commission that any alternative that leaves the spent nuclear fuel at present storage sites indefinitely, whether managed by the owners or by the government, is inconsistent with the NWPA findings of 1982 and would break faith with the communities which host those reactors with the understanding that the spent fuel would be removed by the government; *and be it further*

**RESOLVED,** That the Commission should seek to determine if there is something about a geological repository generally or Yucca Mountain specifically that makes either a poor choice, suggesting a search should begin for a new repository site; *and be it further*

**RESOLVED,** That if a new repository program is to be recommended, then a new, more transparent site selection process should be considered, a new organization might be better suited for managing it and a reformed financing means be established that more reliably supports the new disposal strategy instead of subsidizing unrelated government activities; *and be it further*

**RESOLVED,** That NARUC pro-actively inform the Commission, DOE and the Congress that there are benefits in taking an initial near-term action to provide government or industry-run central interim storage of used nuclear fuel from the nine shutdown reactor sites, since it seems that whatever new disposal or reprocessing strategy is pursued, it will be unlikely to be in operation for another twenty or more years; *and be it further*

**RESOLVED,** That the federal government and owners of spent nuclear fuel should be encouraged to simplify and make equitable settlements over the ongoing litigation that provides payment for past expenses that the owners should not have to have incurred had DOE provided the "disposal services" agreed in the Standard Contracts; and to develop a regime for forecasting future payments without court-ordered judgments including suspension of Nuclear Waste Fund fee payments unless and until a revised program is agreed upon or the Yucca Mountain Project is fully restarted.

*Sponsored by the Committees on Electricity and Energy Resources and the Environment*
*Adopted by the NARUC Board of Directors February 17, 2010*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

**RECEIVED**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

**CLERK**

**Exhibit 6**

**Affidavit of Lewis Darrell Lacy**

11-1271

JUL 29 2011

**RECEIVED**

CASE NO. _11-1271_

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED      JUL 29 2011

**CLERK**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

In Re: AIKEN COUNTY, ROBERT L. FERGUSON, WILLIAM LAMPSON, GARY PETERSEN, STATE OF SOUTH CAROLINA, STATE OF WASHINGTON, NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, NYE COUNTY, NEVADA, Petitioners.

UNITED STATES NUCLEAR REGULATORY COMMISSION, and GREGORY B. JACZKO, Chairman of the United States Nuclear Regulatory Commission, Respondents.

## AFFIDAVIT OF LEWIS DARRELL LACY

I, **Lewis Darrell Lacy**, swear and affirm under penalty of perjury that the following is true and correct.

1.     I am now, and at all times pertinent to this affidavit have been, a citizen of the United States, and am a resident of the State of Nevada, over the age of eighteen years, competent to make this affidavit, and make this affidavit from my own personal knowledge, judgment, and professional experiences.

2.     I am now, and have been, employed as Director, Nye County Nuclear Waste Repository Project Office (NWRPO) at all times pertinent to this affidavit.

3.    In the position of Director of NWRPO, I have had responsibility for coordinating all Nye County staff, consultant, and legal work for the Nye County Commissioners relative to the U.S. Department of Energy (DOE) license application submitted to the U. S. Nuclear Regulatory Commission (NRC) on June 3, 2008, seeking authorization to construct a high-level waste geologic repository at Yucca Mountain, located in Nye County Nevada (hereinafter, "license application") pursuant to the Nuclear Waste Policy Act (NWPA).

4.    NRC published a hearing notice on October 22, 2008, requiring any person whose interests might be affected by the licensing proceeding, and who wished to participate as a party, to file a petition for leave to intervene within sixty days of the notice.

5.    On December 19, 2008, Nye County timely filed a Petition to intervene as a matter of right in the licensing proceeding being conducted by  the NRC Construction Authorization Board (CAB) assigned to adjudicate the application; as required, Nye County also filed seven contentions with the CAB related to health, safety, and environmental protections.

6.    Nye County has maintained from the outset of the NRC proceeding that if legitimate health, safety, and environmental concerns regarding the repository can be satisfactorily addressed and resolved during the adjudication process, Nye County supported NRC issuance of authorization to construct the repository.

7.    By May 11, 2009, the CAB had begun its review and adjudication of the Yucca Mountain application, having admitted all but one of Nye County's contentions and approximately 300 contentions overall for hearing and having initiated a discovery phase. *See* Order of Atomic Safety and Licensing Boards (Identifying Participants and Admitted Contentions), *In re U.S. Dep't of Energy (High-Level Waste Repository)*, Docket No. 63-001, LBP No. 09-06 (United States Nuclear Regulatory Commission) (May 11, 2009).

8.    However, on March 3, 2010, the DOE filed a motion to withdraw its application with prejudice. *See* Dep't of Energy Motion to Withdraw, *In re U.S. Dep't of Energy (High-Level Waste Repository)*, Docket No. 63-001, ASLBP No. 09-892-HLW-CAB04 (United States Nuclear Regulatory Commission) (Mar. 3, 2010).

9.    Nye County and numerous other parties and interveners in the licensing proceeding opposed DOE's Motion to unilaterally withdraw the license application with prejudice, which DOE explicitly stated was not based upon safety concerns or legal inadequacies in the application.

10.    On June 29, 2010, following expedited briefing and oral argument by the participants in the licensing proceeding, the CAB denied DOE's motion to withdraw the Yucca Mountain license application.    Order of Atomic Safety and Licensing Board, *In re U.S. Dep't of Energy (High-Level Waste Repository)*,

Docket No. 63-001, ASLBP No. 09-892-HLW-CAB04 (United States Nuclear Regulatory Commission) (June 29, 2010).

11.    The following day, the NRC *sua sponte* issued an order requesting that the parties file opening and responsive briefing in consecutive weeks on whether the NRC should review the CAB's decision, and if so, whether to affirm or reverse it. Order, *In re U.S. Dep't of Energy (High-Level Waste Repository)*, Docket No. 63-001-HLW (United States Nuclear Regulatory Commission) (June 30, 2010).

12.    NRC, now more than a year later, has still failed to issue a final decision on its review of CAB's decision, and that failure has injured, and continues to injure, Nye County's interests under the NWPA

13.    Nye County is the host County for the Yucca repository, designated by Congress, and approved by the President, as the sole repository site pursuant to the Nuclear Waste Policy Act.

14.    As the host County for the repository, Nye County is recognized by the NWPA as an "affected unit of local government" (AULG) with jurisdiction over the site.  See 42 U.S.C.§10101 (31)

15.    As the host County and AULG, Nye County is entitled under the NWPA to receive several forms of financial assistance and to participate as a full party with standing in the licensing proceeding:

    a.    Section 117 of the NWPA requires DOE to allow the host County the

opportunity to designate a representative to conduct onsite oversight of activities at the site, and to pay reasonable expenses, and Nye County has done so;

b. Section 116 requires DOE to make grants to the AULG for the purposes of participating in activities at the site, and DOE has done so in the past;

c.    Section 116 requires DOE to provide the AULG with additional financial assistance equal to the amount the AULG would receive if authorized to tax the site characterization and development and operation of the repository, and DOE has done so in the past.

16.    Nye County has been provided millions of dollars of funding under these provisions and has used that funding to assist in the characterization of the site and to conduct scientific and technical oversight of activities at the repository site.

17.    Financial assistance under section 116 and 117 of the NWPA; jobs for County citizens; and attendant infrastructure and other improvements will be discontinued if the Yucca Mountain repository project is unjustifiably terminated by NRC's failure to act.

18.    Nye County, Nevada, has a unique, and statutorily recognized interest in the NRC licensing proceeding, because its citizens are those located closest to the repository and would be the among the first to be harmed should an accident occur.

19.     Nye County's stake in the license adjudication exists regardless of NRC's ultimate decision on construction authorization.

20.     If proven to be an unreasonable risk to its citizen's health and safety, Nye County does not want the repository built; only continuation of the NRC licensing proceeding will determine if the repository can be safely built and operated.

21.     If the repository is to be built, Nye County will rely upon the NWPA assistance and redouble its efforts to protect it citizens by continuing its oversight role, ensure adequate, health, safety and environmental protections are made a reality and seek opportunities for economic development.

22.     Nye County also has an interest in preventing the repository from being abandoned without adequate safety justification, and in preserving the economic and other benefits from the safe operation of the repository that are provided by the NWPA for the host county.

DATED this 25 day of July, 2011.

_____
Lewis Darrell Lacy

Subscribed and sworn to before me on ____7-25-11_____ by

Lewis Darrell Lacy

_____
Notary Public in and for the State of Nevada, residing at _NYE COUNTY_

My appointment expires _9-20-2014_ .

Elizabeth Pitsley
Notary Public
State of Nevada
Appt. No. 10-3173-14
Appt expires 9-20-2014

6

USCA Case #11-1271    Document #1321792    Filed: 07/29/2011
UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 2 9 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 2 9 2011

CLERK

11-1271

**Exhibit 7**

**NRC Office of the Inspector General**

**NRC Chairman's Unilateral Decision to Terminate NRC's Review of DOE
Yucca Mountain Repository License Application (OIG Case No. 11-05)**

**June 6, 2011**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**



**UNITED STATES**
**NUCLEAR REGULATORY COMMISSION**
WASHINGTON, D.C. 20555-0001

OFFICE OF THE
INSPECTOR GENERAL

June 6, 2011

MEMORANDUM TO:     Chairman Jaczko

FROM:     Hubert T. Bell
Inspector General

SUBJECT:     NRC CHAIRMAN'S UNILATERAL DECISION TO TERMINATE
NRC'S REVIEW OF DOE YUCCA MOUNTAIN REPOSITORY
LICENSE APPLICATION (OIG CASE NO. 11-05)

This report conveys the results of an Office of the Inspector General (OIG), U.S. Nuclear
Regulatory Commission (NRC), investigation into an allegation that the NRC Chairman, Gregory
Jaczko, unilaterally and improperly closed out the NRC's review of the Department of Energy's
(DOE) Yucca Mountain repository license application while the Government was operating
under a continuing resolution (CR) in fiscal year (FY) 2011. In addition, it was alleged that the
Chairman was purposely preventing the Commission from completing its ruling on the Atomic
Safety Licensing Board's (ASLB) decision to deny DOE's motion to withdraw its Yucca Mountain
repository license application from NRC. During the course of this investigation, concerns were
also raised about the Chairman's management style toward staff and Commissioners and
whether his control of information prevents the other Commissioners from effectively fulfilling
their statutory responsibility to address policy matters.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

OIG's investigation examined whether the Chairman exceeded his authority in directing the NRC staff to close out the Yucca Mountain license application review during the CR period, the Commission's adjudicatory voting process, and the impact the Chairman's management style has on the collegial functioning of the NRC Commission. The investigation findings appear in section III of this report.

## I. BACKGROUND

*NRC Mission and Commission Structure*

NRC was established in 1974 to ensure the safe use of civilian nuclear materials in the United States. NRC's regulatory mission covers nuclear reactors, nuclear materials, and nuclear waste. NRC is an independent regulatory agency headed by a five-member Commission. The Commissioners are appointed by the President and confirmed by the Senate for 5-year terms, and their terms are staggered so that one Commissioner's term expires on June 30 each year. One member is designated by the President to be the Chairman, and no more than three Commissioners may be from the same political party. This report uses the term Chairman to refer to the Commissioner appointed as Chairman, the term Commissioner to refer to the other members of the Commission, and the term Commission to refer to the entire body (Commissioners plus Chairman).

In 1979, 5 years after NRC's creation, the most serious nuclear accident in U.S. history occurred at Three Mile Island nuclear power plant in Pennsylvania. After the accident, President Jimmy Carter established the Kemeny Commission to examine and assess the events that led to the accident. In addition, NRC organized its own review, known as the Rogovin study. Both the Kemeny Commission and Rogovin study recommended that a single administrator should head NRC. However, President Carter decided to maintain a Commission structure, and he submitted Reorganization Plan No. 1 of 1980 (Reorganization Plan) to Congress with the intent to

> . . . improve the effectiveness of the Nuclear Regulatory Commission by giving the Chairman the powers he needs to ensure efficient and coherent management in a manner that preserves, in fact enhances, the commission form of organization. [1]

President Carter's main goals were to strengthen the Chairman's role to clarify where agency responsibility resided while retaining the diversity that a commission form of organization offers.

On October 1, 1980, the Reorganization Plan, as amended, became effective. The Reorganization Plan is the statutory guidance by which the Commission operates. The plan articulates the role of the Chairman as it relates to executive powers and the Commissioners as

---

[1] This statement was made by President Carter when he presented the Reorganization Plan to Congress on March 27, 1980.

2

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

it relates to their policy role. Thus, the Commission's interpretation and implementation of the plan helps set the tone for how well the Commission members work together in a collegial fashion.

Section 1 of the Reorganization Plan establishes the Commission's functions and the Chairman's functions. It designates the Commission as responsible for (1) policy formulation, (2) rulemaking, and (3) orders and adjudications. It also provides that at any time, the Commission may "determine by majority vote, in an area of doubt, whether any matter, action, question or area of inquiry pertains to one of these functions."

Section 2 of the Reorganization Plan assigns the Chairman responsibility for all other functions, including (1) serving as official Commission spokesman, (2) serving as the Commission's principal executive officer responsible for developing policy planning and guidance for consideration by the Commission, (3) administrative functions of the Commission, (4) distribution of business among the offices of the Commission, (5) preparation of the Commission's budget estimate, and (6) the proposed distribution of appropriated funds according to major programs and purposes. The Reorganization Plan states that the Chairman determines the use and expenditure of funds of the Commission, "in accordance with the distribution of appropriated funds according to major programs and purposes approved by the Commission."

The plan also states that the Chairman and the Executive Director for Operations (EDO), who reports to the Chairman, are responsible for insuring the Commission is fully and currently informed about matters within its functions.

NRC's *Internal Commission Procedures* reiterate the Reorganization Plan provisions concerning the role of the Commission as a whole and the Chairman's individual role. The procedures state that each Commissioner, including the Chairman, has equal responsibility and authority in all Commission decisions and actions, has full and equal access to information pertaining to Commission responsibilities, and has one vote. The procedures note that one of the Commission's collegial functions is revision of budget estimates and determining the distribution of appropriated funds according to major programs and purposes.

The procedures also reiterate the Reorganization Plan's provision that the Commission may determine by majority vote, in any area of doubt, whether any matter, action, question, or area of inquiry pertains to policy formulation or any of the Commission's functions. OIG learned that Commissioners use a written form of communication, referred to as a Commission action memorandum (COM), to seek votes from the other Commissioners to determine whether a matter falls into the Commission's purview as opposed to that of the Chairman. A majority vote by the Commission is needed for them to address the matter as policy.

3

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

In December 1999, OIG issued a report, *Special Evaluation of the Role and Structure of NRC's Commission* (OIG-99-E-09), which identified that Commission members, from time to time, have different interpretations of the Reorganization Plan, which can adversely affect the Commission's collegiality.[2]

Chairman Jaczko has been a Commissioner since January 2005 and Chairman since May 2009. His term runs through June 2013.

*U.S. Nuclear Waste Policy*

The current U.S. policy governing permanent disposal of spent nuclear fuel and high-level radioactive waste is defined by the Nuclear Waste Policy Act of 1982, as amended (NWPA), and the Energy Policy Act of 1992. These acts specify that spent nuclear fuel and high-level radioactive waste will be disposed of underground, in a deep geologic repository. The NWPA names Yucca Mountain, a high ridge in the Nevada desert approximately 100 miles northwest of Las Vegas, as the single candidate site for this potential geologic repository. The NWPA specifically states that NRC "shall consider an application for a construction authorization for a repository" and "shall issue a final decision approving or disapproving the issuance of a construction authorization not later than 3 years after" the application is submitted.

DOE, which is charged with constructing and operating the repository, submitted its license application for a repository to hold no more than 70,000 metric tons of spent nuclear fuel and high-level radioactive waste to NRC on June 3, 2008, and NRC formally accepted it for review in September 2008. NRC published its Notice of Hearing in the *Federal Register* on October 22, 2008, starting the 3-year schedule set by Congress for NRC to reach a decision on whether to approve construction. If necessary, NRC may give notice to Congress of the need for an additional year to complete the review.

NRC's Atomic Safety and Licensing Board Panel[3] (ASLBP) is responsible for conducting hearings on a variety of legal and technical contentions regarding the Yucca Mountain license application.

---

[2] The special evaluation defined collegiality as the relationship between a group of associates or coworkers, where authority is vested in all of the members, as they work towards a common duty or role. The full report and NRC's response to the report may be accessed at http://www.nrc.gov/reading-rm/doc-collections/insp-gen/2000/.

[3] The panel conducts all licensing and other hearings as directed by the Commission, primarily through individual Atomic Safety and Licensing Boards (ASLBs) or single presiding officers appointed by either the Commission or the Chief Administrative Judge. The panel, which has no fixed number of positions, is composed of (1) administrative judges (full-time and part-time), who are lawyers, engineers, and scientists, and (2) administrative law judges (ALJs) who are lawyers. Administrative judges and ALJs serve as single presiding officers or on three-member boards, which generally are chaired by a lawyer, for a broad range of proceedings.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

*Continuing Resolutions (CR)*

A CR is a law that provides funding for Federal agencies, specific activities, or both to continue in operation when Congress and the President have not completed action on the regular appropriation acts by the beginning of the fiscal year. For the most part, CRs are temporary and intended by Congress to be stop-gap measures enacted to keep existing Federal programs functioning after the expiration of previous budget authority and until regular appropriation acts can be enacted. Unlike regular appropriation acts, CRs typically do not appropriate specified sums of money. Instead, they usually appropriate "such amounts as may be necessary" for continuing projects or activities at a certain "rate for operations." An agency may determine the pattern of its obligations under a CR provided it operates under a plan that will keep it within the rate for operations limit set by the resolution.

Office of Management and Budget (OMB) Circular A-11, *Preparation, Submission, and Execution of the Budget*, provides guidance on operating under a CR. According to OMB Circular A-11, agencies should carefully review each CR to determine the formula provided and should keep in mind that the amount available under a CR is the product of negotiations among the various factions in Congress and the Administration. OMB Circular A-11 notes that agencies may not obligate funds under a CR that would impinge on final funding prerogatives of Congress. It also states that CRs usually include provisions directing agencies to execute programs using the most limited funding actions permitted in order to provide for continuing projects and activities.

The Comptroller General, head of the Government Accountability Office, has the legal authority to issue decisions and opinions on appropriations law.

*Chronology of Events*

In September 2008, NRC formally accepted DOE's license application to build a geologic repository at Yucca Mountain and embarked on its review process. According to the NWPA, NRC was to reach a decision concerning the viability of the site within 3 years of the license application acceptance date.[4]

NRC planned, at the end of its technical review, to issue a safety evaluation report (SER) containing its findings on the repository design.[5] The SER would determine whether the proposed facility would meet NRC regulations to protect public health and safety. NRC staff responsible for developing the SER decided to issue the SER in five volumes, and estimated[6] that Volume 1 (General Information) would be complete in August 2010, Volume 3 (Review of

---

[4] The NWPA additionally allows the NRC to extend the 3-year deadline by not more than 1 year.

[5] An SER summarizes the NRC staff's technical review and safety evaluation related to the anticipated effect of a proposed license application or licensing action on public health and safety.

[6] Dates reflect the NRC staff's last official estimate, announced in March 2010.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

Repository Safety After Permanent Closure) in November 2010, Volume 4 (Review of Administrative and Programmatic Requirements) in January 2011, and Volume 2 (Review of Repository Safety Before Permanent Closure) and Volume 5 (License Specifications and Conditions) in March 2011.

On February 2, 2010, Energy Secretary Steven Chu noted during a Senate hearing that President Barack Obama's Administration would seek to immediately suspend licensing for the Yucca Mountain repository because it was "not a workable option." DOE's budget proposed zero funding for the project in FY 2011, which conveyed the Administration's intent to terminate the Yucca Mountain project.

In February 2010, NRC published its FY 2011 Congressional Budget Justification, which also conveyed the Administration's intent concerning Yucca Mountain, stating:

> The Administration has indicated that it does not support developing a repository at Yucca Mountain, Nevada. Consistent with that position, DOE may submit to the NRC a motion to withdraw or suspend its Yucca Mountain license application during FY 2010. The NRC Budget reflects that possibility. Upon the withdrawal or suspension of the licensing review, the NRC would begin an orderly closure of the technical review and adjudicatory activities and would document the work and insights gained from the review.

NRC's FY 2011 Congressional Budget Justification allotted $10 million for the Yucca Mountain repository to "support work related to the orderly closure of the agency's Yucca Mountain licensing support activities." This amount was $19 million less than the $29 million appropriated for license application review activities in FY 2010.

On March 3, 2010, DOE submitted to the ASLB a motion to withdraw its Yucca Mountain license application. On June 29, 2010, the ASLB issued a decision that denied DOE's motion to withdraw, concluding that DOE lacks the authority to seek to withdraw the application. The ASLB grounded its decision in its interpretation of the NWPA, reasoning that Congress directed DOE to file the application and the NRC to consider the application and issue a final, merits-based decision approving or disapproving.

On June 30, 2010, the Commission issued an order inviting hearing participants to file briefs as to whether the Commission should review, and reverse or uphold, the ASLB's decision, thus signifying the Commission's decision to review the ASLB's decision.

6

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

On August 10, 2010, in accordance with NRC's process, the Office of Commission Appellate Adjudication (OCAA)[7] submitted adjudicatory paper SECY-10-0102, "U.S. Department of Energy (High-Level Waste Repository), Review of LBP-10-11, Docket No. 63-001-HLW," to the Commission for its review and vote.  Commissioners began casting their votes on SECY-10-0102 on August 25, 2010, and a majority of Commissioners had voted by September 15, 2010.  Chairman Jaczko did not cast his final vote at that time.

On September 30, 2010, Congress issued the first in a series of CRs, directing Federal agencies generally to spend money at FY 2010 levels, as necessary, to continue projects and activities that were conducted during FY 2010.

On October 4, 2010, the NRC Chief Financial Officer (CFO) and the EDO issued guidance to NRC staff related to budget execution under the CR.  The memorandum stated that offices were to commit, obligate, and expend funds for ongoing activities at FY 2010 levels, with the exception of the High-Level Waste Program.  The memorandum stated that during the CR period, new work that was not authorized and funded in FY 2010 should not be started in FY 2011.  With regard to the High-Level Waste Program, the memorandum directed staff to continue its activities on the Yucca Mountain license application in accordance with the Commission's decisions on the FY 2011 budget using available Nuclear Waste Fund resources during the CR period.

In early October 2010, Chairman Jaczko directed NRC staff working on the Yucca Mountain license application review to stop working on Volume 3 of the SER and proceed to orderly closure of the technical review.

On October 29, 2010, Chairman Jaczko voted on SECY-10-0102, completing the Commission's notational voting process on the Yucca Mountain matter; however, as of the date of this report, the Commission has not held an affirmation vote on the matter and the draft order continues to sit in deliberation before the Commission for affirmation.

## II.  INVESTIGATIVE DETAILS

### A.    OIG Review of CR Issue

OIG learned that the language in the EDO's and CFO's October 4, 2010, CR budget guidance memorandum directing staff to follow FY 2011 budget guidance for High-Level Waste Program activities was based on instruction provided by the Chairman's office and was used by the Chairman to stop work on the SER and NRC's Yucca Mountain license application review.

---

[7]OCAA assists the Commission in its adjudicatory functions including the resolution of appeals from decisions of ASLBs; assistance includes analysis of adjudicatory matters and preparation of adjudicatory decisions consistent with Commission policy and guidance.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

While the Chairman told NRC senior officials that the CR budget guidance memorandum language had been reviewed and agreed to by his fellow Commissioners, one Commissioner was not informed of the language, two were provided some information but did not recognize the impact the memorandum would have on the SER, and one Commissioner disagreed with the language because he recognized the impact it would have on the SER.

Furthermore, while all of the NRC Commissioners in February 2010 (Chairman Jaczko, Commissioner Kristine Svinicki, and former Chairman Dale Klein) agreed to the agency's FY 2011 Congressional Budget Justification, which specified criteria that needed to be met before the license application review process could be shut down, there is disagreement among current Commissioners and a former Chairman and agency officials as to (a) whether these criteria were met and (b) the Chairman's shutdown approach.

*NRC's Budgets for the High-Level Waste Repository Program*

NRC's budget documents reflect a significant funding reduction for the High-Level Waste Program between FY 2010 and FY 2011 and elimination of the program by FY 2012.  OIG learned that each NRC budget proposal and subsequent passback appeal letter[8] to OMB for increased funding was voted on and approved by the Commission, although the Commission composition was different for each year.

The Commission's FY 2010 performance budget request – which was voted on and approved by former Chairman Klein, then Commissioners Jaczko and Peter Lyons, and Commissioner Svinicki – sought $99.1 million for the program to support two concurrent processes associated with the "ongoing review": (1) assess the technical merits of the repository design, and (2) support the adjudicatory hearing before the NRC ASLB convened to hear the technical and legal challenges posed by parties to the DOE license application.  Subsequently, Congress appropriated $29 million to NRC for the High-Level Waste Program.

For FY 2011, the Commission (Chairman Jaczko, Commissioner Svinicki, and then Commissioner Klein) requested $39.5 million to support the High-Level Waste Program.  OMB responded with $10 million for the program.  In December 2009, Chairman Jaczko sent NRC's FY 2011 passback letter of appeal to OMB.  This letter, which had been approved by the Commission, stated that DOE:

> . . . is expected to submit to the NRC a motion to withdraw or suspend its Yucca Mountain license application before the end of FY 2010.  Assuming this scenario, the $10 million provided in the FY 2011 pass-back would allow for us to start the process for an orderly disposition of the adjudicatory and technical review activities.  Additional resources may be needed for an orderly disposition of activities beyond FY 2011, the amount dependent upon the timing of the motion.

---

[8] The passback appeal letter is also referred to as the reclama letter.

8

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

NRC's FY 2011 Congressional Budget Justification, published in February 2010 after Commission approval, also referenced the possibility that DOE would move to suspend or withdraw its license application and noted:

> Upon the withdrawal or suspension of the licensing review, the NRC would begin an orderly closure of the technical review and adjudicatory activities and would document the work and insights gained from the review.

Although this document also stated that NRC had requested $10 million, including 32 FTE, to provide for licensing activities, the only activities described were those related to the orderly closure of the agency's Yucca Mountain licensing support activities.

OIG noted differences between NRC's December 2009 passback letter of appeal and the February 2010 Congressional Budget Justification for FY 2011 with regard to (1) proposed activities and (2) prerequisites to trigger those activities. While the NRC passback appeal letter states that *orderly disposition of the adjudicatory and technical review activities* would be based upon a *motion to withdraw or suspend*, the Congressional Budget Justification states the *orderly closure of the technical review and adjudicatory activities* would be based on *withdrawal or suspension of the licensing review.*

For FY 2012, the Commission (Chairman Jaczko and Commissioners Svinicki, William Ostendorff, William Magwood, and George Apostolakis) requested $4.0 million for the termination of all program activities. OMB, however, allocated no money to NRC for the High-Level Waste Program, which is reflected in NRC's FY 2012 Congressional Budget Justification.

*CR Budget Guidance Memorandum*

OIG reviewed the EDO's and CFO's October 4, 2010, CR budget guidance memorandum and four earlier versions that predated the final document. The final October 4, 2010 memorandum stated that NRC's FY 2011 budget request sustains agency programs at about the same level as FY 2010, with the exception of the High-Level Waste Program and that offices should therefore proceed to commit, obligate, and expend funds for ongoing activities to effectively use available resources during the CR. The memorandum specified that, "During the CR period, new work that was not authorized and funded in FY 2010 should not be started in FY 2011." It also provided:

> With respect to the High-Level Waste Program, the CR legislation does not include specific restrictions on spending funds. Therefore, the staff should continue its activities on the Yucca Mountain license application in accordance with the Commission's decisions on the FY 2011 budget using available Nuclear Waste Fund resources during the CR.

9

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

The first version of this memorandum – dated August 31, 2010, contained no mention of the Yucca Mountain repository license application review. Two later versions (dated September 13 and September 14, 2010) directed that the agency would continue to conduct its Yucca Mountain license application review with any available FY 2010 carryover funds until exhausted, and made no reference to the FY 2011 budget. The first version reviewed by OIG that made mention of the FY 2011 budget was dated September 27, 2010. This version directed staff to continue its activities on Yucca Mountain in accordance with the FY 2011 budget.

*Commissioner Ostendorff's COM*

OIG reviewed a COM prepared by Commissioner Ostendorff, titled, "Commission Direction on Staff Budget Guidance Under Fiscal Year (FY) Continuing Resolution." This document was submitted by Commissioner Ostendorff to the other Commissioners on October 6, 2010, in response to the CR budget guidance memorandum sent from the EDO and CFO to the staff on October 4, 2010. The COM states that the direction given to staff in the October 4, 2010 memorandum to continue its Yucca Mountain activities in accordance with FY 2011 budget guidance "is a significant policy matter that I believe warrants the Commission's attention, and which requires that the Commission give direction to the staff to avoid confusion on the Commission's intent for operation under the Continuing Resolution." Commissioner Ostendorff referred to a March 30, 2010 memorandum titled, "Plans for the High-Level Waste Repository Program," from the EDO to the Commission that conveyed the staff's intent to complete SER Volumes 1 and 3 no later than August and November 2010, respectively, and the staff's plan to continue to work on any remaining SER volumes until FY 2010 funds were exhausted. Commissioner Ostendorff said that the March 30, 2010 memorandum was provided to the Commission in the context of both the FY 2010 appropriation and the FY 2011 budget request and must, therefore, continue as standing guidance to staff.

Commissioner Ostendorff wrote, "It is my view that whatever the ultimate disposition of the High-Level Waste Repository activity, complete SER documents are the best and most appropriate way in which to memorialize the Staff's work product." He proposed that the Commission take action no later than October 8, 2010, to direct staff to continue to work on the remaining SER volumes as stated in the March 30, 2010 memorandum, at the rate for operations appropriate given the proposed FY 2011 budget as augmented by reprogrammed funds remaining from FY 2010 appropriations.

*Memo from NRC General Counsel Regarding CR Budget Guidance Memorandum*

OIG also reviewed an October 15, 2010 memorandum from NRC's General Counsel to the Chairman and Commissioners, providing the General Counsel's views regarding the October 4, 2010 CR budget guidance memorandum. The General Counsel concluded in the memorandum that focusing the agency's High-Level Waste Program activities during the CR period on activities related to the orderly closure of the Yucca Mountain review does not violate legal requirements or the principles of appropriations law. According to the General Counsel, the agency's guidance was appropriate for the following reasons:

10

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

- The agency's proposed expenditures during the CR are consistent with the terms of the CR because they support and are within the scope of the continuing projects or activities conducted in the prior fiscal year; unless the CR contains more specific language, the phrase "projects or activities" generally refers to the total appropriation for the account, not to the specific activities contained as activities in a budget submission or committee report.

- While the Yucca Mountain license application may be on a different trajectory than in early fiscal years, it cannot be said that the agency is spending its High-Level Waste Program funds under the CR in a manner unrelated to its Yucca Mountain repository review or contrary to the express direction in the pertinent legislation. Even if activities under the EDO/CFO's guidance are of a more limited scope than in the previous fiscal year, it does not appear that such activities would irreversibly compromise or preclude NRC's ability to engage in a license application review if Congress were to increase NRC's High-Level Waste Program budget and direct a revival of the Yucca Mountain repository review.

- Agencies are directed to act prudently in expending funds under a CR so as not to impinge on the final funding prerogatives of Congress. NRC requested an appropriation from the Nuclear Waste Fund for FY 2011 of $10 million, or about one-third of the FY 2010 appropriation, and there was no indication from the Senate or House that the FY 2011 budget would be increased.

The General Counsel's memorandum also noted that there had also been some internal debate over whether final NRC action permitting DOE to withdraw its application is a condition precedent to the orderly closure activities under the FY 2011 guidance reflected in the Commission's Congressional Budget Justification. Addressing this matter, the General Counsel wrote, "Considering the entire text of the NRC budget document and the context in which it was submitted, I do not believe such a conclusion necessarily follows."

*OIG Interviews of Agency Officials Related to CR Issue*

Interviews of NMSS, OEDO, and OCFO Officials

OIG learned, through interviews with Office of Nuclear Material Safety and Safeguards (NMSS), Office of the Executive Director for Operations (OEDO), and Office of the Chief Financial Officer (OCFO) officials, that during the summer of 2010, NRC managers responsible for NRC's High-Level Waste Program anticipated there would be about $7 million in high-level waste funding left over (carryover) at the end of FY 2010. The managers were interested in seeking Commission feedback about what to do with the carryover funding in FY 2011, given that FY 2010 High-Level Waste Program funding was for licensing review and FY 2011 High-Level Waste Program funding was for orderly shutdown of the High-Level Waste Program. Because a Commission decision was still pending concerning ASLB's denial of DOE's motion to withdraw its license application, the managers sought Commission feedback about how to proceed with the licensing review.

11

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

OIG learned that the NMSS Director initially sought to write a paper for Commission review concerning the staff's plans for the carryover money; however, a decision was made instead to inform the Commission of the staff's plans via a CR budget guidance memorandum issued to staff from the EDO and CFO giving guidance on how to carry out programs and activities during the CR period. The Deputy Executive Director (DEDO) for Materials, Waste, Research, Tribal and Compliance Programs initially proposed that the CR budget guidance memorandum direct High-Level Waste Program staff to use FY 2010 funds until they were exhausted to continue the license application review; language to this effect was included in early versions of the CR budget guidance memorandum. However, the Chairman's office asked to review the draft memorandum and subsequently provided direction to OEDO staff and the CFO that resulted in the official memorandum, issued on October 4, 2010, directing staff to continue its activities on the Yucca Mountain license application in accordance with the Commission's decisions on the FY 2011 budget.

Interview of NMSS Director

The NMSS Director[9] told OIG that she had written a memorandum that she planned to present to the Commission in September 2010 conveying the staff's intent to complete Volume 3 of the SER with the remaining FY 2010 funding and the remaining SER volumes no later than the 2nd quarter of FY 2011 provided the availability of resources and the agency had not terminated the license application review. However, the DEDO for Materials, Waste, Research, Tribal and Compliance Programs told her they did not need the memorandum and would handle the issue through guidance in the CR budget guidance memorandum. The DEDO initially told the NMSS Director that the CR guidance would be to use FY 2010 and FY 2011 funds to continue the review. However, the NMSS Director later learned that the direction from the Chairman was to transition to closure upon entering the new fiscal year. The NMSS Director was concerned about whether the agency could use the FY 2010 carryover – which had been appropriated for license review – during FY 2011 for close-out activities.

Interview of DEDO for Materials, Waste, Research, Tribal and Compliance Programs

The DEDO for Materials, Waste, Research, Tribal and Compliance Programs told OIG that in the absence of a Commission decision on the ASLB adjudicatory matter, he and the NMSS Director recognized the need to communicate to the Commission, and that the Commission needed to provide direction for the High-Level Waste Program. The DEDO told the NMSS Director he would rather communicate through the CR budget guidance memorandum than a paper because it would yield a quicker response. He thought that due to the diversity of views on the Commission, a memorandum simply to inform them would promptly be converted into a vote, and it was unlikely they would reach a decision within a month. The DEDO wanted to convey in the CR budget guidance memorandum that the staff would use FY 2010 carryover funds in FY 2011, which would yield a net of $17 million ($10 million from the FY 2011 budget

_____

[9] The NMSS Director began working in that position in May 2010. Prior to that, she was the Deputy Director for NMSS, and the DEDO for Materials, Waste, Research, Tribal and Compliance Programs was the NMSS Director.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

and $7 million in FY 2010 carryover funds) to move ahead with license application review activities until they had a final decision from the Commission. This was the language the DEDO originally inserted into early draft versions of the CR budget guidance memorandum. However, after the CFO shared the memorandum with the Chairman's office, the Chairman's Policy Director said she thought the Chairman would not want this type of language in the memorandum because it would constitute a change in policy. The DEDO said he had not previously viewed the language in that way, but the Chairman's Policy Director conveyed that when the Commission last addressed the issue in the FY 2011 Congressional Budget Justification, the language was to close out the program.

The DEDO said OEDO and OCFO staff subsequently worked with the Chairman's office to revise the language to reflect something like, ". . . should continue to follow the established Commission policy." He thought the language ultimately used in the memorandum seemed innocuous and did not indicate specifically that this meant "close down the licensing process and commence the orderly closure of the program." He asked the Chairman's Policy Director why not be more explicit in the CR budget guidance memorandum to reflect what was intended, and the Chairman's Policy Director told him it was unnecessary because the CR budget guidance memorandum was pointing to the FY 2011 Congressional Budget Justification, which already captured the intent in writing. The DEDO said he questioned both the Chairman's Policy Director and the Chairman's Chief of Staff as to whether people would understand the connection. The DEDO told them the Congressional Budget Justification paragraph on the High-Level Waste Program could be read as "entry conditions," providing that until the agency allowed "withdrawal or suspension," it should continue the license application review. The Chairman's Policy Director and Chief of Staff responded that this was incorrect and that the budget justification language was background and set the context for the status of the program. They said the program's status was described in the workload paragraph of the Congressional Budget Justification, which reflects what the agency is going to use its resources and funding for. In this case, they said, this was closing down the program.

The DEDO also said the Chairman's Chief of Staff told him that in anticipating the potential controversy that would ensue with the implementation of the CR budget guidance memorandum, the Chairman had consulted with the other Commissioners and that at least a majority of the Commission was supportive of moving forward with the orderly closure of the High-Level Waste Program. The DEDO also recalled a meeting with the Chairman during which the Chairman stated he would complete discussions with the other Commissioners before the end of September 2010, and then NRC would initiate an orderly closure of the High-Level Waste Program.

<u>Interview of the CFO</u>

The CFO told OIG that in August 2010 the staff began generating variations of the CR budget guidance memorandum. At one point, they were prepared to issue the memorandum at which time the Chairman asked to see it. Up until then, his office had not received any direction from the Chairman's office on the memorandum, and the CFO thought the Chairman just wanted to

13

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

be informed about the document.  He said that the Chairman's Policy Director e-mailed him the paragraph on the High-Level Waste Program and he directed his staff to insert the language into the memorandum.  He recalled that just before one of the Chairman's regularly scheduled meetings, the Chairman called the CFO, the General Counsel, and the EDO into his office and asked whether they were "all okay with this memorandum."  The CFO said the Chairman said, "I'm going to talk to my other Commissioners, but I think there's a good chance that this might turn into a vote on Yucca Mountain."  The CFO said he did not understand how the memorandum could turn into a vote on Yucca Mountain because, in his view, the memorandum was a financial budget execution memorandum and not intended to redirect the staff programmatically.  He said he was surprised at the interpretation by the Commission that the memorandum was providing programmatic direction.  The CFO recalled that on October 1, 2010, Commissioner Ostendorff's Chief of Staff called him at home to tell him he had spoken with the Chairman's Chief of Staff about the CR budget guidance memorandum and had problems with the paragraph concerning high-level waste.  Later that evening, the Chairman's Chief of Staff called him at home and said the Chairman's office had clearance on all of the Commission offices to sign out the memorandum.  The CFO said that after the issuance of the CR memorandum and the direction to initiate High-Level Waste Program close-out activities, he asked the Chairman if he had missed something during the meeting with the General Counsel and EDO.  The Chairman explained that his intent was that the memorandum would result in a change in direction for the staff and they were going to go from issuing an SER to a NUREG.[10]  The CFO later asked the Chairman's Policy Director whether the conditions regarding withdrawal or suspension reflected in the FY 2011 Congressional Budget Justification had been met.  She replied that the conditions were met when DOE submitted its motion to withdraw its license application.

Interview of the EDO

The EDO said that initially there was no plan to include specific language about the High-Level Waste Program in the CR budget guidance memorandum.  At the same time, he said, given the Administration's direction to withdraw DOE's Yucca Mountain license application, the staff understood the High-Level Waste Program was on a path to closure.  The DEDO for Materials, Waste, Research, Tribal and Compliance Programs and he had asked to prepare a paper for the Commission describing how the staff would go about close-out and how much funding would be needed.  The staff's intent was to use the $7 million in carryover funds for continuation of the technical review and the $10 million proposed for the FY 2011 budget for close-out activities.  The EDO said that one of his primary responsibilities as EDO is to ensure the entire Commission is kept informed, and that a staff paper on the close-out plan would serve to inform the Commission and seek its input on the matter, which he felt was necessary.  The EDO said the staff had never prepared any papers for the Commission discussing plans for the closure of the High-Level Waste Program in part because the NWPA required NRC to perform a quality

---

[10]NRC NUREG documents communicate various types of information, including support for regulatory decisions, guidance for complying with regulations, results of task force investigations, results of contractor research programs, resolution of generic safety issues, and proceedings of conferences and workshops,

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

review in a timely manner. According to the EDO, his mindset and that of the staff was to accomplish as much of the technical review as they could. He and the NMSS staff believed that even if DOE were to withdraw the application, or the facility was not permitted to operate, it would benefit the country for NRC to have completed the technical review. Furthermore, he felt that because there had not been a Commission decision on DOE's withdrawal request, they should continue the technical review. However, over a period of weeks and months and interaction with the Chairman's office, they received direction from the Chairman to address the High-Level Waste Program in the CR budget guidance memorandum. The EDO said he understood that the Chairman's intent, prior to issuance of the CR budget guidance memorandum, was to close out the license application review process.

The EDO thought it would be okay to address the issue in the CR budget guidance memorandum because he believed the entire Commission would review the CR budget guidance memorandum. He thought the CR budget guidance memorandum would accomplish what needed to be done with regard to the High-Level Waste Program absent a paper from the staff. He believed that if the Commissioners decided the matter was a policy issue, they could vote on it. He said he expressed his concerns to the Chairman that the Commission needed to see the memorandum, and the Chairman told him the memorandum would not be issued until he had spoken with the other Commissioners and all were on board with the memorandum language. Prior to the EDO and CFO signing the memorandum, the Chairman told the EDO that all four Commissioners were in agreement with the language, understood that they were going to close out the High-Level Waste Program, and authorized the issuance of the CR budget guidance memorandum. The EDO anticipated that the contentious issue for the Commission would be whether they would close out or continue the technical review. The CR budget guidance memorandum did not provide any direction on the issue, so the EDO felt it was okay to sign because on face value, it did not provide questionable direction.

Interview of Commissioner Apostolakis

Commissioner Apostolakis told OIG that before the October 4, 2010 CR budget guidance memorandum was issued to the NRC staff, Chairman Jaczko advised him that he was prepared to authorize budget guidance under the CR process and wanted his support. During this conversation, which occurred on September 30, 2010, Chairman Jaczko asked Commissioner Apostolakis whether he would support him if a Commissioner challenged the CR guidance. Chairman Jaczko assured Commissioner Apostolakis that OGC advised him the planned CR guidance was appropriate. Chairman Jaczko requested that he respond to his question that same day. Commissioner Apostolakis told the Chairman that he did not see a problem but wanted to discuss the matter with his staff. Commissioner Apostolakis told OIG that the CR guidance to the staff to follow the Commission's FY 2011 budget direction subject to funding conditions under the CR seemed innocuous. His understanding of a CR was that the agency would continue ongoing work from the previous year.

15

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

Following the September 30, 2010 discussion with Chairman Jaczko, Commissioner Apostolakis' staff received a copy of the paragraph that discussed the High-Level Waste Program in the CR budget guidance memorandum. He recalled that his staff showed him language from the Commission's FY 2011 budget request, which stated that the orderly transition would begin upon withdrawal of the license application or suspension of the licensing review. Commissioner Apostolakis advised that although Chairman Jaczko said he would ask the staff to conduct activities in accordance with the FY 2011 budget, this is not what he did. Commissioner Apostolakis stated that the FY 2011 budget reflected that if the proceedings were suspended, then the agency would proceed with close-out of the license application review. However, the proceedings were not suspended. The Chairman ignored the portion of the budget which referenced upon withdrawal or suspension and directed the staff to close out the High-Level Waste Program. Commissioner Apostolakis stated that Chairman Jaczko did not explain to him what the CR guidance would mean in practice.

Commissioner Apostolakis said that he did not know from his initial discussion with Chairman Jaczko that the likely effect of the October 4, 2010 CR guidance was that SER Volume 3 would not be issued in November 2010 as originally scheduled. Members of his staff raised the prospect that the NRC staff would not complete SER Volume 3 and would work to incorporate Volume 3 in a NUREG report. He did not know what work was required to complete Volume 3.

During the week of October 4, 2010, Chairman Jaczko sought Commissioner Apostolakis' support in opposing any challenge to the CR budget guidance memorandum based on Commissioner Ostendorff's October 6, 2010 COM. Commissioner Apostolakis told Chairman Jaczko he did not provide him with details of the practical impact of the CR guidance when the Chairman originally requested his support. Commissioner Apostolakis was concerned about preserving the staff's work product and he wanted the Commission to see the staff's plan for implementing the October 4, 2010 CR memorandum guidance. The Chairman told him that preserving the staff's work products, such as the draft SER Volume 3, in the internal agency records would not be a problem. However, the Chairman did not want to include regulatory conclusions in any public release of Volume 3.

During the week of October 4, 2010, Commissioner Apostolakis also discussed issues related to the budget guidance and Commissioner Ostendorff's COM with the Chairman and Commissioner Magwood. On October 7, 2010, Commissioner Apostolakis learned of a petition filed with the NRC Commission on behalf of Aiken County, SC, and the States of South Carolina and Washington, raising issues about the budget guidance and its relation to the adjudicatory High-Level Waste proceedings, from which he had recused himself. Based upon this action he decided he would not participate in voting on Commissioner Ostendorff's COM.

Interview of Commissioner Magwood

Commissioner Magwood told OIG that on September 28, 2010, during a regularly scheduled periodic meeting with Chairman Jaczko, the Chairman informed him that the NRC staff was developing a plan for operating under the CR passed by Congress and that this plan would

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

move toward close-out of the High-Level Waste Program as anticipated by the Commission in the FY 2011 budget. According to Commissioner Magwood, the Chairman said that the NRC staff drafted language regarding the High-Level Waste Program and the Chairman asked if he would review the language and let him know if he had any objection. Commissioner Magwood told the Chairman that it would be appropriate to formulate a plan for moving forward and that he would review the draft guidance. He also told the Chairman that he would not support a "precipitous" termination of the High-Level Waste Program. According to Commissioner Magwood, the Chairman assured him that this was not his expectation.

Commissioner Magwood told OIG that his staff reviewed the draft language on the High-Level Waste Program and compared it to the FY 2010 budget and FY 2011 guidance. His staff concluded that the language, which indicated that the staff should begin implementing the FY 2011 plan as reflected in the agency's Congressional Budget Justification, was consistent with both Commission policy and Congressional actions to date. Commissioner Magwood said he thought it prudent to ensure that the NRC's rate of expenditures on the High-Level Waste Program remained within the $10-million ceiling. He instructed his staff to inform the Chairman's office that he would not object to the instruction in the draft CR budget guidance memorandum.

Commissioner Magwood stated that after the October 4, 2010, CR budget guidance memorandum was issued, he learned this memorandum was interpreted as requiring the staff to shut down its work on the Yucca Mountain license application, not issue SER Volume 3 as planned in November 2010, remove the findings from SER Volume 3, and issue the document as a technical evaluation report (TER).

Commissioner Magwood said that after discussions with NRC senior staff members, he learned that what had been portrayed as guidance developed by senior agency staff had actually come from the Chairman. On October 7, 2010, he discussed concerns he had about Chairman Jaczko's actions with the Chairman. According to Commissioner Magwood, the Chairman became very agitated and said that he would never have taken these actions had both Commissioners Apostolakis and Magwood not agreed to support the guidance. Commissioner Magwood said he objected to this statement quite strongly and that the Chairman never told him his plan had been to shut down the High-Level Waste Program and withhold publication of SER Volume 3. The Chairman responded to him, "You should have asked." Commissioner Magwood said that under the statutory framework, the Chairman had an obligation to provide full and accurate information to Commissioners.

After the staff was directed to stop working on the SER, Commissioner Magwood considered writing a COM to address this matter directly. He later found out that Commissioner Ostendorff felt strongly about the actions of the Chairman and was in the process of publishing a COM. He encouraged Commissioner Ostendorff to proceed and offered suggestions to the COM's development which was published on October 6, 2010.

17

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

On October 8, 2010, Commissioner Magwood concluded that Commissioner Ostendorff's views and his were in agreement with regard to the Chairman's actions. However, based on subsequent motions filed by petitioners from Aiken County, SC, and South Carolina and Commissioner Apostolakis' recusal from the matter, he decided the best thing to do was to step back from the matter to examine the issues, particularly the legal issue. Therefore, he decided not to participate in response to Commissioner Ostendorff's COM.

On November 12, 2010, Commissioner Magwood issued a COM to the Chairman and Commissioners pertaining to future activities of the High-Level Waste Program. As of the publication date of this report, this matter was still under deliberation by the Commission.

<u>Interview of Commissioner Ostendorff</u>

Commissioner Ostendorff told OIG that on September 30, 2010, his Chief of Staff told him that the Chairman was planning to issue guidance on the CR and that this guidance would include language that would effectively have the staff discontinue work on DOE's license application, specifically SER Volume 3. His office received a copy of the draft language in the CR budget guidance memorandum pertaining to the High-Level Waste Program from the Chairman's Chief of Staff on the evening of September 30. Commissioner Ostendorff said his Chief of Staff was informed that Commissioners Magwood and Apostolakis had already given their support to this guidance, so there was no point in his office making an issue of it since a majority had already agreed to the CR guidance. The Chairman's Chief of Staff told Commissioner Ostendorff's Chief of Staff that if Commissioner Ostendorff disagreed with the CR guidance, they should discuss a compromise on the Yucca Mountain adjudicatory matter.

Commissioner Ostendorff stated that on October 1, 2010, Chairman Jaczko told him that the CR budget guidance memorandum would have the staff commence orderly closure of the Yucca Mountain license application review. Ostendorff told the Chairman that he disagreed with his direction, the direction was wrong, and he should not issue it. Chairman Jaczko told him he would consider his advice, and get back to him before he made a decision. Later that day, Chairman Jaczko informed him that he had decided to issue the guidance. Commissioner Ostendorff said he told the Chairman that he strongly disagreed with his decision. He said he asked Chairman Jaczko what he planned to do with respect to SER Volume 3. According to Commissioner Ostendorff, the Chairman told him that SER Volume 3 would not be issued in this current form, the staff's findings would be removed from the document, and a document would eventually be issued, possibly as a NUREG.

Commissioner Ostendorff advised OIG that he disagreed with the CR guidance memorandum's direction to follow FY 2011 budget guidance because the conditions that would authorize "orderly closure" had not been met. According to Commissioner Ostendorff, the FY 2011 budget request stated that such closure would not begin until "withdrawal or suspension of the licensing review." Since the issue of whether the license application may be withdrawn was currently before the Commission and a final decision had not been made, that condition clearly had not been met.

18

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

On October 4, 2010, Commissioner Ostendorff related that he spoke with Commissioner Svinicki about the CR guidance memorandum, and explained his concerns on the matter and that he considered issuing a COM. Later that day he was informed that the EDO and CFO had published the CR budget guidance memorandum.

On October 5, 2010, Commissioner Ostendorff directed his staff to prepare a COM that would raise the CR guidance issue as a policy matter for Commission consideration. He met separately with Commissioners Apostolakis and Magwood to discuss his concerns and explain his objections concerning the CR budget guidance memorandum. The feedback he received from both Commissioners was that they felt the memorandum's guidance on the High-Level Waste Program was wrong. Commissioner Ostendorff's COM was issued on October 6, and on October 8, he learned that Chairman Jaczko and Commissioners Apostolakis and Magwood decided not to participate. Only Commissioner Svinicki voted on the matter.

Interview of Commissioner Svinicki

Commissioner Svinicki told OIG that on the morning of September 30, 2010, her staff learned that Chairman Jaczko was proposing to unilaterally issue guidance to the NRC staff on the use of funds for the High-Level Waste Program during the FY 2011 CR. The CR guidance would direct agency staff to follow the FY 2011 budget direction.

Commissioner Svinicki stated that although she attended a regularly-scheduled periodic meeting on the afternoon of September 30 with Chairman Jaczko, neither she nor the Chairman raised the CR budget guidance memorandum. She did not raise the issue because she was not sure if the CR budget guidance memorandum was a rumor. Nevertheless, her legal counsel contacted the NRC General Counsel to question the legal basis for the purported CR guidance. Also during the afternoon of September 30, she learned from Commissioner Ostendorff that he was aware of the same rumor concerning the CR budget guidance memorandum. Both she and Commissioner Ostendorff agreed that the CR guidance was not appropriate. During the evening of September 30, Commissioner Ostendorff e-mailed her a copy of the CR guidance language, which was identical to the language included in the final October 4, 2010 CR budget guidance memorandum. Commissioner Svinicki said that Commissioner Ostendorff's staff was approached by the Chairman's Chief of Staff to discuss the CR budget guidance memorandum. Commissioner Ostendorff's staff specifically asked the Chairman's Chief of Staff if Commissioner Svinicki's office had been informed of the CR budget guidance memorandum. The Chairman's Chief of Staff replied that Commissioner Svinicki's office was already aware of the guidance because her staff had made inquiries to the General Counsel.

While Commissioner Svinicki was on international travel from October 1 to 9, 2010, she learned that the CR budget guidance memorandum was officially issued on October 4. On October 5, her staff informed Chairman Jaczko's office that she objected to the CR guidance.

19

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

Commissioner Svinicki stated that she did not have any direct communication with Chairman Jaczko regarding this matter before the CR budget guidance memorandum was issued on October 4, 2010. She learned on October 1 that the Chairman's staff left two messages for her staff on the evening of September 30 and on October 1. After the CR budget guidance memorandum was issued, she questioned the CFO about his knowledge and involvement in the development of the memorandum. The CFO told her although he was out of the office during much of the memorandum's development, when he returned, he inquired about the status of the memorandum and was told by the Chairman's Policy Director that Chairman Jaczko was walking the guidance memorandum around to the Commissioners.

Commissioner Svinicki said that in reviewing the FY 2011 Congressional Budget Justification and her vote on this budget, she noted that her vote contained specific edits to the narrative description of activities related to the High-Level Waste Program. Of note, she voted to change the language describing the commencement of orderly close-out of the high-level waste technical review from "Assuming withdrawal or suspension..." to "Upon withdrawal or suspension...." The purpose of this edit was to make clear that orderly close-out of the High-Level Waste Program would not begin unless and until the license application had been withdrawn or the technical review had been suspended. This edit was supported by the Commission at that time (Chairman Jaczko, then Commissioner Klein, and Commissioner Svinicki) and was incorporated into the final document.

Commissioner Svinicki told OIG that when reviewing her vote on the FY 2011 budget in light of the events related to the October 4, 2010 CR budget guidance memorandum, she recalled a conversation she had with Chairman Jaczko regarding her January 2010 vote. Shortly after she cast her vote, Chairman Jaczko requested to meet with her. During this meeting, Chairman Jaczko expressed his frustration that she had voted to edit language in the FY 2011 Congressional Budget Justification document, deeming most of her edits insignificant. Further, Chairman Jaczko interpreted her edits to the language describing the High-Level Waste Program to indicate a belief on her part that he was at the NRC for the purpose of dismantling and terminating the Yucca Mountain program at the bidding of Senator Reid. Commissioner Svinicki said the Chairman was very animated and objected to this perceived accusation. She told Chairman Jaczko that none of her edits were intended as an accusation, but rather they were offered to improve the quality of the document on substantive matters.

Commissioner Svinicki said that during the voting process on the appeal to OMB for the FY 2011 budget passback, she had proposed edits to the passback appeal letter. However, the Chairman called her and advised that he was leaving the building in "8 minutes" and if she did not retract her vote edits on the passback appeal letter, he would leave and not submit the letter on behalf of the agency to OMB, which would cause the agency to absorb the funding reductions proposed by OMB. Given this ultimatum, she agreed to the edits of another Commissioner which were similar to hers.

20

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

Commissioner Svinicki told OIG that on October 14, 2010, she voted to approve Commissioner Ostendorff's COM because the FY 2010 budget direction governs during the CR, and even if that were not the case, the prerequisites in the FY 2011 budget under which "orderly closure" of high-level waste review activities would begin had not been satisfied. She objected to the Chairman's CR direction because the NRC Commission had not concluded action on the Commission's ongoing adjudicatory proceedings on the Yucca Mountain license application. She said the direction to NRC staff to stop the license application technical review could achieve the same practical result as overturning the ASLB's decision, effectively granting DOE's motion to withdraw. The proper vehicle for resolving the legal question of DOE's authority to withdraw the license application is through Commission action on the adjudicatory matter, and any direction on the use of funds during the CR, absent specific direction from Congress to the contrary, should not predetermine the outcome of the legal matter pending before the Commission.

Interview of Former Chairman Klein[11]

Former Chairman Klein recalled that he and Commissioner Svinicki wanted two things: first, to follow the NWPA's requirement that NRC evaluate DOE's license application and, second, to see a solution to the high-level waste issue. They felt strongly that the NRC staff needed to make a determination whether the Yucca Mountain site was acceptable or not, and they wanted to make sure the staff had the resources needed to make that determination. There was considerable uncertainty about the future of the High-Level Waste Program, and he and Commissioner Svinicki paid attention to the FY 2011 budget language to make sure it allowed NRC and the staff to fulfill these responsibilities. Even if there was a request to withdraw the license application, a determination had not, and has still not, been made as to whether or not it can be withdrawn. Former Chairman Klein said it was important to capture all the knowledge gained through the license application review and complete the work that staff had ongoing. For example, if they had an SER that was about to be finished, it should be finished. Former Chairman Klein felt strongly that until the license application was withdrawn legally and/or suspended legally, NRC needed to do as much as it could to evaluate the application.

Interview of Chairman's Chief of Staff

The Chairman's Chief of Staff told OIG that he had minimal involvement in the development and publication of the CR budget guidance memorandum and that the draft document was presented to the Chairman's office from the CFO's office. He said the Chairman's Policy Director provided guidance to the EDO and CFO regarding the memorandum on behalf of the Chairman and that it should follow established Commission policy and OMB Circular A-11. The Chairman spoke with Commissioners Ostendorff, Apostolakis, and Magwood about the CR budget guidance memorandum but did not talk to Commissioner Svinicki.

---

[11] From July 2006 to May 2009, Dale Klein was the NRC Chairman. From May 2009 until he resigned in March 2010, he served as a Commissioner.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

According to the Chairman's Chief of Staff, the intent of the CR guidance was to provide a spending limit against the proposed FY 2011 budget, which OMB had directed. However, in the case of high-level waste, Congress did not provide specific direction on how to spend those funds, and NRC actually conveyed its spending intent to Congress through its Congressional Budget Justification and its reclama process. The intent was to spend $10 million, based on the President's budget, and the Commission's decision to proceed to close-out. The Commission knew that for the prior fiscal year, Congress had given NRC half of what it had requested, which conveyed that they were moving NRC toward close-out rather than ramping up the review. The Commission did not oppose OMB's proposed funding for the High-Level Waste Program for FY 2011, and the letter that NRC sent to OMB reflected that the Commission expected DOE to withdraw its license application and understood that the $10 million would be used for orderly close-out. The policy was set when the Commission voted on the passback appeal letter to OMB.

Interview of the General Counsel

The General Counsel told OIG that the direction given in the CR budget guidance memorandum was consistent with existing Commission budget guidance. He recognized some ambiguities, but believed on the whole the CR budget guidance memorandum was consistent with existing Commission budget guidance, and was appropriate to issue. Had the Commission disagreed with that, they could have voted to overturn it, or given some other direction. The General Counsel said that changing this direction would require a majority vote by the Commission and that focusing on close-out activities was a rational and lawful way to proceed. Moreover, close-out activities do not constitute new work under the CR. The CR budget guidance memorandum does not preclude NRC from resuming its licensing review if Congress decides to fully fund DOE and NRC.

The General Counsel noted the wording difference between the OMB passback appeal letter and the NRC Congressional Budget Justification, indicating the OMB letter contained far less ambiguity concerning the conditions to begin close-out activities. He said the NRC's Congressional Budget Justification is an informative document that describes NRC's budget request but ultimately does not have any legal force and effect. Rather, it is the enacted budget that is appropriated by Congress that has authority. When the Congressional Budget Justification is not representative of the final appropriation, it is of somewhat limited value.

Interview of Chairman Jaczko

Chairman Jaczko told OIG that he met with the General Counsel, EDO, and CFO about the language in the CR budget guidance memorandum. During this meeting, he asked them what they thought it meant. He asked if everyone understood that the language meant close-out of the program and whether they were in alignment. He specifically asked, "Does everybody understand what this means, and that this means close-out?" He recalled the EDO said, "I don't really understand what the big deal is with this." Chairman Jaczko then told them he was going to talk to the Commission about the memorandum before he issued it. He said that "there may be Commissioners who don't agree with this, and will try and make it a policy issue." He told OIG that

22

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

the CR budget guidance memorandum was his decision and he wanted to talk directly to the Commissioners to explain it. He did not recall whether he informed the EDO that the discussions had occurred; however, he recalled telling the EDO that he could publish the memorandum.

He told Commissioner Apostolakis that the memorandum would result in closing out the High-Level Waste Program and he was doing this under his authority. Chairman Jaczko explained that the other Commissioners could make an argument that this was a policy issue for the Commission, and he wanted his support if that happened. He specifically recalled coming back from the meeting with Commissioner Apostolakis with the impression that Commissioner Apostolakis did not understand what he meant. As a result, he asked his Chief of Staff to follow up with Commissioner Apostolakis' Chief of Staff to ensure his message was understood.

He did not recall much of the conversation he had with Commissioner Magwood, but did recall he was clear that the CR budget memorandum guidance was to begin closing out the High-Level Waste Program. Commissioner Magwood's Chief of Staff subsequently contacted his office and related that "Commissioner Magwood was fine with how you're going to go forward with the memo." Chairman Jaczko stated at this point he decided to go forward and direct the CFO and EDO to publish the memorandum. Chairman Jaczko said that Commissioner Magwood may not have understood what the CR guidance meant and if he did not understand that was not his fault. He then spoke with Commissioner Ostendorff about the CR budget guidance memorandum. Commissioner Ostendorff immediately understood and was very unhappy about it. Chairman Jaczko spoke with Commissioner Ostendorff twice on the matter during which Commissioner Ostendorff urged him not to publish the memorandum.

Chairman Jaczko told OIG that prior to the issuance of the CR budget guidance memorandum, he had two meetings with the staff about moving to close-out, and that they would stop working on the SER. In doing so, they would capture the information and publish a TER, and they were not going to be reporting findings for a project that they were no longer working on formally for licensing review. According to the Chairman, this was the general understanding long before October 1.

Chairman Jaczko related he had discussions with two Commissioners concerning the publication of the CR budget guidance memorandum and its result being to stop the publication of Volume 3 of the SER. He believed these discussions were subsequent to the memorandum's publication. During these discussions, the Commissioners asked what impact the CR budget guidance memorandum would have on the SER, and the Chairman responded that publishing the SER volumes was not something they were going to be doing as part of this close-out. Furthermore, he told OIG that if his colleagues did not understand, there was only so much he could do to explain. Chairman Jaczko related that these were heated, intense discussions, but his colleagues had given him a commitment to support him on the CR budget guidance memorandum.

Chairman Jaczko said the intent of the budget was that when DOE submitted its motion to withdraw, the license application would be withdrawn. Therefore, submittal of the motion was the triggering factor and not the actual withdrawal. In hindsight, the language in the Congressional Budget Justification, given what has materialized in the adjudicatory process,

23

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

appears to make it seem different that what it really meant. The intent as he understood it was that DOE would submit its motion to withdraw and that would be the agency's trigger to begin closing the program. That has always been his intent, and he could not read the budget any other way. Chairman Jaczko said that while the Commission composition has been different at various decisionmaking points during the FY 2010, FY 2011, and FY 2012 budget processes, in each case the Commission at the time has approved the budget documents currently in place. These budget documents show the agency's shift to program close-out, and include the FY 2012 Congressional Budget Justification, which the current Commission approved, and which reflects close-out of the program without conditioning it on a motion to withdraw. Chairman Jaczko said even if one read the FY 2011 Congressional Budget Justification to mean that the Commission should not have closed out the program at the beginning of FY 2011, waiting to see the completion of the motion to withdraw, he made the decision at the beginning of the fiscal year. He told the staff to "follow the guidance in the FY 2011 budget."

Chairman Jaczko said he asked the General Counsel about the significance of the language (withdrawal or suspension) in the FY 2011 Congressional Budget Justification, and the General Counsel told him that one of the Commissioners had made the point that the document does not mean begin close-out. Chairman Jaczko asked the General Counsel whether that viewpoint was consistent with the General Counsel's interpretation of the budget, and the General Counsel said "no." Chairman Jaczko said the withdrawal or suspension language in the Congressional Budget Justification was odd and probably got inserted through the Commission's editing process. He clearly missed it and it was not the intent of what they were doing. According to Chairman Jaczko, the language was irrelevant because if a withdrawal request came in, there was no way the Commission would disapprove it, and in his mind it did not change the operative nature of what the budget did. Moreover, the Congressional Budget Justification had to get approved by OMB, which missed it. He commented that the passback letter to OMB laid out the trigger as being the withdrawal request, which put them on the path to close-out.

He told OIG that the closure of the High-Level Waste Program was not an endeavor he accomplished through his executive authority over budget that he could not accomplish through the adjudicatory process. He commented that they were closing out the review in budget space, and that what was not understood was they had not resolved the adjudicatory matter.

*Coordination with U.S. Government Accountability Office*

OIG coordinated with the U.S. Government Accountability Office with regard to the allegation that the NRC Chairman had exceeded his authority during the CR period by stopping the review of the DOE license application for a geological repository at Yucca Mountain, NV. GAO declined to provide a formal legal opinion regarding this issue as it was too closely related to an authority matter rather than an appropriations matter.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

*Coordination with U.S. Office of Management and Budget*

OIG coordinated with the Office of Management and Budget (OMB) regarding how it was determined to appropriate $10 million for NRC's High-level Waste Program for FY 2011. OMB advised that it does not disclose this type of information in accordance with Circular A-11, paragraph 22.1, "Confidentiality of budget deliberations."

**B.    OIG Review of SER Issue**

OIG learned that between April and May 2010, NMSS staff informed the Chairman that they were ahead of schedule with their work on the SER volumes, and they inquired whether they should attempt to issue the volumes at earlier dates than those which had been established in March 2010. The Chairman responded in a June 2010 memorandum that they should not expedite issuance of the reports, but should instead maintain the timeline that had been announced publicly in March 2010. According to that timeline, Volume 1 would be issued in August 2010, and Volume 3 in November 2010. Volume 1 of the SER was issued as scheduled; however, in October 2010, at the start of the new fiscal year, Chairman Jaczko directed staff to stop working on all SER volumes. Subsequently, the Chairman gave direction to the staff to prepare a document for public release that captures the knowledge gained through the NRC's technical review of DOE's license application but would not contain any of the staff's findings and conclusions.

*NRC's Plans for Developing SER To Meet NWPA Review Requirements*

Completion of NRC's technical review of DOE's license application and subsequent issuance of the SER are governed by the schedule established in 10 CFR, Part 2, Appendix D, which requires the SER be completed no later than 18 months following NRC's issuance of a Notice of Hearing regarding DOE's license application. The schedule in 10 CFR Part 2, Appendix D, codifies an NWPA stipulation that NRC issue a decision approving or disapproving the issuance of a construction authorization no later than 3 years after the date of the submission of an application for authorization to construct a geologic repository. The NWPA additionally allowed NRC to extend the 3-year deadline by no more than 1 year. NRC published the Notice of Hearing in the Federal Register on October 22, 2008, starting the 3-year clock. The date corresponding to the 18-month deadline for issuance of the SER was April 23, 2010. Originally, NRC planned to meet the April 23, 2010 deadline to complete and issue the SER; however, due to budgetary constraints, NRC indicated in July 2009 that it would not be able to issue the SER in accordance with the 10 CFR Part 2, Appendix D, schedule. It was at this point that the agency announced the SER would be issued serially in five volumes. As of July 2009, Volume 1 (General Information) was projected to be issued in March 2010, and Volume 3 (Review of Repository Safety after Permanent Closure) in September 2010; at the time, NRC was unable to estimate completion dates for the remaining three volumes.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

On January 27, 2010, NRC revised its schedule regarding issuance of SER Volumes 1 and 3; SER Volume 1 was now scheduled to be issued in August 2010 and SER Volume 3 in November 2010.

On March 30, 2010, the EDO sent a memorandum to the Commission informing the Commission of the staff's plans regarding the High-Level Waste Program, including its review of DOE's application, in light of the Administration's plan to terminate the Yucca Mountain repository program and DOE's March 3, 2010 request to withdraw its repository application. This memorandum proposed to the Commission that in light of the President's FY 2011 budget and assuming Congress provided no additional funding or direction to the contrary, the staff would continue the technical review of DOE's application and SER preparation until FY 2010 funds were exhausted. The memorandum also informed the Commission that as of the end of February 2010, DOE had responded to all of NRC's requests for additional information and, at that time, the NRC staff had not identified a need for additional information from DOE to complete the SER volumes. The memorandum included a projected schedule for completion of all SER volumes. Volumes 1 and 3 were still on schedule to be issued in August and November 2010, respectively, and all of the remaining volumes would be issued by the end of March 2011. OIG learned that between May and June 2010, the Commission was informed that SER Volumes 1 and 3 were ahead of schedule; however, on June 11, 2010, Chairman Jaczko sent a memorandum to the EDO titled, "Schedule for HLW SER," stating that the staff should not attempt to issue the volumes ahead of the projected schedule provided in the EDO's March 30, 2010 memorandum. The Chairman wrote:

> I believe it is in the best interests of the agency not to alter the schedule for the completion of SER volumes at this time, but instead to maintain the predictable schedule previously provided to the Commission in March 2010, regarding plans for the High-Level Waste Repository Program. The agency's overall resources would be better utilized by maintaining the current schedule. Therefore, the information in Volume 1 of the SER should be finalized and presented no earlier than August 2010, and subsequent volumes consistent with and not earlier than the schedule provided to the Commission in March 2010.

In accordance with the March 2010 schedule for SER volume publication, Volume 1 was issued on August 23, 2010. No additional volumes have been issued.

*Interviews of Senior Staff on SER Issue*

The NMSS Director said that prior to the Chairman's June 11, 2010 memorandum instructing staff to maintain the March 30, 2010 SER publication schedule, she had attended meetings with the Chairman, EDO, and DEDO for Materials, Waste, Research, Tribal and Compliance Programs concerning the status of the staff's progression on the SER volumes. She said she informed the group that the staff was well ahead of schedule with regard to completing the SER. She said the group discussed the appropriateness of slowing down the work and that she and the EDO specifically indicated to the Chairman that it would be contrary to the agency's values

26

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

of openness and transparency to do so. She recalled that the Chairman thanked them for their views and ended the discussion. The NMSS Director said she believed the motivation to slow down the work was related to the DOE's request to withdraw its license application and the formulation of the Blue Ribbon Commission to look at the national policy on waste. She had been told that if NRC were to publish the SER volumes, it would indicate that NRC was "out in front" of the Administration with regard to the disposal of high-level waste. The NMSS Director told OIG that she received SER Volume 1 for review, concurrence, and authorization to publish on June 24, 2010, and Volume 3 for review, concurrence, and authorization to publish on July 15, 2010. The NMSS Director believed that minimal resources were needed to complete the review process and issue Volume 3. She also commented that by September 30, 2010, NRC had all the information it needed from DOE to complete the SER. The NMSS Director recalled that prior to October 1, 2010, the DEDO directed that her staff would begin transition to closure on October 1.

The DEDO for Materials, Waste, Research, Tribal and Compliance Programs told OIG that when they met with the Chairman in June 2010 to discuss the staff's progress on the SER, the Chairman already knew that as of October 1, 2010, when the agency moved into the new fiscal year that he would be closing down the license application review. The DEDO said the reason that he and the NMSS Director went to meet with the Chairman was to inform him that they could publish the volumes ahead of the designated schedule if the Chairman preferred. However, the Chairman's preference was to stick to the original schedule. The DEDO said the practical effect of the Chairman's June memorandum was that it prevented the staff from issuing Volume 3 should it have been finalized prior to October 1.

The Deputy Division Director for the Licensing and Inspection Directorate, Division of High-Level Waste Repository Safety, NMSS, told OIG that Volume 3 of the SER was nearly finished, minus the office director comments and concurrence and review by the Office of the General Counsel (OGC). In early October 2010, staff were in the process of resolving OGC comments on Volume 3. He and the Deputy Division Director for the Technical Review Directorate had personally reviewed Volume 3 and they were both comfortable with the insights gained from the information DOE had provided. The Deputy Division Director for the Licensing and Inspection Directorate said the direction to stop working on the SER came directly from the Chairman, who met with the NMSS staff in early October 2010. The Chairman explained that the budget drove his decision and that the NRC General Counsel agreed with his decision. The Chairman did not indicate for the staff to shut down in a way from which they could not recover. Instead, the Chairman conveyed that the shutdown should take place in a reversible manner so that, if needed, they could resume their review activities.

The Deputy Division Director for the Licensing and Inspection Directorate also explained that an SER is a licensing product based on regulatory requirements, and a TER is a technical review without licensing requirements. He advised that a TER has scientific value, but little licensing value.

27

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

The EDO told OIG that he had the impression that Volume 3 was ready for publication in late summer 2010. He recalled that it was around the period of the election and that they were going to wait until elections had concluded to publish the volume. He said the staff had advised the Chairman that the work on Volume 3 was done, and the Chairman said to maintain the original schedule because earlier publication of the volume could be interpreted as trying to influence the decision on whether DOE was authorized to withdraw its license application.

The Assistant General Counsel for High-Level Waste, Fuel Cycle & Nuclear Security, OGC, said that the completion status of Volume 3 was open to interpretation. She said that as of July 15, 2010, Volume 3 had been provided to the NMSS Director and was reported to be substantially complete. However, the document was undergoing additional editing and formatting, including a final quality control check, to assure appropriate nomenclature, proper numbering, and sequencing, and other minor administrative changes that may be necessary to ensure completeness and accuracy. OGC had been asked to review the document and indicate, by August 25, 2010, whether they had any legal objections regarding the document.

The Chairman's Chief of Staff recalled that when the Chairman was informed by NMSS staff that they were ahead of schedule with regard to the SER volumes, the Chairman did not think it best to change the timing that had been publicly announced as to the publication dates. The Chief of Staff said that Volume 3 had not undergone senior management or General Counsel review and was a predecisional document. His understanding was that the NMSS Director had not completed her review of the document, and that as of the new fiscal year NRC had transitioned to a categorically different activity (close-out) for which $10 million had been allocated. Based on this transition, the agency needed to use the resources for that specific purpose.

The General Counsel acknowledged that under the NWPA, the NRC was to determine up or down within 4 years from the DOE application acceptance date on the license application. However, many factors have come to bear, such as a non-willing applicant and an unfunded program. This is budget reality and he would argue this course is a prudent way; if Congress decided to fund this project, the agency is actually in a better position to resume than shutting it off all together. He did not believe that the Chairman had put the Commission in jeopardy because Congress has not properly funded the program to meet its obligations. He further advised the activities and authorizations outlined in the Nuclear Waste Policy Act are subject to appropriations. He stated that "unless Congress appropriates money, you can't do any of those things."

*Interviews of Commissioners on SER Issue*

Commissioner Ostendorff recalled Chairman Jaczko informing him, during a routine periodic meeting on June 8, 2010, that the Chairman was considering whether to provide direction to NMSS to delay issuance of SER Volume 1, which was ready to be issued 2 months ahead of its scheduled issuance in August 2010. The Chairman asked him for his thoughts on the matter and said he thought it would look "funny" for the SER to be issued in the middle of the ongoing

28

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

high-level waste adjudication. The Chairman told Commissioner Ostendorff he was directing this action in his capacity as NRC's principal executive officer and that it was not a policy matter. Following the meeting, Commissioner Ostendorff called the Chairman to tell him he strongly disagreed with the Chairman's proposed course of action. Commissioner Ostendorff thought it was a "big mistake" to provide direction to the staff to slow down the SER review, and that it would look very bad for the Chairman to interfere with the staff's activities, particularly in light of the ongoing high-level waste adjudication. Commissioner Ostendorff cautioned the Chairman that he would likely have to deal with any accusations of tampering with the proceedings if word got out that he had provided such direction.

Commissioner Ostendorff said that on June 11, 2010, during a routine periodic meeting with the General Counsel, he discussed his concerns with the Chairman's proposed direction on delaying issuance of SER Volume 1. The General Counsel told Commissioner Ostendorff that it was his opinion that the direction was not legally objectionable, but that he did not provide an opinion to the Chairman on the policy implications. The General Counsel told Commissioner Ostendorff that it was his experience that there were certain issues that the Chairman does not want to hear from him on. This conversation left him with the impression that there was possibly not an open environment for OGC to provide unfiltered advice to the Chairman without fear of retribution.

Commissioner Ostendorff was aware that the draft SER Volume 3 had been sent to the NMSS Director for review in July 2010. On October 1, when the Chairman informed Commissioner Ostendorff of his plans to issue the CR budget guidance memorandum and to remove the findings from SER Volume 3 prior to issuance, the Commissioner expressed his concerns about not completing SER Volume 3 as previously planned by the staff. Commissioner Ostendorff's concerns included censoring staff technical work already completed and the fact that the actions directed to the staff were directly related to the outcome of the high-level waste adjudication that was currently before the Commission but had not yet been decided.

Commissioner Svinicki advised OIG that she considered the issuance of the SER volumes to be a policy matter for Commission involvement, particularly in light of the Chairman's unilateral direction in June 2010 to direct agency staff to issue SER Volume 1 no earlier than the staff's scheduled date of August 2010. She recalled advising against that course of action when the Chairman informed her of his intent to issue that direction. According to Commissioner Svinicki, she voted to approve Commissioner Ostendorff's COM because she supported finalizing and issuing Volume 3.

Commissioner Magwood advised that the Chairman's actions relative to Volume 3 of the SER may not, strictly speaking, be illegal from the perspective of appropriations and CR law, but his actions under the Commission's organic statutes present a different picture. Under the Commission's statutes and standing procedures, policy determinations are made by majority vote of the Commission, not by the unilateral action of the Chairman. According to the Commissioner, the Chairman's specific direction to the staff regarding implementation of the CR

29

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

(e.g., the decision not to issue SER Volume 3 as planned and previously communicated to the Commission) was a significant policy shift, not merely administrative guidance, and therefore was not proper.

Former Chairman Klein said that NRC is under a legal obligation to review DOE's application but he recognized that the agency needs the funding to complete the task. He recalled once making the point during a speech that guidance was needed from Congress on this matter. He thought it was inappropriate for Congress not to fund NRC for a law it had passed, and that the agency had to meet. He said because NRC had that law, and the requirement, but not the funds to carry it out, the agency needed relief. He said, "Either we needed to get the money to do it, or they needed to give us relief from it. And they have not given us relief from it."

*Interview of Chairman on SER Issue*

Chairman Jaczko told OIG that he did not want NRC to publish Volume 3 early because it could give an impression that the agency was trying to rush information out before it was actually complete, knowing the project was terminating. This would create challenges for NRC from a public communications perspective; it would look political if they moved forward in this way. He said that as Chairman, it is his responsibility to manage the agency's workload and workflow with regard to scheduling. Shortly after the CR budget guidance memorandum was published, he personally directed the staff that the agency would publish Volume 3 as a TER that would reflect where they were in the review process, but would not reflect NRC's findings. He said the staff's work on the SER would be preserved as an internal non-public document in ADAMS, the agency's document management system. Further, he never directed anyone to destroy or delete the document as the hearings have not ended. Chairman Jaczko said the agency has an obligation to preserve the document if hearings are to resume.

Chairman Jaczko advised that his office had contacted several members of Congress who told them there was nothing illegal or wrong with what he was doing in relation to the CR guidance and it was perfectly consistent with appropriations. The commentary and correspondence he received reflecting congressional dismay against his actions were solely political in nature. The agency had a budget from OMB that reflected "do close-out" and Congress had not passed an appropriation which was how they indicate to agencies what to do with their funding. He told OIG that several times, Congress passed a CR and had the opportunity to specifically direct the agency not to proceed with close-out activities but that several CRs had been passed with no direction to NRC to do anything different. He related the fundamental obligation for the agency was to go with the lower values of what has been approved by the House and the Senate. This was reflected in OMB Circular A-11. The FY 2011 budget that was approved by the Senate and the House for NRC was $10 million for closure activities. Chairman Jaczko said that as the head of the agency, he was bound by the agency's budget. He also commented that the activities in the NWPA were subject to appropriations. For example, there are provisions in the NWPA that say NRC is supposed to finish its licensing review within 3 years. According to the Chairman, " that language is fairly meaningless

30

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

because it has no enforcement mechanism. It does not say what happens if we miss that deadline. And clearly, based on the $29 million that we were getting in FY 2010, we were not going to meet the 3-year deadline."

**C.    Commission Voting on ASLB Decisions**

OIG learned that the Office of the Secretary (SECY) did not enforce adherence to the Commission's adjudicatory voting process with regard to SECY-10-0102 and generally does not enforce the voting process to facilitate completion of adjudicatory matters. Although SECY staff attempt to enforce the process, their success is dependent on whether and how the Chairman and Commissioners respond to their attempts. According to NRC's General Counsel, the Commission's procedures are guidelines that have been developed based on practice but they are not requirements.

*Commission Procedures*

NRC's *Internal Commission Procedures* explain that Commission decisionmaking is accomplished through voting at scheduled Commission meetings, through notational voting on prescribed vote sheets, and by orally affirming a notational vote at an affirmation session. Appendixes 4 and 5 of the procedures address the basis for determining voting results and how to resolve a 2-2 vote. According to the procedures, votes from at least a quorum of three Commissioners are required to act, and action is based on the majority of those participating. As a general matter, requests for Commission action will be denied if the Commission vote is 2-2.

The *Internal Commission Procedures* also describe Commission voting on adjudicatory SECY papers[12] such as SECY-10-0102 and for holding the subsequent affirmation session vote; however, they do not provide details or direction on the process that occurs between the completion of an adjudicatory SECY paper vote and the conduct of an affirmation vote on the matter. OIG learned about the latter process through an interview with a SECY Technical Advisor who tracks adjudicatory SECY papers for the Commission.

According to the *Internal Commission Procedures*, Commissioners are expected to vote on adjudicatory SECY papers no later than 10 business days after receipt of the paper. The procedures state that when a majority of the Commission has voted, a request for an extension of time to vote beyond the 10 business day voting period or a request to delay the affirmation of the vote should be granted only by a majority of the Commission. Per the procedures, it is the Secretary of the Commission's responsibility to schedule a weekly affirmation session. It is also the Secretary's responsibility to, within 48 hours of the issuance of an adjudicatory SECY paper,

---

[12] The *Internal Commission Procedures* state that written issue papers, referred to as SECY papers, are the "primary decision-making tool of the collegial Commission." These papers are submitted by the Office of the Executive Director for Operations, the Chief Financial Officer, or other office directors reporting directly to the Commission.

31

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

notice the affirmation of the paper so that the affirmation will be held at the earliest available session following the close of the 10-day voting period unless a majority of the Commission has advised that the affirmation should be set for a later date. Although the *Internal Commission Procedures* state that it is the Secretary's responsibility to schedule these sessions, they also state that in order for Commissioners to vote orally at meetings, the Chairman must call for the vote.

A SECY Technical Advisor told OIG that although the procedures state that Commissioners are expected to vote within 10 days after the issuance of an adjudicatory SECY paper, in practice, the significant deadline in the process is the point at which the majority of Commissioners have voted. This is the point that the Technical Advisor tracks for adjudicatory SECY papers because at this point it is required that Commissioners who have not voted either submit a vote or request an extension to which a majority of other Commissioners must agree. The Technical Advisor said that he sends e-mail notices (addressed from the Secretary of the Commission) to the Commissioners who have not voted to request that they either vote or ask for an extension. If a Commissioner requests an extension, the Technical Advisor said he polls the other Commissioners to see if a majority agree to grant it. The Technical Advisor, who has been tracking Commission voting on adjudicatory matters for more than 20 years, could not recall any occasion where an extension request was denied by a Commissioner.

The Technical Advisor explained that after he has received all of the Commissioners' notational vote sheets on an adjudicatory SECY paper and the attached ASLB order, he drafts an affirmation notice that is high-level in nature and is used during the affirmation voting process. He said the affirmation notice simply provides the outcome of the vote; thus, when all Commissioners vote "aye" during the affirmation vote, they are voting to note their agreement with the language in the affirmation notice. In contrast, the vote sheets note whether a Commissioner is in favor of the order, against it, not participating, or abstaining and will sometimes include comments explaining why they are for or against, or suggesting modified language for the order.

The Technical Advisor also explained that OCAA may need to revise the order before an affirmation vote can be held if Commissioners indicate in their notational vote sheets that revision is needed. The Technical Advisor said that OCAA works with lawyers in the Commissioner offices to make the modifications requested and obtain their concurrence on the updated language. The length of time it takes for OCAA to make the Commissioners' changes in the order and obtain their concurrence on the update varies, depending on the level of change needed. The Technical Advisor said an affirmation vote is not held until all of the Commissioners are satisfied with both the affirmation notice and the order.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

*OIG Review of Commission Adherence to Procedures*

OIG reviewed the Commissioners' voting process associated with SECY-10-0102[13] and learned that the *Internal Commission Procedures* were not followed relative to voting deadline, extension requests, or polling of other Commissioners to determine whether they agree with extension requests. As noted in section I of this report, OCAA issued SECY-10-0102 to SECY on August 10, 2010, and Commissioners were asked to provide completed vote sheets and comments to SECY by August 25, 2010. The paper was to be scheduled for an affirmation vote at an open meeting once all votes were received.

Despite the August 25, 2010 voting deadline, voting was not complete until Chairman Jaczko submitted his second vote (approximately 6 weeks after the majority of Commissioners had voted) on October 29, 2010. The voting process proceeded as follows:

| Commissioner and Action | Date |
| --- | --- |
| Commissioner Apostolakis announced he would not participate | August 10, 2010 |
| Commissioner Svinicki voted | August 25, 2010 |
| Chairman Jaczko provided initial vote | August 25, 2010 |
| Commissioner Ostendorff voted | August 26, 2010 |
| Chairman Jaczko retracted initial vote | August 30, 2010 |
| Commissioner Magwood voted | September 15, 2010 |
| Chairman Jaczko voted for second time | October 29, 2010 |

OIG reviewed SECY documents associated with SECY-10-0102 and learned that the Commission Secretary sent an August 27, 2010 e-mail notice advising Commissioner Magwood to vote or request an extension to vote, but the request was withdrawn after Chairman Jaczko retracted his first vote. This occurred after the first time the majority of Commissioners had voted. After Commissioner Magwood voted on September 15, 2010, now constituting a majority, the Secretary sent an e-mail to Chairman Jaczko requesting his vote or an extension request. The e-mail stipulated absent the Chairman providing a vote or request for an extension, which must be approved by a majority of the Commission, it would be presumed, in accordance with the Commission's rule of procedure, the Chairman would not be participating in the action. There were no additional documents indicating that the Secretary followed up with the Chairman or his office. However, OIG identified (1) a September 16, 2010 e-mail from the Chairman's Chief of Staff to the Chairman recommending that the Chairman never request an extension on the Yucca Mountain matter and (2) an October 6, 2010 e-mail from the Secretary to NRC's General Counsel stating that the Chairman's Chief of Staff had indicated that the Chairman would vote the following week.

---

[13] Because this remains an open adjudicatory matter before the Commission, OIG could only report matters of process and not of substance.

33

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

OIG reviewed 13 other adjudicatory SECY paper files[14] to assess whether Commission voting and polling procedures were followed in connection with these documents. OIG sought to determine whether (1) memoranda were sent to Commissioners reminding them to vote after a majority of Commissioners had voted, (2) Commissioners requested extensions or voted timely in response to the e-mail prompt, and (3) polling of other Commissioners occurred as warranted. OIG's review found that procedures were not followed in connection with 7 of the 13 files reviewed. In three of the seven cases, memorandum prompts should have been sent after the majority voted, but were not. In three other cases, memorandum prompts were sent; however, extension requests and polling did not occur. In one case polling was initiated but not concluded.

OIG also learned that 2 days after the Chairman voted on SECY-10-0102, the OCAA Director provided the Commission with a draft affirmation order detailing the status of the Commission's votes. Although the notational voting process associated with SECY-10-0102 was complete as of October 29, 2010, as of the date of this report the Commission has not held an affirmation vote on the matter and the draft order continues to sit in deliberation before the Commission for affirmation.

*OIG Interviews of Agency Officials Concerning Commission Procedures*

The Secretary told OIG that she uses a "voting notice document" to prompt Commissioners who have not yet voted on an adjudicatory matter after the majority has voted, and that she sent such a notice to the Chairman concerning SECY-10-0102 on September 16, 2010. She said that although the Chairman never formally responded to the notice with a request for an extension to vote on SECY-10-0102, he told her on several occasions that he planned to vote. She never documented these exchanges, and did not proceed with the polling of other Commissioners to see whether they agreed with the delay. She recalled having conversations with some of the Commissioner staff members prior to Chairman Jaczko's second vote wherein they asked her to draft an affirmation statement even though Chairman Jaczko had not yet voted. She did not do this because the Chairman had told her he would be participating in the matter and because, based on discussions with one Commissioner and several Commissioner staff members, she believed that not all of the Commissioners who had voted were ready to affirm their votes during an affirmation session. The Secretary also said that while the *Internal Commission Procedures* direct her to schedule affirmation votes at the earliest opportunity after the 10-day voting period, Chairman Jaczko has wanted to make sure that all Commissioners are ready to affirm their votes before an affirmation session is scheduled.

The OCAA Director told OIG that in accordance with their process, following the Chairman's October 29, 2010 vote on SECY-10-0102, she prepared a draft affirmation order for circulation via e-mail that indicated the status of the votes at the completion of the voting process. She circulated the draft via e-mail to all of the Commissioners on November 1, 2010, and was subsequently called to the Chairman's office, where an OGC attorney and the Secretary were

---

[14] Files corresponded with adjudicatory SECY papers issued between March 2008 and August 2010.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

also present. The OCAA Director said the Chairman was animated and expressed displeasure that she had circulated the document. She told him she had done this as part of the normal process of circulating the draft decision. She was surprised and shaken up by the Chairman's manner and that he had never been angry with her before. The Chairman asked her something like, "Do you think this was a helpful thing to do?" She responded that she thought it was and he told her he was working with the Commissioners to settle the matter and to "just stay out of it." In hindsight, the OCAA Director said the Chairman may have felt that in circulating the draft decision, she did not give the other Commissioners time to consider the content of the Chairman's vote. However, at the time, she thought she was doing the correct thing by being prompt with a matter that was of interest to the Commission.

A majority of Commission staff members interviewed told OIG that with the exception of SECY-10-0102, the *Internal Commission Procedures* are generally followed. All of the staff members were aware that the procedures directed extension requests to be made and that extensions needed majority Commission approval. The Chairman's Chief of Staff acknowledged that although he was aware of the procedures concerning extension requests, he sent an e-mail to Chairman Jaczko recommending that the Chairman never ask for an extension to vote in connection with SECY-10-0102. A Commissioner's Chief of Staff asked the Secretary how her office would proceed given that a majority of the Commissioners had voted. The Secretary responded that she knew that one Commissioner would not proceed to affirmation before the Chairman voted, so she would not initiate measures to move the issue. According to this Chief of Staff, the Secretary was in a difficult position because she feared being "chewed out" by the Chairman if she were to proceed to affirmation before he cast his vote. A Commissioner's Legal Advisor told OIG that the Chairman wanted matters pertaining to the affirmation to be decided prior to scheduling an affirmation session and that he would not support the Secretary in moving to affirmation until that time.

The General Counsel told OIG that the *Internal Commission Procedures* should generally be followed, but that there are circumstances that require deviations, and the procedures themselves are not binding law. The procedures are a reflection of decisions among the Commissioners of how to handle and process certain matters, especially those matters identified in the Energy Reorganization Act and the Reorganization Plan. With regard to adjudicatory affirmation voting, the Commission needs to have a majority willing to go to affirmation. Normally, the Secretary would poll members to see if they were ready to go to affirmation; however, he said that if there is no consensus it is hard for the Secretary to go forward with a draft affirmation notice or order to reflect a consensus position. The General Counsel said that this is the situation with the high-level waste matter. He acknowledged that this matter has sat in abeyance with a draft affirmation order before the Commission since November 1, 2010. He said that as a theoretical matter, this could "rest in limbo" until NRC is posed with a forcing function, such as being party to litigation against the Government. He told OIG there have been matters previously before the Commission in appeal status that have gone unresolved for a year or longer.

35

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

*Interviews of Commissioners Concerning Commission Procedures*

Commissioner Ostendorff told OIG he queried Chairman Jaczko about when he planned to vote on SECY-10-0102 during meetings he had with the Chairman on September 9, September 14, October 5, October 19, and October 27, 2010, and the Chairman always responded that he would vote. Commissioner Ostendorff said Chairman Jaczko offered different reasons for not voting. For example, Chairman Jaczko told him he was concerned that a 2-2 vote would leave the ASLB "in limbo." He also told Commissioner Ostendorff that he would not take action until a majority of the Commission agreed to suspend the ASLB's adjudicatory proceedings. Commissioner Ostendorff disagreed with the Chairman's view that a 2-2 split could leave the matter unresolved. Rather, after discussions with OGC, OCAA, the Chief Administrative Judge of the ASLBP, and Commissioner Ostendorff's legal counsel, Commissioner Ostendorff concluded that based on the *Internal Commission Procedures*, a 2-2 split would uphold the ASLB's decision. Commissioner Ostendorff communicated this view to the Chairman.

Commissioner Svinicki said she believed it was important for the Commission to act on the adjudicatory matter to resolve the legal question of DOE's authority to withdraw.

Commissioner Magwood advised that subsequent to the Chairman initially casting his vote on the matter, the Chairman allegedly withdrew his vote asserting he had done so as to afford Commissioner Magwood time to prepare a vote. Commissioner Magwood advised this representation was not accurate and he had not asked the Chairman to assist or to remove his vote on his behalf.

*Interview of Chairman Concerning Commission Procedures*

Chairman Jaczko told OIG he did not recall the e-mail from his Chief of Staff advising him not to request an extension to vote on SECY-10-0102, and that he did not realize that an extension was required on adjudicatory matters if a vote was not cast within a 10-day period. He said that the Commission does not always act in accordance with the procedures. For example, the procedures say that the Commission votes on matters within 10 days of receiving them. Yet, he noted, the Secretary waits until three people have voted to issue notices to other Commissioners that they need to act. He said the Commission procedures are a guideline, and not absolute rules. However, he said he did at one point talk to the Secretary, who told him that he needed to request an extension, but he responded that he was getting ready to vote and, furthermore, told the Secretary she needed to proceed however she wanted to proceed. Chairman Jaczko told OIG that while some people have an impression that he is purposely holding up the affirmation vote, this is not the case. Instead, the reason the Commission has not held an affirmation vote on the Yucca Mountain matter is that the Commission has not come to majority agreement on the affirmation notice. He said NRC's governing statute directs that Commission action is accomplished by majority vote. According to Chairman Jaczko, his practice is to go to affirmation once the Commission is in agreement about the language in the

36

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

affirmation notice even though the procedures describe a process wherein the affirmation is scheduled once the votes are in. He said that has proven to be an embarrassing situation because "voting does not end the process. It's just the beginning of the process for us."

Chairman Jaczko advised that all of the Commissioners agreed to the practice of proceeding to affirmation only after everyone agrees to the affirmation notice and "there has really been little discussion."

**D.    Information Flow/Work Environment**

During the course of the investigation, a number of interviewees conveyed their perception that Chairman Jaczko controls and restricts the information available to his fellow Commissioners and noted concerns about his interpersonal style. Senior officials, managers, and staff provided examples that they believed illustrated the Chairman's failure to share with his fellow Commissioners information needed to support their fully informed decisionmaking. Examples included the CR budget guidance memorandum described earlier in this report, the FY 2012 budget process, the Commission agenda planning process, and the Chairman's involvement in determining what constitutes a policy versus an administrative matter. In addition, a number of interviewees described instances of behavior by the Chairman that they viewed as unprofessional or manipulative. Examples included the Chairman's use of foreign travel or threats to contact members of the Administration as means of persuading his fellow Commissioners to support him on issues, and displays of anger towards individuals whom he does not view as supportive.

The Chairman defended his management style with regard to information flow as aligning with the division of Commission and Chairman responsibilities established by the Reorganization Plan and as necessary for efficiency and effectiveness. He acknowledged using forceful management techniques to accomplish his objectives but maintained that these techniques were necessary to facilitate the work of the Commission.

*The FY 2012 Budget Process*

OIG learned from Commissioner chiefs of staff and legal advisors that, historically, when the NRC Chairman presented his/her budget estimate to the other Commissioners, the Chairman included the staff's independently developed "Program Priorities and Considerations" document. This is a spreadsheet, prepared by staff, that presents each division's plans and priorities, which, historically, the Chairman has used to develop his/her budget proposal based on the staff's considerations. OIG learned that the FY 2012 process differed from past practice in that:

1.  The Chairman personally met with division directors regarding their funding and programs and provided direction and priorities for the agency. Subsequently, the staff formulated their requirements for funding and programs based on the Chairman's direction, which was then incorporated into the Chairman's budget estimate.

37

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

2. The Chairman's budget estimate was submitted to the Commission for its consideration without fundamental supporting documents developed by the staff.

The majority of Commissioner staff members and Commissioners indicated that this process caused problems in that the Commission could not assess the differences between the staff's projected needs and priorities and those of the Chairman. Furthermore, staff explained that the Chairman directed that if the Commissioners wanted to make inquiries to division directors regarding their funding needs and priorities, the requests needed to be funneled through the Chairman's office. Office responses, in turn, were submitted to the Chairman's office, and OIG learned that responses were either edited or not provided back to the requestor. OIG also learned that all of the Commissioner offices were able to obtain various versions of the "Program Priorities and Consideration Documents" through personal connections that Commissioner office staff had with NRC staff. However, the Commissioners remained unable to distinguish the staff's priorities from the Chairman's priorities due to the Chairman's process for developing the budget.

The CFO told OIG that the Chairman's FY 2012 budget process, wherein the Chairman had meetings with staff to discuss priorities directly before the offices developed their priorities document, was much quicker than the previous budget process. However, he said, the problem was that the Chairman did not provide the staff's supporting documents to the Commission. The CFO said he raised this issue with the Chairman's Chief of Staff and conveyed that without the supporting documents it would be difficult for the Commission to decide on a budget. The Chairman's Chief of Staff responded that the Commission did not need that level of detail, that this was the Chairman's budget, and that all inquiries to the CFO from the Commission about the budget should be cleared with the Chairman prior to providing a response.

The EDO told OIG that the Chairman did not want any differences between his budget and staff's budget and saw it as his budget proposal. The Chairman also wanted the opportunity to review and change any of the staff's responses to the Commissioners' questions.

An OEDO manager told OIG that he was familiar with the issue of information from the staff to the Commission being edited by the Chairman before it was provided to the Commission. He said the Energy Reorganization Act addressed this issue and that it could be debated in two ways. One way would be to edit information provided by the staff, and the other is to be passive and just present what the staff has identified on a matter. He said he discussed this matter with the General Counsel, who said the Chairman had the authority to edit information that was to be provided to the Commission. The OEDO manager said the Chairman did not believe there should be two separate budget proposals (Chairman's budget and staff budget). He said the Chairman viewed himself as the head of the agency and felt that there should be just one budget – the staff's proposal reviewed by the Chairman – presented to the Commission for its consideration.

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

Chairman Jaczko told OIG that he was closely involved in the budget process as it is his responsibility to present the budget to the Commission and he was entitled to develop the budget however he wanted. He said he chose a method to help the staff shape a budget that would be more successful in getting through the Commission. He believes that this is what occurred with regard to the FY 2012 budget proposal. He said that the budget was presented 3 weeks earlier than usual and went through the Commission with almost no real change. He said he had assumed he did not have to provide the Commission with the "Program Considerations and Priorities" documents, but had since learned from the General Counsel that he had been incorrect. He said he now understood that once the budget was developed and presented to the Commission, the Commissioners were entitled to some of the draft documents.

*Agenda Planning Process*

According to the *Internal Commission Procedures*, policy, rulemaking, and adjudicatory matters, as well as general information, are provided to the Commission for consideration in documents referred to as SECY papers. There are four categories of SECY papers. Commission meeting papers present a major issue on which collegial deliberation and vote at a Commission meeting, usually in a public session, is anticipated. Notation vote papers present an issue requiring consideration by the Commission or consultation with the Commission prior to action by the staff, but not requiring collegial deliberation among Commissioners or a formal vote in a meeting, thereby lending themselves to a written notation process. Affirmation papers convey Commission business that does not require deliberation among the Commissioners in a meeting mode, but must be voted on by the Commissioners in each others' presence. Information papers provide information on policy, rulemaking, or adjudicatory issues. These papers are purely informational and should not assume or request any action by the Commission.

The *Internal Commission Procedures* also describe monthly agenda planning sessions during which the Commission reviews and approves the Chairman's proposed meeting agendas that he has developed with the SECY and representatives from OGC, EDO, and the Office of Congressional Affairs. The procedures state, "In recognition of the collegial process, an individual Commissioner's request that a meeting be scheduled will be granted unless a majority of the Commission disapproves the request."

During this investigation, OIG learned that the process by which SECY papers are conceived by the staff and subsequently submitted for Commission consideration is subject to the Chairman's influence and allows him, in his role as principal executive officer, to influence information that staff develop for Commission review.

OIG learned that the general practice for developing a SECY paper is as follows:

- Staff develop an issue that is either identified as a potential policy matter or of significant interest to the Commission for their consideration.

39

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

- The Division Director may have periodic meetings with individual Commission members with regard to this information and may present the issue as an informal informational matter.

- Senior staff coordinate the matters identified by the staff with their designated DEDO who holds "alignment meetings" to determine whether this information is to be conveyed to the Commission and in what form.

- If the alignment meeting consensus is to develop a paper, the paper is generated by staff and submitted to the EDO who provides a paper to SECY for tracking, and simultaneously tracks the paper in the EDO's system.

- The paper topic is provided to the Commission for consideration at the Chairman's agenda planning session at which time the Commissioners vote to determine when they will address the paper.

OIG learned that the Chairman, unlike the other Commission members, can direct the staff not to develop a paper for the Commission's review. Based on information learned during the periodic meetings or any other meetings, the Chairman sometimes directs the EDO not to develop a paper for Commission review. If other Commissioners disagree, they must prepare a COM and gain majority support to direct the staff to prepare a paper for Commission review.

The EDO told OIG that the Chairman's staff track staff-generated papers and the Chairman decides what is considered a policy matter and whether he will inform the Commission of the matter. The EDO said the only way a Commissioner can influence when a staff paper is submitted or the timing of presentation to the Commission would be to prepare a COM and gain a majority on the matter to direct the staff. The EDO said the Chairman told him that he wanted to control the flow of policy issues to the Commission to enable them to be more efficient and effective by not overloading them so they could focus on certain issues.

Several OEDO managers and managers of offices that report to the EDO told OIG of problems with information flow, while others said they were unaware of any incidents where information was not provided to the Commission. For example, one manager told OIG that the current approach to information flow to the Commission was not the best way, and the Chairman regulates the information to the extent he believes the Commission needs the information to make a decision. He said the Commission is "not working well at all today, unfortunately" and attributed this to the Chairman's interpretation of his role and responsibilities and the other Commissioners disagreeing with his interpretation. In addition, he said, there is so much distrust at the chief of staff level that the Commissioners often jump to conclusions about the Chairman's directions. In contrast, another manager believed the current Chairman has taken the initiative to better integrate the Commission's agenda through agenda planning. He said the Chairman has the view that there are policy matters and there are administrative matters and he believes the administrative matters should not go to the rest of the Commission. However, he

40

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

acknowledged that the Chairman could incorrectly label something as administrative and not inform the Commission. He said the staff was sensitive to this and noted that with the CR budget guidance memorandum, a known controversial matter, the staff asked the Chairman if he was coordinating the matter with the other Commissioners.

The majority of Commissioner chiefs of staff and legal advisors told OIG that the Chairman withholds information to the Commission by either suppressing papers or manipulating the agenda planning process because he controls the sequencing of papers to be presented to the Commission for vote. They said that this, in turn, causes papers to sit for weeks or months as the Chairman decides when information meetings are to be scheduled. Commissioner staff perceived this as an effort to control information available to the Commission as the Chairman's priorities often did not align with those of individual Commissioners.

Commissioners Svinicki, Ostendorff, and Magwood told OIG that they sometimes learn of potential papers the staff intend to submit to the Commission during their periodic meetings with agency managers, but then the papers do not materialize. This makes them question whether they are sufficiently informed and aware of policy issues affecting the agency. In particular, the three Commissioners mentioned a paper on the National Fire Protection Association (NFPA) 805 rule,[15] where there were indications the staff wanted to raise policy matters to the Commission, but were unable to do so as the Chairman had determined the matter was not a policy issue. One DEDO told OIG that the Chairman stated he did not want a paper on NFPA 805 and as a result staff stopped working on the paper.

Another example provided by two Commissioner staff members was a paper on the International Regulatory Review Service (IRRS),[16] which the Chairman allegedly directed staff to stop preparing.[17] Commissioners told OIG that the distinction between policy issues and administrative actions was a subject of contention within the Commission. One Commissioner said that where disputes exist, the matters should be decided by the Commission; however, the Chairman has established a practice of categorizing a matter as "administrative" when it may have policy implications. The Commissioner noted that the CR budget guidance memorandum was a good example of this behavior.

---

[15] NRC regulation 10 CFR 50.48(c), otherwise known as NFPA 805, is a risk-informed, performance-based fire protection regulation adopted by the agency in 2004. Lessons learned by the NRC staff from their review of the two NFPA 805 pilot plant license amendment requests revealed that the NRC staff had underestimated the resources necessary to review NFPA 805 license amendment requests. The NRC staff anticipated receiving 25 license amendment requests by the end of June 2011 as a result of the current Commission enforcement policy related to NFPA 805. Completing the reviews of such a large number of submittals would be a significant challenge to the agency. The NRC staff desired to propose an approach to the Commission to address the expected large number of submittals.

[16] The IRRS is an International Atomic Energy Agency peer review and appraisal service. At the Government's request, during October 2010, an international team of safety experts reviewed NRC's regulatory framework for safety regarding operating U.S. nuclear power plants and the effectiveness of regulatory functions implemented by the NRC. The IRRS team identified a number of good practices, and made suggestions and recommendations where improvements are desirable or necessary.

[17] Since OIG's interviews with the Commissioners, the staff submitted a paper on NFPA 805 to the Commission for review, and the Commissioners received a copy of the IRRS assessment.

41

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

The Chairman's Policy Director told OIG that she meets with the EDO and the Secretary of the Commission at least twice monthly to coordinate upcoming policy matters and open items before the Commission, the EDO, and SECY. The EDO maintains a tracking system for all open and upcoming policy items from staff, and that SECY maintains a separate tracking system for all matters before the Commission. She uses these coordination sessions to ensure that all matters are addressed and to ensure the Commission has been notified on all matters. She said that Chairman Jaczko is very transparent in keeping the other Commissioners informed on matters, including when he makes decisions from a non-policy, resources perspective. She cited the CR budget guidance memorandum as an example where the Chairman held back issuing the memorandum until he had coordinated the guidance with the other Commissioners.

Chairman Jaczko told OIG he decides what is and is not a policy matter by consulting with the General Counsel, his interpretations of his statutory authority, and consultations with the EDO. He said the statute notes that the Commissioners always have the option to raise a matter as policy, which is why he consulted as he did with the other Commissioners on the CR budget guidance memorandum. He said he knew the Commission did not support the budget guidance for the High-Level Waste Program and that he wanted to be prepared for battle. He said he proceeded to line up the votes on the matter to ensure if it was addressed as a policy matter, his position would be supported. Chairman Jaczko said the agenda planning process allows the Commission to decide by majority which direction to proceed. He said it is a tool for him to keep the agency's business moving and gives the Commission a more predictable and efficient way to manage its business.

Chairman Jaczko told OIG that it was within his authority to tell the staff to prepare or not prepare papers. With regard to NFPA 805, he said he never directed staff not to prepare a paper on the topic. He recalled the staff came to him and said they would not be able to complete the required number of license amendments applications for NFPA 805. Chairman Jaczko told the staff they had been budgeted to complete the license amendments and they needed to figure out how to accomplish the task. As Chairman, it was within his authority to execute the budget and manage the policy and workload of the agency. Consequently, he decided the issue would not be on the Commission's agenda. The staff later informed him that they were unable to conduct the application reviews, and that this would have enforcement discretion implications. As a result, he directed them to prepare a paper for the Commission because now this was a policy issue the Commission needed to work out.

*Foreign Travel*

NRC Management Directive (MD) 14.1, *Official Temporary Duty Travel*, assigns the Chairman responsibility for approving official foreign travel for himself and the Commissioners. The handbook associated with MD 14.1 assigns approving officials responsibility to ensure that the travel is necessary to carry out NRC's mission and directs officials reviewing requests for official foreign travel at NRC's expense to "scrutinize the official purpose of the trip and the value of collateral purposes to ensure validity."

42

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

OIG learned the Chairman required different levels of justification from each Commissioner concerning their requests for foreign travel. For example, one Commissioner was required to provide written justification to the Chairman for international trips, while other Commissioners were granted approval by the Chairman based simply on verbal notification of the planned trip. Additionally, the Chairman used foreign travel as an incentive for supporting him on issues.

Commissioner Svinicki said the Chairman has ambiguous approval criteria for foreign travel, which has made her reluctant to pursue trips. She said it is not worth her time and effort to develop a justification for a trip that she may be denied and because the Chairman does not provide an answer in a timely manner. For example, when requested by a host country to speak at conferences, she is unable to provide a timely response. She is now reluctant to pursue foreign travel because she is concerned about having to cancel depending on the Chairman's decision and the impact this has on her reputation.

Commissioner Magwood relayed one example where Chairman Jaczko wanted Commissioner Magwood to withdraw his request for an additional staff member to support the Commission offices. He said the Chairman told him that if he pursued the request, he would withhold authorizations on Commissioner Magwood's foreign travel.

Chairman Jaczko told OIG that as the Chairman of the agency he is responsible for managing the agency's workload and workflow, and in that respect he has overall management authority of the staff. He related that it was within his discretion to approve or not approve his colleague's foreign travel requests. As Chairman, he has tools that he uses to manage the agency, including the Commission, and to negotiate and get leverage. One such tool is his discretion to approve foreign travel. It was his responsibility to decide who best represented the agency and if he had colleagues who did not support him on votes, he was not likely to send them to represent him and the agency on international travel. Chairman Jaczko commented that there is nothing unethical or inappropriate about that and, in fact, it was his job, to make those difficult decisions. Further, he has never taken away anybody's international travel, or not signed a request for international travel.

*Interpersonal Interactions with Commissioners and Staff*

Commissioner staff members told OIG of incidents they perceived as unprofessional behavior by Chairman Jaczko toward their Commissioners or members of the staff. For example, staff mentioned the Chairman's behavior toward the OCAA Director when she circulated the draft order for SECY-10-0102 shortly after the Chairman submitted his vote. Several Commissioner staff members relayed incidents where the Chairman angrily confronted their Commissioner on issues; however, the Commissioners themselves did not relay such examples. Several current and former Commission staff members said the Chairman's behavior caused an intimidating work environment. A former Chairman told OIG that the Chairman often yelled at people and his tactics had a negative effect on people. He described the behavior as ruling by intimidation. The former Chairman said he verbally counseled Chairman Jaczko on his behavior on two occasions before leaving the agency.

43

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

A number of NRC senior managers interviewed described examples of the Chairman losing his temper with them or stories they had heard about him losing his temper with others. Some characterized these incidents as disagreements on matters where the Chairman held a strong view and they were reluctant to characterize the Chairman's behavior as unprofessional; however, they said that if they had subordinates who displayed the same behaviors, they would not tolerate it. Conversely, other senior managers interviewed said they never witnessed any unprofessional behavior on the Chairman's part.

Chairman Jaczko acknowledged that he sometimes loses his temper. He said he worked to control it and there are times when he has wished he has said or done things differently. He said he mainly loses his temper with the Commissioners, but acknowledged that there have been a few times when he has said some fairly strong things to the staff. He concluded that his behavior created an environment sometimes in which it is difficult for people to work with him, and he regretted that.

## III. FINDINGS

1. OIG determined that Chairman Jaczko used a FY 2011 CR budget guidance memorandum to initiate NRC's FY 2011 plans to close out its Yucca Mountain license application review even though the FY 2011 budget had not yet been passed. The Chairman's decision to direct the staff to follow the FY 2011 budget guidance was supported by the NRC General Counsel and consistent with (1) the discretion within his budget execution authority under the Reorganization Plan, (2) OMB Circular A-11 guidance to spend prudently during a CR period, (3) the Administration's decision to terminate the Yucca Mountain repository project, and (4) the Chairman's interpretation of the Commission's FY 2011 budget policy decisions, which articulated close-out activities.

   OIG determined that although the Chairman had the authority to direct staff to follow the FY 2011 budget guidance, he was not forthcoming with the other Commissioners about his intent to stop work on the SER as part of implementing close-out activities. This included stopping work on SER Volume 3 (Review of Repository Safety After Permanent Closure), which NRC staff believed to be near completion by the end of FY 2010. The Chairman anticipated that proceeding to close-out in this manner could be controversial and viewed as a policy decision for full Commission consideration. Therefore, prior to directing issuance of the CR budget guidance memorandum, he strategically provided three of the four other Commissioners with varying amounts of information about his intention to proceed to closure and not complete SER Volume 3. He did not provide Commissioner Svinicki with any information about his intentions. Although two of the three Commissioners he spoke with did not fully understand the implications of the CR

44

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

budget guidance memorandum, the Chairman told the EDO and the Chairman's Chief of Staff told the CFO, prior to their signing the memorandum, that all the Commissioners were informed and supported issuance of the CR budget guidance memorandum. In fact, subsequent to the issuance of the CR budget guidance memorandum, a majority of Commissioners disagreed with the outcome of the memorandum, which was the Chairman's direction to stop work on SER Volume 3. Additionally, a majority of the Commissioners did not think the conditions to proceed to closure (i.e., withdrawal or suspension) had been met.

OIG also determined that after Commissioner Ostendorff issued a COM to the Commission asking to direct the staff to continue its work on the SER, the Chairman communicated to Commissioners Magwood and Apostolakis that he expected their continued support. He told them that he would not have directed issuance of the CR budget guidance memorandum had they not committed to support him. Despite their view that they had not been fully informed about the Chairman's intent behind the CR budget guidance memorandum, Commissioners Apostolakis and Magwood elected not to participate in voting on the COM. Therefore, without a majority, the Commission was unable to move the matter from budget space, within the Chairman's purview, to policy space, within the Commission's purview.

2.  OIG determined that although the NWPA requires NRC to consider DOE's Yucca Mountain repository license application and issue a final decision approving or disapproving issuance of a construction authorization, there are various factors preventing the agency from meeting its statutory obligation. These factors include the Administration's decision to terminate the Yucca Mountain repository project, decreasing appropriations to NRC for the High-Level Waste Program, and the Chairman's direction to stop working on the SER.

3.  OIG determined that although the Commission has internal procedures intended to facilitate collegial Commission decisionmaking based on majority rule, adjudicatory voting procedures are not consistently enforced. Furthermore, these written procedures do not provide details on the process that occurs between the completion of an adjudicatory SECY paper vote and the conduct of an affirmation vote on the matter. The lack of enforcement of and specificity in the Commission's written procedures, coupled with the Commission's practice not to move to affirmation until all Commissioners agree to the affirmation notice and order, allows matters to sit in abeyance without final Commission action.

4.  OIG determined that the Chairman controls information provided to the other Commissioners based on his interpretation of his statutory authority as Chairman versus the authority given to the Commission. Because he acts as the gatekeeper to determine what is a policy matter versus an administrative matter, and manages and controls

45

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

information available to the other Commissioners, they are uncertain as to whether they are adequately informed of policy matters that should be brought to their attention. Ultimately, however, all Commissioners have the ability to bring what they perceive as policy matters before the Commission by writing a COM and gaining majority Commission support.

Please respond to this office on what, if any, action you intend to take in response to this report.

cc:    Commissioner Svinicki
       Commissioner Apostolakis
       Commissioner Magwood
       Commissioner Ostendorff

**OFFICIAL USE ONLY – OIG INVESTIGATION INFORMATION**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

**RECEIVED**



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    **JUL 2 9 2011**

**CLERK**

11-1271

Exhibit 8

**CQ Congressional Transcripts**

**House Energy and Commerce Subcommittees on Energy and Power and Environment and the Economy Hold Joint Hearing on the Role of the Nuclear Regulatory Commission in America's Energy Future**

**May 4, 2011**

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
May 4, 2011
House Energy and Commerce Subcommittees on Energy and Power and Environment and the Economy Hold Joint Hearing on the Role of the Nuclear Regulatory Commission in America's Energy Future

LIST OF PANEL MEMBERS AND WITNESSES

REP. JOHN SHIMKUS, R-ILL. CHAIRMAN
REP. TIM MURPHY, R-PA.
REP. EDWARD WHITFIELD, R-KY.
REP. JOE PITTS, R-PA.
REP. MARY BONO MACK, R-CALIF.
REP. JOHN SULLIVAN, R-OKLA.
REP. CHARLES BASS, R-N.H.
REP. BOB LATTA, R-OHIO
REP. CATHY MCMORRIS RODGERS, R-WASH.
REP. GREGG HARPER, R-MISS.
REP. BILL CASSIDY, R-LA.
REP. CORY GARDNER, R-COLO.
REP. JOE L. BARTON, R-TEXAS EX OFFICIO
REP. FRED UPTON, R-MICH. EX OFFICIO

REP. GENE GREEN, D-TEXAS RANKING MEMBER
REP. G.K. BUTTERFIELD, D-N.C.
REP. DORIS MATSUI, D-CALIF.
REP. FRANK PALLONE JR., D-N.J.
REP. LOIS CAPPS, D-CALIF.
REP. DIANA DEGETTE, D-COLO.
REP. TAMMY BALDWIN, D-WIS.
REP. JOHN BARROW, D-GA.
REP. JOHN D. DINGELL, D-MICH. EX OFFICIO
REP. HENRY A. WAXMAN, D-CALIF. EX OFFICIO

WITNESSES
THE HON. GREGORY B. JACZKO, CHAIRMAN, NUCLEAR REGULATORY COMMISSION

KRISTINE L. SVINICKI, COMMISSIONER, NUCLEAR REGULATORY COMMISSION

WILLIAM D. MAGWOOD, COMMISSIONER, NUCLEAR REGULATORY COMMISSION

WILLIAM C. OSTENDORFF, COMMISSIONER, NUCLEAR REGULATORY COMMISSION

http://www.cq.com/doc/congressionaltranscripts-3863984?wr=U2ZyOGV0Ymg1TTNGMmdjUUhaT2ZFZw

REP. BARROW:  Anybody else on the commission wish to elaborate? All I'll add is -- first of all, thank you for the explanation -- is just to understand that they are actually building the thing, huge investments have been made, commitments have been made, the rate payers are already paying for something they haven't got a return on their investment yet, and the state and the federal governments have both combined and cooperated to try and make this possible.  So I urge you all to approach this review in the most constructive manner possible.  You decide what's best.  I understand that's where we are. And again I want to commend you all and your staff for the work that you all have done thus far.

With that, I yield back.

REP. SHIMKUS:  The gentleman yields back his time.  The chair now recognizes the gentleman from Texas, Dr. Burgess for five minutes.

REP. BURGESS:  And I thank the chairman for the recognition.  My apologies for being out of the room on some of these questions.  And so if I'm covering ground that has already been covered, bear with me. That's what the committee process is all about.

On -- Chairman Jaczko and any of the other commissioners who wishes to answer -- on the budget approved by the commission, the 2011 budget approved by the commission in February 2011, appeared to set conditions for ending review of the Yucca application.  Is that an accurate read of the budgetary document?

MR. JACZKO:  The 2012 budget has zero funding for the Yucca Mountain review.

REP. BURGESS:  But what about for the year 2011?  MR. JACZKO:  For 2011, the appropriation approved by Congress was for $10 million which is for close down of the review.

REP. BURGESS:  And the Department of Energy has made a motion to withdraw the license, but that motion was denied by the Nuclear Regulatory Commission.  Is that correct?

MR. JACZKO:  A licensing board at the NRC denied that motion. The commission as a whole has not rendered a final action. But I would note that those actions are separate from the budgetary decision.  The budgetary decision goes to our review and

ultimately our general activities. So it is possible for the
agency to close out the review with the legal question of withdraw
still outstanding.

In essence, it would be moth balled and all the documents
would be frozen in time as they are, that legal question would be
frozen in time. But from a practical matter, there really isn't
that much of a difference I think because the Department of Energy
has no funding, the program has been terminated at the Department
of Energy at this time and it's been terminated now for over a
year.

REP. BURGESS: Okay. I'd like to share with you having
been there with Chairman Shimkus last week I mean I was shocked by
the lack of activity, the inactivity after such a sizable
investment as Mr. Barrow has indicated the rate payers have
invested this money. And again, I was shocked by what I saw. But
at this point, the application has not been withdrawn, is that
correct?

MR. JACZKO: It's still -- the application is still in
front of the commission and the question of withdraw is in front
of the commission. But again, from a budgetary perspective, we
are closing out our review and intend to close out by the end of
this year.

REP. BURGESS: Well have the policy conditions been met
to begin the termination?

MR. JACZKO: We have received a Congressional
appropriation for $10 million which is to close out the program.
The issues about the policy conditions, again, we have, I have
perhaps answered this question many times in front of this
committee, we reviewed all of the questions and all of the issues
that have been raised by my colleagues here, and those were
ultimately reviewed by the commission in Commissioner Ostendorf's
communication about whether or not this was the appropriate action
for the commission to take.

And I would note that Commissioner Ostendorf in the
meeting that we had in October in front of the entire NRC staff
indicated that he disagreed with the decision, that the decision
was looked at by the commission, and he ultimately respected that
the majority of his colleagues did not agree with his
interpretation. So that issue was put to rest in October of that
year. REP. BURGESS: Well just so I'm clear on this, the budget
guidance issued by the Nuclear Regulatory Commission in February

REP. INSLEE:  Now, the situation is, is that the Atomic Safety and Licensing Board, an independent trial-level adjudicatory body, they've issued a ruling that the DOE cannot withdraw the application. On what grounds can your organization ignore that clear adjudicatory ruling that stands as of this moment?  I just -- it just boggles my mind to think that they can just be ignored in this regard.

MR. JACZKO:  The commission -- congressman, the commission has not yet acted on that particular matter.  The budget issues are a separate matter.  We will be done with closeout by the end of this fiscal year.  At that time, if those legal questions are unresolved, they are unresolved.  But I would just remind you there is no program at the Department of Energy anymore for high-level waste.  That program and that office were terminated almost two years ago now. There is no longer any Yucca Mountain program.

So, you know, I think of this as the best analogy as a developer: wanting to build a shopping mall, and the fire marshal conducting inspections and reviewing fire safety for that particular shopping    mall, and the developer deciding after two years to stop work and stop developing the project.  The fire marshal doesn't still go out and tell the developer to keep building so they can conduct their licensing inspections.  That's the scenario that we have.

We are not in charge of the Yucca Mountain program.  That is a Department of Energy program.  It has been terminated.  It ultimately would be a tremendous waste of taxpayer dollars to continue to review an application for which there is no applicant. And that is the situation we find ourselves in from a budgetary standpoint.

REP. INSLEE:  I would just point out that I don't think it's the private citizens' right to tell the fire marshal what they're doing. That's the metaphor I would suggest.

Thank you.

REP. WHITFIELD:  The gentleman's time is expired.

The chair recognizes the gentleman from Louisiana, Mr. Cassidy, for five minutes.

REP. CASSIDY:  Thank you.

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

CLERK

11-1271

**Exhibit 9**

**Order (Regarding Use of LSN)**

NRC Atomic Safety and Licensing Board
NRC No. 63-001-HLW
ASLBP No. 09-892-HLW-CAB04

**June 10, 2011**

UNITED STATES OF AMERICA
NUCLEAR REGULATORY COMMISSION

ATOMIC SAFETY AND LICENSING BOARD

Before Administrative Judges:

Thomas S. Moore, Chairman
Paul S. Ryerson
Richard E. Wardwell

| | |
|---|---|
| In the Matter of | Docket No. 63-001-HLW |
| U.S. DEPARTMENT OF ENERGY | ASLBP No. 09-892-HLW-CAB04 |
| (High Level Waste Repository) | June 10, 2011 |

<u>ORDER</u>
(Regarding Use of LSN)

For the reasons explained in the Board's order of June 9, 2011,[1] the Licensing Support

Network (LSN) may cease being operational sometime before September 30, 2011 because of

fiscal year (FY) 2011 fiscal constraints.  After any shutdown of the LSN, it could be some time

before documents would again be fully accessible electronically, assuming that the current

controversial FY 2012 budget is resolved in a manner directing continuation of the licensing

proceeding.  Nonetheless, while the Board has issued a protective order to prevent potentially

unnecessary depositions from going forward at this time,[2] the Board believes that—if and when

discovery actively resumes—Phase I depositions should then commence without undue delay.

Accordingly, to the extent they have not already done so, the parties are directed to

make good faith efforts, in the ensuing weeks before the LSN is shut down, to take advantage

of their existing opportunity to access documents relevant to the depositions of previously–

identified Phase I Nevada safety contention witnesses (whether proffered by Nevada or DOE).

---

[1] <u>See</u> CAB Order (Granting in Part and Denying in Part Reconsideration Motion) (June 9, 2011)
(unpublished).

[2] <u>See</u> CAB Order (Granting Motion for Protective Order) (May 20, 2011) (unpublished).

- 2 -

Specifically, the Department of Energy, Nevada, and other parties who wish to participate in the depositions of identified Phase I Nevada safety contention witnesses shall endeavor in good faith to identify and take possession of documents from the LSN they may wish to use in deposing such witnesses. Likewise, the parties defending such depositions shall endeavor in good faith to identify and take possession of the documents from the LSN that must be indexed for the benefit of other parties pursuant to 10 C.F.R. § 2.1019(i). Notwithstanding the provisions of 10 C.F.R. § 2.1019(i)(1) concerning the timing of their disclosure, the parties defending depositions shall circulate such document indices as soon as practicable, so there can be an opportunity to confer and consult in good faith as to their adequacy while the LSN remains operational.

In short, if and when the adjudicatory process actively resumes, the Board does not expect that potential limitations on the initial performance of the LSN should constitute a blanket excuse for deferring these depositions. There may, of course, be reasons why certain of these depositions cannot proceed fairly and efficiently without the LSN, and—if and when necessary—the Board will address such exceptions at the appropriate time.

It is so ORDERED.

THE ATOMIC SAFETY
AND LICENSING BOARD
*/RA/*

_____
Thomas S. Moore, Chairman
ADMINISTRATIVE JUDGE
*/RA/*

_____
Paul S. Ryerson
ADMINISTRATIVE JUDGE
*/RA/*

_____
Richard E. Wardwell
ADMINISTRATIVE JUDGE

Rockville, Maryland
June 10, 2011

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT     Document #1321792     Filed: 07/29/2011

JUL 29 2011

**RECEIVED**

11-1271

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED     JUL 29 2011

CLERK

**Exhibit 10**

**Order (Granting DOE's Partial Reconsideration Motion)**

NRC Atomic Safety and Licensing Board
NRC No. 63-001-HLW
ASLBP No. 09-892-HLW-CAB04

**July 18, 2011**

UNITED STATES OF AMERICA
NUCLEAR REGULATORY COMMISSION

ATOMIC SAFETY AND LICENSING BOARD

Before Administrative Judges:

Thomas S. Moore, Chairman
Paul S. Ryerson
Richard E. Wardwell

| | |
|---|---|
| In the Matter of | Docket No. 63-001-HLW |
| U.S. DEPARTMENT OF ENERGY | ASLBP No. 09-892-HLW-CAB04 |
| (High Level Waste Repository) | July 18, 2011 |

ORDER
(Granting DOE's Partial Reconsideration Motion)

The Department of Energy (DOE) moves for partial reconsideration of the Board's June 10, 2011 order,[1] to the extent it directs defending parties to circulate deposition document indices while time still remains to confer and consult as to their adequacy before the Licensing Support Network (LSN) stops operating.[2] The State of Nevada (Nevada) supports DOE's motion,[3] and Nye County, Nevada opposes it.[4] No other party has expressed a position.

DOE claims the requirement to circulate document indices is not necessary to allow discovery to resume without undue delay, when and if circumstances warrant. To address this concern, DOE says, "[t]he Board's actions to date to preserve the LSN and ensure that parties

---

[1] CAB Order (Regarding Use of LSN) (June 10, 2011) (unpublished).

[2] U.S. Department of Energy's Motion for Leave to File Motion for Reconsideration of June 10, 2011 CAB Order (June 20, 2011) at 1 [hereinafter DOE Motion].

[3] State of Nevada Answer to DOE Motion for Leave to File Motion for Reconsideration of June 10, 2011 CAB Order (June 30, 2011) at 1.

[4] Nye County, Nevada's Answer to NRC Staff's Request for Stay and to the Department of Energy's Motion for Leave to File Motion for Reconsideration (June 30, 2011) at 7.

- 2 -

take possession of LSN documents relevant to Phase 1 Nevada safety contentions witnesses are sufficient."[5]

The Board is less optimistic. As explained in our June 9, 2011 order,[6] the Board has merely ordered the parties (with the exception of the NRC Staff) to submit their LSN document collections to the NRC Office of the Secretary on optical storage media or external hard drives.[7] Initially, the Secretary need only place those physical objects in the docket just as physical objects are placed in the docket of any proceeding.[8] Unfortunately, without a functioning search engine, a large number of documents on optical storage media or external hard drives are virtually useless. That is why the Board further instructed the Secretary to install the documents in a separate LSN library docket of ADAMS for public access via the agency's website.[9] The Board's instructions in this regard, however, established no deadline and recognized that the Secretary's compliance would necessarily depend upon the availability of funding.[10] Thus, the Board's orders do not ensure timely access to searchable LSN document collections through the NRC.

DOE asserts that, nonetheless, the Board's imposition of an accelerated deposition document index requirement is not necessary to expedite discovery. Pointing out that NRC regulations require such indices only ten days in advance of scheduled depositions,[11] DOE

---

[5] DOE Motion at 2.

[6] See CAB Order (Granting in Part and Denying in Part Reconsideration Motion) (June 9, 2011) (unpublished) [hereinafter Board June 9, 2011 Order]; see also CAB Order (Concerning LSNA Memorandum and Parties' LSN Document Collections) (Apr. 11, 2011) (unpublished).

[7] Board June 9, 2011 Order at 6.

[8] Id.

[9] Id.

[10] Id. at 6-7.

[11] 10 C.F.R. § 2.1019(i).

- 3 -

states that "[t]here is no reason to believe that meeting this ten-day time frame will be problematic if discovery resumes, or that lack of access to documents previously on the LSN will be an issue for deposition scheduling."[12]

DOE represents that it "has a copy in a searchable database of all documents on the LSN."[13]  DOE further represents that it "has cooperated with Nevada to ensure it receives a copy of DOE's public LSN document collection."[14]  DOE and Nevada subsequently executed a written agreement to this effect.[15]  Likewise, DOE represents that it "will cooperate in making available copies of its public LSN collection to other parties for a reasonable cost should they so request,"[16] as its agreement with Nevada appears to require.[17]

DOE expressly assures the Board that "[t]his will allow parties to engage in deposition preparation notwithstanding any LSN unavailability."[18]  It therefore concludes that "there is no need to require parties at this time to incur the undue and potentially unnecessary expense associated with identifying and preparing an index of documents in the possession of potential deponents."[19]

Accordingly, based solely upon DOE's representations, the State of Nevada's concurrence in the motion containing those representations, and the absence of objection by all

---

[12] DOE Motion at 6.

[13] Id. at 2.

[14] Id.

[15] See U.S. Department of Energy's and State of Nevada's Joint Response to July 7, 2011 CAB Order (July 12, 2011) [hereinafter Joint Response].

[16] DOE Motion at 2.

[17] Joint Response, Attachment, Agreement to Provide Licensing Support Network Document Collection (July 12, 2011) at 5.

[18] DOE Motion at 6.

[19] Id.

- 4 -

but one of the other parties, pursuant to 10 C.F.R. § 2.323, DOE's motion for reconsideration

and rescission of the indexing requirement in the Board's June 10, 2011 order is <u>granted</u>.

It is so ORDERED.

THE ATOMIC SAFETY
 AND LICENSING BOARD

*/RA/*

Thomas S. Moore, Chairman
ADMINISTRATIVE JUDGE

*/RA/*

Paul S. Ryerson
ADMINISTRATIVE JUDGE

*/RA/*

Richard E. Wardwell
ADMINISTRATIVE JUDGE

Rockville, Maryland
July 18, 2011

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

USCA Case #11-1271   Document #1321792       Filed: 07/29/2011   Page 1 of 1

JUL 29 2011

**RECEIVED**



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   JUL 29 2011

**CLERK**

**11-1271**

**Exhibit 11**


### July 26, 2011 Memorandum
### Shutdown of the Licensing Support Network

NRC Atomic Safety and Licensing Board
NRC No. 63-001-HLW
ASLBP No. 09-892-HLW-CAB04



**UNITED STATES**
**NUCLEAR REGULATORY COMMISSION**
**ATOMIC SAFETY AND LICENSING BOARD PANEL**
WASHINGTON, DC 20555 - 0001

July 26, 2011

MEMORANDUM TO:    Administrative Judge Thomas S. Moore
                 Chair, Construction Authorization Board 4

                 Administrative Judge Paul S. Ryerson
                 Member, Construction Authorization Board 4

                 Administrative Judge Richard E. Wardwall
                 Member, Construction Authorization Board 4

FROM:            Daniel J. Graser /RA/
                 Licensing Support Network Administrator

SUBJECT:         Shutdown of the Licensing Support Network

This is to advise Construction Authorization Board 4 that the Licensing Support Network (LSN) components operated by the Atomic Safety and Licensing Board Panel will cease operations on or about August 5, 2011.

Once the LSN search engine and website are shut down, the parties will still control their own documentary material and bibliographic headers stored on systems operated under their control, and therefore have the ability to comply with the Board's orders addressing submission to the docket. However, access to the individual collections by other parties, and presumably the public, will no longer be pursuant to the agency regulations at 10 C.F.R. Part 2, Subpart J, regardless of the status of the proceeding.

A number of issues are worthy of further consideration by the Board. Parties to the proceeding have, by Board direction, consistently identified documents by their LSN Accession Number. The docket contains references by LSN Accession Number throughout both the motions practice and the transcript collections. As the LSN Accession Number is no longer viable for identification purposes, the Board may desire to direct the substitution of Participant Accession Numbers in all future communications. To facilitate that effort, the LSNA staff has prepared a list of LSN Accession Numbers and their associated Participant Accession Number. If requested by the Board, we can make that list available to the parties to the proceeding via CD transfer media, as well as submit it to the docket as a cross-reference tool for any future identification purposes.



UNITED STATES
**NUCLEAR REGULATORY COMMISSION**
**ATOMIC SAFETY AND LICENSING BOARD PANEL**
WASHINGTON, DC 20555 - 0001

The LSN portal page contains a roster entitled "License Application Supporting Documents"[1] that provides the document title, DOE report number, LSN Accession Number and Participant Accession Number for all the primary underlying technical materials that support DOE's License Application.  This list represents a valuable finding tool and should be considered for inclusion in the docket together with the above noted cross-reference list of LSN/Participant Accession Numbers.  Although not a party to the proceeding, LSNA staff could submit this to the docket if directed to do so.

Administratively, the procedures for submitting newly-identified materials to the docket and any associated certification of those submissions should be addressed by the Board and communicated to the parties as soon as possible.

Similarly, the various Board Orders addressing ongoing document collection certification and reporting requirements applicable to the LSN environment should be revisited to ensure that comparable procedures exist for the docket collection and its routine updating.

---

[1] Currently found at http://www.lsnnet.gov/download/196LASupportingDocuments6-30WithLSNLinks.htm

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT



JUL 29 2011

RECEIVED

FILED
JUL 29 2011

CLERK

11-1271

**Exhibit 12**

**Order (Concerning LSNA July 26 Memorandum)**

NRC Atomic Safety and Licensing Board
NRC No. 63-001-HLW
ASLBP No. 09-892-HLW-CAB04

**July 28, 2011**

UNITED STATES OF AMERICA
NUCLEAR REGULATORY COMMISSION

ATOMIC SAFETY AND LICENSING BOARD

Before Administrative Judges:

Thomas S. Moore, Chairman
Paul S. Ryerson
Richard E. Wardwell

| | |
|---|---|
| In the Matter of | Docket No. 63-001-HLW |
| U.S. DEPARTMENT OF ENERGY | ASLBP No. 09-892-HLW-CAB04 |
| (High Level Waste Repository) | July 28, 2011 |

ORDER
(Concerning LSNA July 26, 2011 Memorandum)

On July 26, 2011, the Licensing Board received a Memorandum filed and served by the Licensing Support Network (LSN) Administrator (LSNA) informing the Board and the parties that the LSN will cease operations on or about August 5, 2011.[1]  In light of the LSNA announcement, each party's duty to supplement its LSN document collection by the first of every month[2] is suspended, effective August 2, 2011.  Each party is directed, however, to retain, in either electronic form or paper copy, all of its newly created or newly discovered documentary material for its LSN document collection so that, if circumstances warrant, the LSN may be reconstituted in the future.

As volunteered in his July 26, 2011 Memorandum, the LSNA is directed to submit to the Secretary for inclusion in the docket, the list, on a CD transfer media, of LSN Accession

---

[1] See Memorandum from Daniel J. Graser, Licensing Support Network Administrator, to CAB-04 (July 26, 2011) at 1 [hereinafter LSNA Memorandum].

[2] See Revised Second Case Management Order (Pre-License Application Phase Document Discovery and Dispute Resolution) (July 6, 2007) at 21 (unpublished); CAB Case Management Order #1 (Jan. 29, 2009) at 2 (unpublished).

- 2 -

Numbers and their corresponding Participant Accession Numbers.[3]  The Secretary shall place the LSNA's list (on the CD transfer media) cross-referencing LSN Accession Numbers with Participant Accession Numbers in the docket of the high-level waste proceeding as it would any other physical object.  The Secretary shall not serve the LSNA CD upon the parties.  Any party interested in obtaining a copy of the cross-referencing index shall make arrangements to obtain it directly from the LSNA no later than August 31, 2011.

As also volunteered by the LSNA, he shall file and serve, by August 31, 2011, the DOE generated spreadsheet from the LSN portal containing identifying information for 193 primary reference documents supporting the DOE license application.[4]

It is so ORDERED.

FOR THE ATOMIC SAFETY
AND LICENSING BOARD

*/RA/*

_____
Thomas S. Moore, Chairman
ADMINISTRATIVE JUDGE

Rockville, Maryland
July 28, 2011

_____

[3] See LSNA Memorandum at 1.

[4] See id. at 2.

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 29 2011

RECEIVED

FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 29 2011

CLERK

11-1271

Exhibit 13

Licensing Timeline

## NRC LICENSING PROCESS FOR THE YUCCA MOUNTAIN HLW REPOSITORY

### Three parties participate throughout the licensing process: NRC, DOE, and Intervenors
*Ref. 10 CFR Part 2, Subparts C, G  and J*

